## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PAO TATNEFT<br>75 Lenin St.<br>Almetyevsk, 423400<br>Republic of Tatarstan, Russia | ) ) ) ) ) ) | Case No. |
| Petitioner, | ) ) | |
| -against- | ) ) ) | |
| UKRAINE<br>c/o Mr. Pavlo Petrenko, Minister of Justice<br>Ministry of Justice<br>13 Horodetskogo St.<br>Kyiv 01001<br>Ukraine | ) ) ) ) ) ) ) | |
| Respondent. | ) ) | |

### PETITION TO CONFIRM ARBITRAL AWARD AND
### TO ENTER JUDGMENT IN FAVOR OF PETITIONER

Pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention") and its implementing legislation, 9 U.S.C. §§ 201-208, petitioner PAO Tatneft, formerly OAO Tatneft ("Tatneft" or "Petitioner"), by its attorneys, Cleary Gottlieb Steen & Hamilton LLP, hereby respectfully petitions the Court for an Order confirming the final arbitration award (the "Final Award" or "Award") entered on July 29, 2014 by the International Arbitration Tribunal in *OAO Tatneft v. Ukraine*, an arbitration seated in Paris, France and conducted pursuant to the Rules of the United Nations Commission on International Trade Law ("UNCITRAL").

In the Final Award, the Tribunal awarded Tatneft $112,000,000, plus interest accruing at the U.S. dollar LIBOR rate plus 3%, as described in more detail in paragraph 18 this Petition.  A certified copy of the Final Award sought to be enforced is attached as Exhibit A to the Declaration of Jonathan I. Blackman, dated March 30, 2017, which is submitted with this Petition (the "Blackman Declaration").  The Final Award was rendered pursuant to the arbitration provision of the November 27, 1998 bilateral investment treaty between the Russian Federation and Ukraine (the "Russia-Ukraine BIT"),[1] which is attached to the Blackman Declaration as Exhibit B.

## THE PARTIES

1.      Petitioner PAO Tatneft is a publicly-traded open joint stock company, established and existing under the laws of the Russian Federation, with a registered address of 75 Lenin St., Almetyevsk, 423400, Republic of Tatarstan, Russia.  Tatneft was the claimant in the arbitration proceeding that resulted in the Final Award.

2.      Respondent Ukraine is a "foreign state" under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603.  Ukraine was the respondent in the arbitration, and its address for purpose of notices in the arbitration is its Ministry of Justice, 13 Horodetskogo St., Kyiv 01001, Ukraine.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1330(a) and 9 U.S.C. § 203, as it relates to an arbitration award falling under the New York Convention, implemented at 9 U.S.C. §§ 201-208.  Pursuant to 28 U.S.C. § 1605(a)(6),

---

[1] The full name of the Russia-Ukraine BIT is the Agreement Between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments.

Respondent is not immune from the court's jurisdiction because this is an action to enforce an arbitral award "governed by a treaty or other international agreement in force in the United States calling for the recognition and enforcement of arbitral awards," i.e., the New York Convention.

4.      This Court has personal jurisdiction over Respondent pursuant to 28 U.S.C. § 1330(b), which grants personal jurisdiction over a foreign state where subject matter jurisdiction exists pursuant to 28 U.S.C. § 1330(a).

5.      Venue is proper in this District under 28 U.S.C. § 1391(f)(4), which provides that a civil action against a foreign state may be brought in the U.S. District Court for the District of Columbia.

## **BACKGROUND**

6.      On July 4, 1995, the Republic of Tatarstan—a constituent republic of the Russian Federation—entered into a commercial agreement with Ukraine to create CJSC Ukrtatnafta Transnational Financial and Industrial Oil Company ("Ukrtatnafta"), a Ukrainian joint-stock company that owns and operates the Kremenchug Refinery, which is the largest oil refinery in Ukraine.  Award ¶¶ 57-59.  When Ukrtatnafta was formed, Tatneft, Ukraine, and Tatarstan were its three major shareholders pursuant to its articles of incorporation.  *Id.* ¶ 59.

7.      Ukrtatnafta's articles of incorporation originally contemplated that Tatneft and Tatarstan would make capital contributions of oil-related fixed assets to Ukrtatnafta.  *Id.* ¶ 61. However, between 1997 and 1998, Ukrtatnafta's shareholders (including Ukraine) agreed that Tatneft and Tatarstan would make capital contributions of cash and other assets, instead.  *Id.* ¶¶ 61, 174, 176.

8.      In 1998 and 1999, Ukrtatnafta's shareholders approved several share offerings that resulted in U.S.-based Seagroup International Inc. ("Seagroup") and Switzerland-based AmRuz Trading Co. ("AmRuz") each also owning portions of Ukrtatnafta's shares.  *Id.* ¶ 62. Tatneft, Tatarstan, and Ukraine continued to be major shareholders, with Ukraine's shares held by its state-owned oil and gas company, NJSC Naftogaz ("Naftogaz"), after 2004.  Together, Tatneft, Tatarstan, AmRuz, and Seagroup (collectively, the "Tatarstan Shareholders") owned 56% of Ukrtatnafta's shares, and they agreed to vote their shares in an alliance, allowing Tatneft and the other Tatarstan Shareholders to control Ukrtatnafta's management.  *See id.* ¶¶ 141, 562 n. 903.

9.      In 2007, Ukrtatnafta became the target of a group of companies (the "Privat Group") associated with PrivatBank, a major Ukrainian bank.  *Id.* ¶ 143.  The Privat Group at all relevant times was controlled by Igor Kolomoisky, an influential oligarch with extensive interests and close political ties with the government of Ukraine and a notorious "raider" of other businesses.  *See id.* ¶¶ 69, 143.[2]  In January 2007, the Privat Group acquired a 1% interest in Ukrtatnafta.  *Id.* ¶¶ 143, 223, 268.  Soon afterwards, the Privat Group enlisted the assistance of Ukrainian courts and prosecutors in a series of strong arm tactics and pretextual legal actions to seize control of Ukrtatnafta at the expense of Tatneft and its allied shareholders.  *Id.* ¶¶ 223, 266-68, 396, 400-4.

10.     Though a series of actions in which Ukrainian government actors were complicit, including unlawful court orders, the physical seizure of the Kremenchug Refinery under the direction of a Ukrainian court bailiff and with the assistance of Ukrainian troops, and various

---

[2] The Privat Group was well known for conducting "black raider" actions, a Ukrainian phenomenon whereby an organized group criminally seizes other persons' businesses and property through the assistance of unlawful court decisions and various corrupt state actors.  *See* Award ¶ 69.

judgments purporting to nullify the Tatarstan Shareholders' rights by invalidating the 1997 and 1998 shareholder resolutions, the Privat Group ousted Tatneft and its allied shareholders from both the management of Ukrtatnafta and their ownership of its shares. This could not have been accomplished without the indispensable aid of Ukrainian state agents, both executive and judicial. *Id.* ¶¶ 126-28, 147, 156, 159-62, 169-71, 174-76, 221-38, 276-80, 316, 320, 325, 465. By 2009, as a result of these actions, Tatneft and its allied shareholders had been deprived of their entire shareholdings in Ukrtatnafta. *Id.* ¶¶ 380, 403, 562 n. 903.

## THE ARBITRATION

11.     On December 11, 2007, Tatneft sent a notice of dispute to Ukraine, requesting that they open negotiations pursuant to Article 9(1) of the Russia-Ukraine BIT, which requires that a state party to the treaty (here, Ukraine) and an investor based in the other state party (here, Tatneft, which is a Russian company) exert their best efforts to resolve a dispute through negotiations. Award ¶ 6; Russia-Ukraine BIT Art. 9(1). However, Tatneft and Ukraine were unable to settle their dispute. Award ¶ 6.

12.     On May 21, 2008, Tatneft served Ukraine with a Notice of Arbitration and Statement of Claim under the UNCITRAL rules. Tatneft initiated the arbitration pursuant to Article 9(2) of the Russia-Ukraine BIT, which provides that if a dispute is not resolved through negotiations within six months, the dispute may be decided by an UNCITRAL arbitral tribunal. Award ¶ 6; Russia-Ukraine BIT Art. 9(2).

13.     Tatneft's Statement of Claim alleged that Ukraine had violated its obligations to Tatneft under, *inter alia*, Articles 2 and 3(1) of the Russia-Ukraine BIT, which respectively guarantee that each state will grant legal protection to investors from the other state and will not discriminate against those investors. Award ¶ 7; Russia-Ukraine BIT Arts. 2, 3(1).

14.     Following extensive written submissions and a hearing, the arbitral tribunal issued a decision on September 28, 2010 (the "Jurisdiction Decision") confirming that it had jurisdiction over Tatneft's claims.  After further detailed written submissions and document disclosure, the arbitration tribunal held a hearing on the merits from March 18, 2013 to March 27, 2013 at which numerous fact and expert witnesses testified and were cross-examined.  Award ¶¶ 6-46.  Post-hearing submissions were completed on May 30, 2013.  *Id.* ¶¶ 47-48.

## FINAL AWARD IN FAVOR OF TATNEFT

15.     On July 29, 2014, the arbitral tribunal issued the Final Award, which concluded that Ukraine's actions resulted in a "total deprivation of [Tatneft's] rights as a shareholder of Ukrtatnafta."  Award ¶ 464.  The tribunal explained that "almost every decision adopted [by the Ukrainian courts] resulted in a sequence that was with each step more adverse to [Tatneft] and directly l[ed] to findings that would in the end deprive [Tatneft] of all rights in [Ukrtatnafta]." *Id.* ¶ 267.  In each instance, "the relevant cases were initiated by requests that the [Ukrainian] Prosecutor brought to the courts, invariably seeking to reopen matters in respect of which limitation periods had long become applicable."  *Id.* ¶ 268.[3]  The Final Award held that the Ukrainian courts wrongfully refused to apply the relevant statutes of limitations, gave inadequate notice to Tatneft and its allied shareholders, and disregarded key Ukrainian statutory provisions. *Id.* ¶¶ 398-400, 406.

16.     Accordingly, the Final Award concluded that Ukraine had breached its obligation under the Russia-Ukraine BIT to provide "fair and equitable treatment" to Tatneft, "first on the

---

[3] For instance, the Ukrainian courts issued judgments on trumped up pretexts without even a colorable basis in Ukrainian law, annulling, *seriatim*, first AmRuz and Seagroup's shareholder rights, then Tartarstan's rights, and finally Tatneft's rights, despite an earlier ruling of the Ukraine Supreme Court upholding the validity of the first of these shareholdings, and the prior running of the statute of limitations on any claim to challenge any of them. *See, e.g.*, Award ¶¶ 174-76, 178-85, 221-42, 245-49, 276-80, 320, 323-25.

ground of deprivation of the investor's management and control of the company and ultimately based on the deprivation of its ownership rights, . . . coupled with questions of due process rights and the manner of how what had been a predictable, consistent and stable legal framework resulted in the opposite." *Id.* ¶ 412.  The Final Award also stated that Ukraine had violated the Russia-Ukraine BIT by failing to provide sufficient "police protection and physical security," given the seizure of the Kremenchug Refinery with the assistance of Ukraine's enforcement service and Ukrainian troops.  *Id.* ¶ 428.

17.     Having concluded that Ukraine was liable to Tatneft "as a result of its conduct in the period between 2004 and 2007 and the associated breaches of certain [Russia-Ukraine] BIT provisions," *id.* ¶ 520, the Final Award ordered Ukraine to "pay [Tatneft] the amount of US$ 112 million as compensation for its breaches of the Russia-Ukraine BIT." *Id.* ¶ 642(1).

18.     The Final Award also provided that Ukraine must pay interest on this amount at the U.S. dollar LIBOR rate plus 3%, compounded every three months, accruing until the date of payment.   The Award stated that the interest on $68.44 million (of the total $112 million) would begin accruing on May 12, 2009, while the interest on the other $43.56 million would begin accruing on January 27, 2010, though accrual of interest was suspended for the sixty days after the issuance of the Award (i.e., from July 29, 2014 to September 27, 2014).  *Id.* ¶¶ 642(2), 642(3).

## PARIS COURT OF APPEAL'S REJECTION
## OF RESPONDENT'S ANNULMENT REQUEST

19.     On August 27, 2014, Ukraine brought an action before the Paris Court of Appeal in France—which has primary jurisdiction over the Final Award, as the arbitration was seated in Paris—to annul the Final Award and the earlier Jurisdiction Decision.  Blackman Decl. ¶ 5.

20.     On November 29, 2016, the Paris Court of Appeal rejected Ukraine's annulment request as meritless, finding that the arbitral tribunal was properly constituted and had jurisdiction, and that neither the Final Award nor the Jurisdiction Decision should be annulled. *Id.* The court also ordered Ukraine to pay Tatneft €200,000 in attorneys' fees and costs. *Id.*[4]  To date, Ukraine has not paid this amount. *Id.* ¶ 6.

## RESPONDENTS' FAILURE TO SATISFY THE BINDING FINAL AWARD

21.     On December 29, 2016, after the Paris Court of Appeal rejected Ukraine's annulment request, Tatneft sent a letter to Ukraine to demand payment of the amount specified in the Final Award, which totaled $142,670,000 as of that date. *See* Blackman Decl. Ex. C at 1. The letter noted that if Ukraine failed to make payment by February 15, 2017, it would "commence enforcement actions to compel Ukraine to comply with the Final Award." *Id.* at 2.

22.     As of the date of this Petition—more than two and a half years after the Final Award was first issued—Ukraine has failed to make any payment to Tatneft.  Blackman Decl. ¶ 8.

23.     Tatneft therefore brings this Petition to confirm and enforce the Final Award. None of the grounds for refusal or deferral of recognition or enforcement of an arbitral award as specified under the New York Convention exist.

---

[4] On March 21, 2017, Ukraine filed a discretionary request for further appeal to the French Court of Cassation, which is the French equivalent of the U.S. Supreme Court.  Blackman Decl. ¶ 5.  That request for a further appeal has no bearing on Tatneft's entitlement to recognition of the Final Award.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner prays:

24.     That the Court enter an order pursuant to 9 U.S.C. § 207 confirming the Final

Award against Respondent.

25.     That, on the basis of the confirmed Final Award, the Court enter judgment that

Respondent is liable to pay Petitioner $112 million, plus interest through the date of payment by

Respondent calculated as described in paragraph 18 above, as well as Petitioner's costs of these

confirmation proceedings.

Dated:   Washington, D.C.
         March 30, 2017

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:  /s/ Matthew D. Slater
     Matthew D. Slater (D.C. Bar # 386986)
     A Member of the Firm

2000 Pennsylvania Avenue, N.W.
Washington, D.C.
Tel: (202) 974-1500
Fax: (202) 974-1999

Jonathan I. Blackman
(*pro hac vice* application forthcoming)
One Liberty Plaza
New York, New York
Tel: (212) 225-2000
Fax: (212) 225-3999

Attorneys for Petitioner PAO Tatneft

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PAO TATNEFT | ) |
|  | ) |
| Petitioner, | ) **Case No.** |
|  | ) |
| -against- | ) |
|  | ) |
| UKRAINE | ) |
|  | ) |
| Respondent. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PETITION TO CONFIRM ARBITRATION AWARD**
**AND TO ENTER JUDGMENT IN FAVOR OF PETITIONER**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Matthew D. Slater
2000 Pennsylvania Avenue, N.W.
Washington, D.C.
Tel: (202) 974-1500
Fax: (202) 974-1999

Jonathan I. Blackman
One Liberty Plaza
New York, New York
Tel: (212) 225-2000
Fax: (212) 225-3999

*Attorneys for Petitioner PAO Tatneft*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 2

I.      Background to the Parties' Arbitration ................................................................. 2

II.     The Arbitration.................................................................................................... 3

III.    Final Award in Favor of Tatneft ......................................................................... 4

IV.     Paris Court of Appeal's Rejection of Respondent's Annulment Request ........................ 6

V.      Respondents' Continued Failure to Satisfy the Binding Final Award............................. 6

ARGUMENT ........................................................................................................................ 7

I.      The New York Convention Governs the Final Award ......................................... 7

II.     This Court Has Jurisdiction to Enforce the Final Award..................................... 8

        A.      The Court Has Subject Matter Jurisdiction........................................... 8

        B.      The Court Has Personal Jurisdiction..................................................... 9

III.    The Federal Arbitration Act Requires Confirmation of the Final Award.......................... 9

CONCLUSION.................................................................................................................... 12

# TABLE OF AUTHORITIES

**Federal Cases**

*BCB Holdings Ltd. v. Government of Belize*,
110 F. Supp. 3d 233, 243-44 (D.D.C. 2015)....................................................................8, 11

*Belize Social Development Ltd. v. Government of Belize*,
668 F.3d 724 (D.C. Cir. 2012) ............................................................................................10

*Belize Social Development Ltd. v. Government of Belize*,
794 F.3d 99 (D.C. Cir. 2015) ................................................................................................7

*Chevron Corp. v. Republic of Ecuador*,
949 F. Supp. 2d 57 (D.D.C. 2013) ......................................................................................11

*Creighton Ltd. v. Government of the State of Qatar*,
181 F.3d 118 (D.C. Cir. 1999) ..............................................................................................8

*Doe I v. State of Israel*,
400 F. Supp. 2d 86 (D.D.C. 2005) ........................................................................................9

*G.E. Transport S.P.A. v. Republic of Albania*,
693 F. Supp. 2d 132 (D.D.C. 2010) ......................................................................................8

*Henry v. Murphy*,
No. M-82, 2002 WL 24307 (S.D.N.Y. Jan. 8, 2002)............................................................7

*I.T. Consultants, Inc. v. Republic of Pakistan*,
351 F.3d 1184 (D.C. Cir. 2003) ............................................................................................9

*International Trading & Industrial Investment Co. v. DynCorp Aerospace Technology*,
763 F. Supp. 2d 12 (D.D.C. 2011) ......................................................................................10

*Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*,
962 F. Supp. 2d 152 (D.D.C. 2013) ......................................................................................9

*Mediso Medical Equipment Developing Services, Ltd v. Bioscan, Inc.*,
75 F. Supp. 3d 359, 363-64 (D.D.C. 2014)..........................................................................10

*TMR Energy Ltd. v. State Property Fund of Ukraine*,
411 F.3d 296 (D.C. Cir. 2005) ..............................................................................................7

**Federal Statutes**

9 U.S.C. §§ 201-08 ...................................................................................................7

9 U.S.C. § 202...........................................................................................................7

9 U.S.C. § 203...........................................................................................................8

9 U.S.C. § 207 ................................................................................................... 1, 9-10

28 U.S.C. § 1603........................................................................................................8

28 U.S.C. § 1330(a) ................................................................................................ 8-9

28 U.S.C. § 1330(b) ...................................................................................................9

28 U.S.C. §§ 1605-07 ................................................................................................8

28 U.S.C. § 1605(a)(6)...............................................................................................8

28 U.S.C. § 1608........................................................................................................9

28 U.S.C. § 1608(a)(2)...............................................................................................9

**Other Authorities**

Agreement Between the Government of the Russian Federation and the Cabinet of
    Ministers of Ukraine on the Encouragement and Mutual Protection of Investments.........4, 11

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of
    June 10, 1958 .............................................................................................. passim

UNCITRAL Arbitration Rules ...................................................................................11

Petitioner PAO Tatneft, formerly OAO Tatneft ("Petitioner" or "Tatneft"), a public joint-stock company organized and existing under the laws of the Russian Federation, respectfully submits this memorandum of law in support of its petition to confirm a foreign arbitration award under Section 207 of the Federal Arbitration Act, 9 U.S.C. § 207, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), and for entry of judgment in favor of the Petitioner.

## PRELIMINARY STATEMENT

Respondent Ukraine ("Respondent" or "Ukraine") and Tatneft were founding shareholders of a Ukrainian oil company, which they and other shareholders ran together for more than a decade.  In a process beginning in 2007, Tatneft's shares in the oil company were wrongfully seized by a Ukrainian business conglomerate with the indispensable assistance of the government of Ukraine, which issued a series of unlawful court decisions and provided state enforcement services to physically seize the oil company's assets and then divest Tatneft of its entire shareholdings.  To remedy this wrong, Tatneft initiated proceedings against Ukraine, in accordance with the bilateral investment treaty between Ukraine and the Russian Federation, before an arbitral tribunal seated in Paris, France, under the rules of the United Nations Commission on International Trade Law ("UNCITRAL").

On July 29, 2014, the arbitral tribunal issued a unanimous final award (the "Final Award" or "Award") against Ukraine, ruling that Ukraine had violated Tatneft's rights under the bilateral investment treaty and awarding Tatneft $112 million plus interest in damages.  Although more than two and a half years have now passed since the Final Award was issued, Ukraine still has not made any payment to Tatneft.  Therefore, pursuant to Section 207 of the Federal Arbitration Act, Tatneft brings this action to confirm and enforce the Final Award in the United States.

1

**STATEMENT OF FACTS**

I.      **Background to the Parties' Arbitration**

On July 4, 1995, the Republic of Tatarstan—a constituent republic of the Russian Federation—entered into a commercial agreement with Ukraine to create CJSC Ukrtatnafta Transnational Financial and Industrial Oil Company ("Ukrtatnafta"), a Ukrainian joint-stock company that owns and operates the Kremenchug Refinery, which is the largest oil refinery in Ukraine.  Award ¶¶ 57-59.  When Ukrtatnafta was formed, Tatneft, Ukraine, and Tatarstan were its three major shareholders pursuant to its articles of incorporation.  *Id.* ¶ 59.  The articles of incorporation originally contemplated that Tatneft and Tatarstan would make capital contributions of oil-related fixed assets to Ukrtatnafta, but between 1997 and 1998, Ukrtatnafta's shareholders (including Ukraine) agreed that Tatneft and Tatarstan would make capital contributions of cash and other assets, instead.  *Id.* ¶¶ 61, 174, 176.

In 1998 and 1999, Ukrtatnafta's shareholders approved several share offerings that resulted in U.S.-based Seagroup International Inc. ("Seagroup") and Switzerland-based AmRuz Trading Co. ("AmRuz") each also owning portions of Ukrtatnafta's shares.  *Id.* ¶ 62.  Tatneft, Tatarstan, and Ukraine continued to be major shareholders, with Ukraine's shares held by its state-owned oil and gas company, NJSC Naftogaz ("Naftogaz"), after 2004.  Together, Tatneft, Tatarstan, AmRuz, and Seagroup (collectively, the "Tatarstan Shareholders") owned 56% of Ukrtatnafta's shares, and they agreed to vote their shares in an alliance, allowing Tatneft and the other Tatarstan Shareholders to control Ukrtatnafta's management.  *See id.* ¶¶ 141, 562 n. 903.

In 2007, Ukrtatnafta became the target of a group of companies (the "Privat Group") associated with PrivatBank, a major Ukrainian bank.  *Id.* ¶ 143.  The Privat Group was controlled by Igor Kolomoisky, an influential oligarch with extensive interests and close political ties with

the government of Ukraine and a notorious "raider" of other businesses.  *See id.* ¶¶ 69, 143.[1]

After acquiring a 1% "toehold" interest in Ukrtatnafta in January 2007, the Privat Group enlisted

the assistance of the Ukrainian state to seize control of Ukrtatnafta.  *Id.* ¶¶ 69, 143, 223, 266-68,

396, 400-4.  Through a series of actions in which Ukrainian government actors were complicit—

including the issuance of unlawful court orders, the physical seizure of the Kremenchug Refinery

under the direction of a Ukrainian court bailiff and with the assistance of Ukrainian troops, and

various court judgments purporting to nullify the Tatarstan Shareholders' rights by invalidating

the 1997 and 1998 shareholder resolutions—the Privat Group ousted Tatneft and its allied

shareholders from both the management of Ukrtatnafta and their ownership of its shares.  This

could not have been accomplished without the indispensable aid of Ukrainian state agents, both

executive and judicial.  *Id.* ¶¶ 126-28, 147, 156, 159-62, 169-71, 174-76, 221-38, 276-80, 316,

320, 325, 465.  By 2009, as a result of these actions, Tatneft and its allied shareholders were

deprived of their entire shareholdings in Ukrtatnafta.  *Id.* ¶¶ 380, 403, 562 n. 903.

## II.     The Arbitration

Tatneft is incorporated in the Russian Federation, which entered into a bilateral

investment treaty with Ukraine (the "Russia-Ukraine BIT"[2]) on November 27, 1998, to

encourage investments and economic cooperation in their respective countries.  Russia-Ukraine

BIT at 1.  On December 11, 2007, Tatneft sent a notice of dispute to Ukraine requesting that they

open negotiations pursuant to Article 9(1) of the Russia-Ukraine BIT, which requires that a state

party to the treaty (here, Ukraine) and an investor of the other state party (here, Tatneft) exert

---

[1] The Privat Group was well known for conducting "black raider" actions, a Ukrainian phenomenon whereby an organized group criminally seizes other persons' businesses and property through the assistance of unlawful court decisions and various corrupt state actors.  *See* Award ¶ 69.

[2] The full name of the Russia-Ukraine BIT is the Agreement Between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments.

their best efforts to resolve a dispute through negotiations.  Award ¶ 6; Russia-Ukraine BIT Art. 9(1).  However, Tatneft and Ukraine were unable to settle their dispute.  Award ¶ 6.  On May 21, 2008, in accordance with Article 9(2) of the Russia-Ukraine BIT—which provides that if a dispute is not resolved through negotiations within six months, the dispute may be decided by an UNCITRAL arbitral tribunal—Tatneft served Ukraine with a Notice of Arbitration and Statement of Claim under the UNCITRAL rules.  *Id.*; Russia-Ukraine BIT Art. 9(2).  Tatneft alleged that Ukraine had violated its obligations to Tatneft under, *inter alia*, Articles 2 and 3(1) of the Russia-Ukraine BIT, which respectively guarantee that each state will grant legal protection to investors from the other state and will not discriminate against those investors.  Award ¶ 7; Russia-Ukraine BIT Arts. 2, 3(1).

Following extensive written submissions and a hearing, the arbitral tribunal issued a decision on September 28, 2010 (the "Jurisdiction Decision") confirming that it had jurisdiction over Tatneft's claims.  After further detailed written submissions and document disclosure, the arbitration tribunal held a hearing on the merits from March 18, 2013 to March 27, 2013 at which numerous fact and expert witnesses testified and were cross-examined.  Award ¶¶ 6-46.  Post-hearing submissions were completed on May 30, 2013.  *Id.* ¶¶ 47-48.

## III.    Final Award in Favor of Tatneft

On July 29, 2014, the arbitral tribunal issued the Final Award, which concluded that Ukraine's actions resulted in a "total deprivation of [Tatneft's] rights as a shareholder of Ukrtatnafta."  Award ¶ 464.  The tribunal explained that "almost every decision adopted [by the Ukrainian courts] resulted in a sequence that was with each step more adverse to [Tatneft] and directly l[ed] to findings that would in the end deprive [Tatneft] of all rights in [Ukrtatnafta]."  *Id.* ¶ 267.  In each instance, "the relevant cases were initiated by requests that the [Ukrainian]

Prosecutor brought to the courts, invariably seeking to reopen matters in respect of which limitation periods had long become applicable." *Id.* ¶ 268.[3]  The Final Award held that the Ukrainian courts wrongfully refused to apply the relevant statutes of limitations, gave inadequate notice to Tatneft and its allied shareholders, and disregarded key Ukrainian statutory provisions. *Id.* ¶¶ 398-400, 406.

Accordingly, the Final Award concluded that Ukraine had breached its obligation under the Russia-Ukraine BIT to provide "fair and equitable treatment" to Tatneft, "first on the ground of deprivation of the investor's management and control of the company and ultimately based on the deprivation of its ownership rights, . . . coupled with questions of due process rights and the manner of how what had been a predictable, consistent and stable legal framework resulted in the opposite." *Id.* ¶ 412.  The Final Award also stated that Ukraine had violated the Russia-Ukraine BIT by failing to provide sufficient "police protection and physical security," given the seizure of the Kremenchug Refinery with the assistance of Ukraine's enforcement service and Ukrainian troops.  *Id.* ¶ 428.

Having concluded that Ukraine was liable to Tatneft "as a result of its conduct in the period between 2004 and 2007 and the associated breaches of certain [Russia-Ukraine] BIT provisions," *id.* ¶ 520, the Final Award ordered Ukraine to "pay [Tatneft] the amount of US$ 112 million as compensation for its breaches of the Russia-Ukraine BIT."  *Id.* ¶ 642(1).  The Final Award also stated that Ukraine must pay interest on this amount at the U.S. dollar LIBOR rate plus 3%, compounded every three months, accruing until the date of payment.  The Award

---

[3] For instance, the Ukrainian courts issued judgments without even a colorable basis in Ukrainian law, annulling, *seriatim*, first AmRuz and Seagroup's shareholder rights, then Tartarstan's rights, and finally Tatneft's rights, despite an earlier ruling of the Ukraine Supreme Court upholding the validity of the first of these shareholdings, and the prior running of the statute of limitations on any claim to challenge any of them.  *See, e.g.*, Award ¶¶ 174-76, 178-85, 221-42, 245-49, 276-80, 320, 323-25.

specified that the interest on $68.44 million (of the total $112 million) would begin accruing on

May 12, 2009, while the interest on the other $43.56 million would begin accruing on January

27, 2010, though accrual of interest was suspended for the sixty days after the issuance of the

Award (i.e., from July 29, 2014 to September 27, 2014). *Id.* ¶¶ 642(2), 642(3).

## IV.   **Paris Court of Appeal's Rejection of Respondent's Annulment Request**

On August 27, 2014, Ukraine brought an action before the Paris Court of Appeal in

France—which has primary jurisdiction over the Final Award, as the arbitration was seated in

Paris—to annul the Final Award and the earlier Jurisdiction Decision. Blackman Decl. ¶ 5. On

November 29, 2016, the Paris Court of Appeal rejected Ukraine's annulment request as

meritless, finding that the arbitral tribunal was properly constituted and had jurisdiction, and the

Final Award and the Jurisdiction Decision should be upheld. *Id.* The court also ordered Ukraine

to pay Tatneft €200,000 in attorneys' fees and costs. *Id.*[4] To date, Ukraine has not paid this

amount or any portion of the Final Award. *Id.* ¶¶ 6, 8.

## V.   **Respondents' Continued Failure to Satisfy the Binding Final Award**

On December 29, 2016, after the Paris Court of Appeal rejected Ukraine's annulment

request, Tatneft demanded payment by Ukraine of the amount specified in the Final Award,

which totaled $142,670,000 as of that date. *See* Blackman Decl. Ex. C at 1. Tatneft's letter

noted that if Ukraine failed to make payment by February 15, 2017, it would "commence

enforcement actions to compel Ukraine to comply with the Final Award." *Id.* at 2.

As of this date—more than two and a half years after the Final Award was first issued—

Ukraine has failed to make any payment to Tatneft. Blackman Decl. ¶ 8.

---

[4] On March 21, 2017, Ukraine filed a discretionary request for further appeal to the French Court of Cassation, which is the French equivalent of the U.S. Supreme Court. Blackman Decl. ¶ 5. That request for a further appeal has no bearing on Tatneft's entitlement to recognition of the Final Award.

## ARGUMENT

### I.  The New York Convention Governs the Final Award

Confirmation of the Final Award is governed by the New York Convention, which is codified in the Federal Arbitration Act ("FAA").  *See* 9 U.S.C. §§ 201-208.  Under the FAA, any "arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial" and relates to a foreign state is deemed to "fall[] under the [New York] Convention."  9 U.S.C. § 202.  To be "commercial," the relationship need only "arise out of or in connection with commerce."  *Belize Soc. Dev. Ltd. v. Government of Belize*, 794 F.3d 99, 104 (D.C. Cir. 2015) (quoting Restatement (Third) of U.S. Law of Int'l Comm. Arbitration § 1-1 (Am. Law. Inst. 2012)).

Here, Ukraine and Tatneft had a longstanding commercial, legal relationship as major shareholders of Ukrtatnafta, beginning with the incorporation of Ukrtatnafta in 1995 and continuing until the Ukrainian courts invalidated Tatneft's shareholdings in 2009.  In accordance with Article 9(2) of the Russia-Ukraine BIT, Tatneft brought arbitral claims alleging that Ukraine had unlawfully deprived its fellow shareholder Tatneft of its shares in and control over Ukrtatnafta, in part by helping seize control of Ukrtatnafta's management from Tatneft and its allies, and in part by invalidating shareholder resolutions that were previously agreed by Tatneft and Ukraine.  Under these circumstances, there can be no dispute that the Final Award arose out of a commercial, legal relationship between the parties, and the Award therefore falls under the New York Convention. *See, e.g.*, *TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 305 (D.C. Cir. 2005) (arbitral award resolving conflict between co-owners of Ukrainian oil company enforceable under New York Convention); *Henry v. Murphy*, No. M-82, 2002 WL

24307, at *4 (S.D.N.Y. Jan. 8, 2002) (conflict between corporate shareholders involves a commercial legal relationship within the meaning of the New York Convention).

## II.   This Court Has Jurisdiction to Enforce the Final Award

### A.   The Court Has Subject Matter Jurisdiction

The FAA states that "[t]he district courts of the United States . . . shall have original jurisdiction" over any "action or proceeding falling under the [New York] Convention." 9 U.S.C. § 203.  Thus, because the Final Award falls under the New York Convention, the FAA grants the Court original subject matter jurisdiction over this action.

Because Ukraine is a "foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603, the Court must and does also have subject matter jurisdiction under 28 U.S.C. § 1330(a), which grants federal district courts original jurisdiction over civil actions against foreign states where "the foreign state is not entitled to immunity" under the various exceptions in the FSIA.  *See* 28 U.S.C. §§ 1605-07.  Here, the applicable exception is for an action to confirm an arbitral award that "is or may be governed by a treaty . . . in force for the United States calling for the recognition and enforcement of arbitral awards," 28 U.S.C. § 1605(a)(6), including the New York Convention.  *See, e.g.*, *Creighton Ltd. v. Government of the State of Qatar*, 181 F.3d 118, 123-24 (D.C. Cir. 1999) ("[It] has been said with authority that the New York Convention 'is exactly the sort of treaty Congress intended to include in th[is] arbitration exception.'") (citation omitted); *BCB Holdings Ltd. v. Government of Belize*, 110 F. Supp. 3d 233, 243-44 (D.D.C. 2015) (finding subject matter jurisdiction to confirm arbitral award against foreign state that fell under the New York Convention); *G.E. Transp. S.P.A. v. Republic of Albania*, 693 F. Supp. 2d 132, 135-36 (D.D.C. 2010) (same).

B.       The Court Has Personal Jurisdiction

The FSIA provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under [28 U.S.C. § 1330(a)] where service has been made under [28 U.S.C. § 1608]."  28 U.S.C. § 1330(b); *see also I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1191 (D.C. Cir. 2003) (Roberts, J.) ("Once subject matter jurisdiction exists under the FSIA, personal jurisdiction over a foreign state defendant is established . . ., so long as the defendant was properly served.").

Here, subject matter jurisdiction exists under 28 U.S.C. § 1330(a) for the reasons set forth above, and Petitioner will serve Respondent in accordance with the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention"), to which the United States and Ukraine are parties, as authorized by 28 U.S.C. § 1608(a)(2).  *See, e.g.*, *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 101 (D.D.C. 2005) (section 1608(a)(2) authorizes service "pursuant to any applicable international convention concerning service of judicial documents," including the Hague Convention).  Therefore, the Court has personal jurisdiction to confirm the Final Award under the FSIA.[5]

## III.       The Federal Arbitration Act Requires Confirmation of the Final Award

The FAA provides that a party to an arbitration may apply to confirm an arbitral award when the award was issued within the last three years, as is the case here.  *See* 9 U.S.C. § 207. The FAA further mandates that "[t]he court *shall* confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New

---

[5] Because Ukraine is a foreign state, as long as sections 1330(a) and 1608 are satisfied the Court need not establish further "minimum contacts" with this forum to exercise personal jurisdiction.  *See I.T. Consultants*, 351 F.3d at 1191; *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 160 n.2 (D.D.C. 2013).

York] Convention," 9 U.S.C. § 207 (emphasis added), and the party opposing confirmation of

the award bears the burden to prove why the court should not do so.  *Mediso Med. Equip.*

*Developing Servs., Ltd v. Bioscan, Inc.*, 75 F. Supp. 3d 359, 363-64 (D.D.C. 2014); *Int'l Trading*

*& Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011).  Thus,

"the FAA affords the district court little discretion in refusing or deferring enforcement of

foreign arbitral awards," which is "[c]onsistent with the 'emphatic federal policy in favor of

arbitral dispute resolution' recognized by the Supreme Court."  *Belize Soc. Dev. Ltd. v.*

*Government of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (quoting *Mitsubishi Motors Corp. v.*

*Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).

Article V of the New York Convention lists the "narrow circumstances when a court may

deny confirmation of an arbitral award." *Int'l Trading*, 763 F. Supp. 2d at 20.  Recognition and

enforcement may be refused only if the party opposing confirmation proves that:

> (a) The parties to the agreement [to arbitrate] were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
>
> (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
>
> (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or
>
> (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

New York Convention art. V(1). Article V provides that a state may also refuse to recognize an arbitral award if "[t]he subject matter of the difference is not capable of settlement by arbitration" under the law of that country, or if "[t]he recognition or enforcement of the award would be contrary to the public policy of that country." *Id.* art. V(2)(a), (b).

None of these narrow exceptions applies here. Ukraine had notice of the arbitration, it fully participated in it, and the arbitrators' jurisdiction was upheld by both the Paris Court of Appeal and the tribunal itself. *See, e.g.*, *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 67 (D.D.C. 2013) ("[I]n the context of a bilateral investment treaty, incorporation of the UNCITRAL Rules provides clear and unmistakable evidence that the parties intended for the arbitrator to decide questions of arbitrability.") (citation omitted). The Final Award is also fully binding, as both the UNCITRAL rules and Russia-Ukraine BIT state that all awards are "final and binding" on the parties. Russia-Ukraine BIT art. 9.3; UNCITRAL Arbitration Rules art. 34. The composition of the arbitral tribunal was proper, as the Paris Court of Appeal (applying the "law of the country where the arbitration took place") recently affirmed. *See* Blackman Decl. ¶ 5. Finally, the dispute between the parties was obviously "capable of settlement by arbitration" under U.S. and other applicable laws, and confirmation of the award is not contrary to U.S. public policy. *See, e.g.*, *BCB Holdings Ltd.*, 110 F. Supp. 3d at 250 (declining to apply the New York Convention's public policy exception, which "is construed extremely narrowly and applied 'only where enforcement would violate the forum state's most basic notions of morality and justice.'") (citation omitted).

In short, "the showing required to avoid summary confirmation [of the Final Award] is high," *Int'l Trading*, 763 F. Supp. 2d at 20 (citation omitted), and Ukraine cannot carry the high

burden of proving that any of the circumstances listed in Article 5 of the New York Convention

apply.  Therefore, the FAA mandates that this Court confirm the Final Award.

## <u>CONCLUSION</u>

For the foregoing reasons, Petitioner Tatneft respectfully requests that the Court confirm

the Final Award in its entirety, together with such other and further relief as the Court deems just

and proper, and enter judgment against Respondent Ukraine accordingly.

Dated:   March 30, 2017
          Washington, D.C.

                          Respectfully submitted,

                          CLEARY GOTTLIEB STEEN & HAMILTON LLP

                          By:  _/s/ Matthew D. Slater_____
                              Matthew D. Slater (D.C. Bar # 386986)
                              A Member of the Firm

                          2000 Pennsylvania Avenue, N.W.
                          Washington, D.C.
                          Tel: (202) 974-1500
                          Fax: (202) 974-1999

                          Jonathan I. Blackman
                          (*pro hac vice* application forthcoming)
                          One Liberty Plaza
                          New York, New York
                          Tel: (212) 225-2000
                          Fax: (212) 225-3999

                          Attorneys for Petitioner PAO Tatneft