## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAO TATNEFT, | |
| Petitioner, | |
| v. | Civil Action No. 1:17-cv-00582- CKK |
| UKRAINE, | |
| Respondent. | |

## RESPONDENT'S MOTION TO DISMISS
## <u>PETITIONER'S PETITION TO CONFIRM ARBITRAL AWARD</u>

<u>**TABLE OF CONTENTS**</u>

**Page**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 1

    A.    The Parties ................................................................................................ 1

    B.    The Interstate Economic Project Ukrtatnafta ........................................... 2

    C.    Contributions to Ukrtatnafta .................................................................... 4

    D.    Litigation Surrounding the Shareholding in Ukrtatnafta ......................... 6

        1.    Litigation regarding Amruz's and Seagroup's shares in Ukrtatnafta ......... 6

        2.    Litigation regarding Tatneft's shares in Ukrtatnafta.................................. 8

    E.    Tatneft's Simultaneous Acquisition of the Shares of Amruz and Seagroup and Notification of the Investment Dispute to Ukraine ......................... 8

    F.    The BIT Arbitration ............................................................................... 10

    G.    The French Setting-Aside Proceeding ................................................... 11

ARGUMENT ........................................................................................................... 11

    A.    This Court Lacks Subject Matter Jurisdiction Under Section 1605(a)(6) of the FSIA ............................................................................................ 11

        1.    The "arbitration exception" does not apply because Tatneft is not a "private party"...................................................................................... 13

            a.    Tatneft is a State-controlled entity ................................................. 14

                i.    Tatarstan owns/controls the stock of Tatneft .................... 15

                ii.    Tatarstan controls the decision-making of Tatneft ........... 16

                iii.    Tatarstan uses Tatneft to fulfill its budgetary needs ......... 17

            b.    Tatneft was Tatarstan's agent in Ukrtatnafta ................................ 19

            c.    "Piercing the corporate veil" is not required, but would be warranted under the facts of this case ........................................... 20

        2.    The "arbitration exception" does not apply because the award was not made "pursuant to" any agreement to arbitrate .................................. 24

            a.    An agreement to arbitrate is formed by accepting the State's standing offer to arbitrate on its terms .............................. 24

            b.    The Merits Award was not made pursuant to the terms of the offer to arbitrate ...................................................................... 26

i.      The "fair and equitable treatment" provision was excluded from the offer to arbitrate ................................. 26

ii.      Most of the damages were awarded for the shares of Swiss and American companies *contrary to* the offer to arbitrate with *bona fide* Russian investors .......... 33

B.      This Matter Should Be Dismissed On The Basis Of *Forum Non Conveniens* ........................................................................... 41

1.      Ukraine is an adequate alternative forum ................................... 41

2.      The balancing of public and private interest factors weighs in favor of dismissal .............................................................................. 42

CONCLUSION ..................................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agrocomplect, AD v. Republic of Iraq*,
   524 F. Supp. 2d 16 (D.D.C. 2007) ........................................................................11

*Air France v. Saks*,
   470 U.S. 392 (1985) ..............................................................................................25

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989) ..............................................................................................11

*BG Group, PLC v. Republic of Argentina*,
   134 S. Ct. 1198 (2014) ...........................................................................................25

*Bridas S.A.P.I.C. v. Government of Turkmenistan*,
   345 F.3d 347 (5th Cir. 2003) ...........................................................................21, 22

*Edmonds v. United States*,
   436 F. Supp. 2d 28 (D.D.C. 2006) .......................................................................12

*Figueiredo Ferraz E Engenharia de Projeto Ltda v. Republic of Peru*,
   665 F.3d 384 (2d Cir. 2011)..............................................................................40, 41

*Gulf Oil Corp. v. Gilbert*,
   330 U.S. 501 (1947)......................................................................................39, 40, 41

*Gunn v. Minton*,
   568 U.S. 251 (2013) ..............................................................................................11

*Haven v. Polska*,
   215 F.3d 727 (7th Cir. 2000) ...............................................................................12

*In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz
   of Ukraine*,
   311 F.3d 488 (2d Cir. 2002)...................................................................................40

*MBI Grp., Inc. v. Credit Foncier du Cameroun*,
   616 F.3d 568 (D.C. Cir. 2010) ........................................................................39, 40

*McKesson Corp. v. Islamic Republic of Iran*,
   672 F.3d 1066 (D.C. Cir. 2012) ...........................................................................12

*Nader v. The Democratic Nat'l Comm.*,
   555 F. Supp. 2d 137 (D.D.C. 2008), *aff'd*, 567 F.3d 692 (D.C. Cir. 2009)...........12

*Permanent Mission of India to the United Nations v. City of N.Y.*,
  551 U.S. 193 (2007) ............................................................................................ 11

*Peterson v. Islamic Republic of Iran*,
  627 F.3d 1117 (9th Cir. 2010) ............................................................................ 12

*Peterson v. Royal Kingdom of Saudi Arabia*,
  416 F.3d 83 (D.C. Cir. 2005) .............................................................................. 11

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981) ............................................................................................ 39

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  294 F.3d 82 (D.C. Cir. 2002) .............................................................................. 12

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1993) ............................................................................................ 11

*Shekoyan v. Sibley Int'l Corp.*,
  217 F. Supp. 2d 59 (D.D.C. 1992)) ..................................................................... 12

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
  549 U.S. 422 (2007) ............................................................................................ 39

*Stati v. Republic of Kazakhstan*,
  199 F. Supp. 3d 179 (D.D.C. 2016) ..................................................................... 12

*TMR Energy Ltd. v. State Property Fund of Ukraine*,
  411 F.3d 296 (D.C. Cir. 2005) ............................................................................ 40

*Verlinden B.V. v. Central Bank of Nigeria*,
  461 U.S. 480 (1983) ............................................................................................ 11

*Wright v. Henkel*,
  190 U.S. 40 (1903) .............................................................................................. 25

**Arbitration Cases**

*Ambatielos Case (Greece v. UK)* (1963) XII UNRIAA, Award of Mar. 6, 1956 ........................ 27

*Inceysa Vallisoletana S.L. v. Republic of El Salvador, ICSID Case No.
  ARB/03/26*,
    Award of Aug. 2, 2006 ...................................................................................... 32

*Philip Morris v. Australia*,
  PCA Case No. 2012-12 ........................................................................... 32, 34, 35

*Phoenix Action v. Czech Republic*,
  ICSID Case No. ARB/06/5, Award of Apr. 15, 2009 ................................ 32, 33, 34

iv

*RosInvest v. Russian Federation*,
    Judgment of Svea Court of Appeal of Sept. 3, 2013 ........................................29, 30

*Telenor Mobile Commc'ns A.S. v. Republic of Hungary*,
    ICSID Case No. ARB/04/15, Award of Sept. 13, 2006.........................................31

*Yukos Universal Ltd. (Isle of Man) v. The Russian Federation*, *UNCITRAL*,
    PCA Case No. AA 227 .........................................................................................38

**Statutes**

28 U.S.C. § 1605(a)(5).............................................................................................20

28 U.S.C. § 1605(a)(6)..................................................................................... *passim*

28 U.S.C. § 1608......................................................................................................1

**Other Authorities**

C. Simson, *Tatneft Can't Get USD 112M Award Against Ukraine OK's in Russia*,
    LAW360, July 3, 2017 .........................................................................................42

H.R. Rep. 94-1487, 9, 1976 U.S.C.C.A.N. 6604 ......................................................14

*Tatarstan got $230 mln through Tatneft loans*, THE RUSSIA JOURNAL, Sept. 12,
    1999....................................................................................................................18

*Tatneft Plans to Submit Claims on Behalf of Russian and Foreign Shareholders*,
    NEWS SERVICE, Nov. 13, 2007.......................................................................8, 36

*Tatneft to Continue Project to Expand Bituminous Oil Production*, NEWSROOM,
    April 4, 2016........................................................................................................19

*Ukrainian Immunity Did Not Surrender*, KOMMERSANT.RU, June 27, 2017 ................42

*Who Led Ukrtatnafta to Bankruptcy*, DNI RU, Nov. 9, 2007 ...................................6, 37

## INTRODUCTION

Pursuant to the Court's Minute Order of July 10, 2017, Sections 1608 and 1605(a)(6) of the United States Foreign Sovereign Immunities Act ("FSIA") and Rule 12(b)(1) of the Federal Rules of Civil Procedure and the doctrine of *forum non conveniens*, Respondent Ukraine respectfully submits its Motion to Dismiss Petitioner Tatneft's Petition for recognition and enforcement of the Merits Award.

Petitioner Tatneft brings its Petition pursuant to the "arbitration exception" in Section 1605(a)(6) of the FSIA, pretending to be a "private party."  Petitioner cannot avail itself of the "arbitration exception" because it is not a "private party" but rather a State-controlled entity under pervasive control of the Republic of Tatarstan.  Moreover, the "arbitration exception" does not apply because the Merits Award here was not made "pursuant to" any agreement to arbitrate with a private party, but rather contrary to any such agreement to arbitrate.  Finally, the District of Columbia is not a convenient forum for recognition and enforcement of the Merits Award, insofar as Ukraine is an adequate alternative forum, and the public and private interest factors weigh in favor of recognition and enforcement in Ukraine, upon the completion of the French setting-aside proceeding.  The Petition should therefore be dismissed for lack of subject matter jurisdiction and *forum non conveniens*.

## BACKGROUND

### A.     The Parties

Respondent Ukraine is a sovereign State, which declared its independence from the Soviet Union on August 24, 1991, and which is entitled to privileges and immunities accorded to it by the United States under the FSIA.

Petitioner Tatneft is a Tatarstan State-owned oil company under pervasive State control.[1] The history of Tatneft goes back to 1943, when the first oil field in the region was discovered. Tatneft was created on April 28, 1950, pursuant to a resolution of the Council of Ministers of the USSR, "On Measures to Speed Up the Oil Development in the Tatar Autonomous Soviet Socialist Republic," which was signed by Joseph Stalin acting as Chairman of the Council of Ministers of the USSR.  Kostytska Decl., Ex. 1, Tatneft Anniversary.  In 1994, Tatarstan transformed Tatneft into a shareholding company.[2]  Kostytska Decl., Ex. 2, History, Tatneft Anniversary.

The Republic of Tatarstan is a territorial unit, a political subdivision of the Russian Federation.  According to the Constitution of the Republic of Tatarstan, it is a sovereign State within the Russian Federation retaining elements of statehood, such as its own State symbols (emblem, anthem, flag), citizenship and official language.  Kostytska Decl., Ex. 3, Constitution of the Republic of Tatarstan, art. 4, 8, 9, 21, 121.  According to the Constitution of the Russian Federation, the Republic of Tatarstan is a subject of the Russian Federation.  Kostytska Decl., Ex. 4, Constitution of the Russian Federation, art. 65.

### B.      The Interstate Economic Project Ukrtatnafta

The underlying dispute arises out of the interstate economic project Ukrtatnafta.[3] Ukrtatnafta was created as an interstate economic project by the Treaty between the Government of Ukraine and the Government of the Republic of Tatarstan, "On Creation of Transnational Finance and Production Petroleum Company 'Ukrtatnafta'" ("Ukrtatnafta Treaty"), following the collapse of the Soviet Union and the emergence of new international borders, to reestablish the

---

[1] "Neft" (*нефть*) means "oil" in Russian.  "Tatneft" therefore stands for the Tatarstan State-owned oil company, as Turkmenneft means the Turkmenistan's State-owned oil company, and Rosneft means the Russian State-owned oil company.

[2] The terms "stocks" and "shares" (in Russian, *акции*) are used interchangeably.  The terms "joint stock company" and "shareholding company" (in Russian, *акционерное общество*) are used interchangeably.

[3] "Nafta" (*нафта*) means "oil" in Ukrainian.  "Ukrtatnafta" stands for the Ukrainian-Tatar oil company.

supply of oil from Tatarstan to the Kremenchug refinery in Ukraine.  Kostytska Decl., Ex. 5, Ukrtatnafta Treaty, art. 1.

The Ukrtatnafta Treaty was concluded within the framework of the Treaty on Cooperation in Development of the Fuel and Energy Complexes, concluded by the Government of Ukraine and the Government of the Russian Federation on September 7, 1994 ("Fuel and Energy Cooperation Treaty").  Kostytska Decl., Ex. 5, Ukrtatnafta Treaty, preamble.  The framework Fuel and Energy Cooperation Treaty, among other things, encouraged the creation of interstate joint ventures in the fuel and energy sector to address the problems affecting interconnected energy projects in the aftermath of the dismemberment of the Soviet Union.  Ex. 6, Fuel and Energy Cooperation Treaty, preamble, art. 7.

The Ukrtatnafta Treaty was also concluded pursuant to Ukrainian and Tatar presidential decrees aimed at protecting State economic interests.  The Decree of the President of Ukraine No. 704/94 on the creation of Ukrtatnafta of November 29, 1994, was aimed at "provid[ing] for the economic interests of Ukraine and [] satisfy[ing] the needs of consumers of fuel and energy resources."  Kostyska Decl., Ex. 7, Decree of the President of Ukraine No. 704/94 of Nov. 29, 1994, preamble, art. 1.  The mirror-image Decree of the President of the Republic of Tatarstan No. UP-883 on the creation of Ukrtatnafta of December 13, 1994, was likewise was adopted for "effective use of the oil development and subsoil potential as well as guaranteeing economic interests of the Republic of Tatarstan and its commercial companies, strengthening the cooperation between companies and state organs of Ukraine and Tatarstan."  Kostytska Decl., Ex. 8, Decree of the President of the Republic of Tatarstan No. UP-883 of Dec. 13, 1994, preamble, art. 1.

The interstate joint venture Ukrtatnafta was created on a parity basis between the Ukrainian and Tatar shareholders.  Kostytska Decl., Ex. 5, Ukrtatnafta Treaty, art. 1.  The object and purpose

of Ukrtatnafta were to ensure continued supply of large quantities of oil from Tatarstan for refining in Ukraine: "equal to or greater than 8 million tons per annum starting in 1996, including up to 4 million tons of oil in 1995." Kostytska Decl., Ex. 5, Ukrtatnafta Treaty, art. 4.

### C. Contributions to Ukrtatnafta

On the Ukrainian side, Ukraine was required to contribute the Kremenchug refinery in exchange for its 49.986% stake in Ukrtatnafta, which it did. Kostytska Decl., Ex. 9, Agreement on the Creation and Activity of Ukrtatnafta of July 27, 1995, art. 5.2.

On the Tatar side, Tatarstan was required to contribute 25 oil deposits in Tatarstan valued at USD 267.61 million in exchange for its 29.734% stake in Ukrtatnafta. Tatneft was required to contribute fixtures for oil extraction from those 25 oil deposits valued at USD 180.90 million in exchange for its 20.01% stake in Ukrtatnafta. Kostytska Decl., Ex. 9, Agreement on the Creation and Activity of Ukrtatnafta of July 27, 1995, arts. 5.2 and 5.3.

These capital contributions were supposed to be made within 30 days of the registration of Ukrtatnafta. Kostytska Decl., Ex. 9, Agreement on the Creation and Activity of Ukrtatnafta of July 27, 1995, art. 5.5. While Ukraine contributed the Kremenchug refinery in the aftermath of the creation of Ukrtatnafta, the Tatar shareholders failed to make any capital contributions for four to five years.

Tatneft never contributed the promised oil fixtures for oil extraction. Three years later, on June 1, 1998, Zenith Bank contributed USD 30 million in cash instead of Tatneft, temporarily becoming a shareholder en lieu of Tatneft. Kostytska Decl., Ex. 10, Minutes No. 6 of Ukrtatnafta General Meeting of Shareholders of May 23, 2000. Five years later, on August 14, 2000, Tatneft itself contributed USD 1 million in cash. Kostytska Decl., Ex. 11, Statements of Personal Account of Aug. 11 and 14, 2000. As a result of Tatneft's reduced substitute contribution of USD 31 million

in cash, its shareholding interest dropped to 8.613%.  Kostytska Decl., Ex. 12, Minutes No. 7 of Ukrtatnafta General Meeting of Shareholders of Aug. 29, 2000.

Tatarstan never contributed the promised 25 oil deposits in Tatarstan.  Four years later, Tatarstan contributed 73.92% of the shares of Tatnefteprom, a wholly State-owned company, valued at USD 103 million.  Initially, Tatnefteprom was supposed to be a Tatar minority 0.08% *shareholder* alongside Tatarstan and Tatneft.  Eventually, Tatnefteprom ended up being Tatarstan's *contribution* due to Tatarstan's failure to contribute the promised oil fields.  Even the substitute contribution was the subject of controversy due to the Tatnefteprom shares' being overvalued.

The Tatar shareholders' failure to make their timely contributions into the charter capital[4] of Ukrtatnafta and the resulting shortage of capital paved the way for the entry of obscure minority shareholders.  On June 1, 1999, while Tatneft was still "in the process of completing formal procedures relating to the payment of its shares in the charter capital of ZAO Ukrtatnafta," obscure companies, Amruz, incorporated in Switzerland, and Seagroup, incorporated in the United States, entered the shareholding of Ukrtatnafta and acquired a combined 18.296% stake therein. Kostytska Decl., Ex. 14, Minutes No. 5 of Ukrtatnafta General Meeting of Shareholders of July 27, 1999, ¶ 2.5; Ex. 15, Seagroup Sale and Purchase Contract of June 1, 1999; Ex. 16, Amruz Sale and Purchase Contract of June 1, 1999.  Amruz acquired 8.336% of the shares of Ukrtatnafta worth USD 30 million, and Seagroup acquired 9.96% worth approximately USD 36 million.  Contrary to the Ukrainian legislation, these companies "paid" for their shares in the interstate economic project Ukrtatnafta with promissory notes.  Amruz ended up redeeming only one out of 30

---

[4] The terms "charter capital" or "charter fund" or "statutory fund" (in Ukrainian, *статутний фонд*; in Russian, *уставный капитал*) are used interchangeably; they mean capital contributed by the company founders at the time of the company creation.

promissory notes to Ukrtatnafta; Seagroup ended up redeeming only two out of 36 promissory notes.  Ukrtatnafta subsequently ended up selling the remaining promissory notes at a loss. Kostytska Decl., Ex. 17, Chief Control and Audit Office of Ukraine memorandum of Nov. 28, 2006, pp. 2-3.

Upon the entry of Amruz and Seagroup into the shareholding of Ukrtatnafta, they formed the Tatar shareholder block and voting alliance with Tatarstan and Tatneft.  Kostytska Decl., Ex. 18, Tatneft Answer on Jurisdiction, ¶ 121.  To this day, Ukraine does not know who the ultimate beneficiaries of Amruz and Seagroup are.  According to press reports, behind Amruz and Seagroup are/were Tatneft high-level business executives.  Kostytska Decl., Ex. 19, *Who Led Ukrtatnafta to Bankruptcy*, DNI RU, Nov. 9, 2007.

### D.    Litigation Surrounding the Shareholding in Ukrtatnafta

The legality of the acquisition of the shares in Ukrtatnafta by Tatneft, Amruz and Seagroup was litigated in Ukrainian courts.

### 1.    Litigation regarding Amruz's and Seagroup's shares in Ukrtatnafta

The litigation challenging the acquisition of Ukrtatnafta shares by Amruz and Seagroup started as early as August 2001, when the State Property Fund of Ukraine brought a claim before the Kyiv Economic Court to annul the share purchase agreements with Amruz and Seagroup.  On November 28, 2001, the Kyiv Economic Court decided that the payment for the shares with promissory notes was contrary to the Ukrainian Companies Law and annulled the share purchase agreements with Amruz and Seagroup.  On May 29, 2002, the Supreme Economic Court reversed. Kostytska Decl., Ex. 20, Decision of the Higher Economic Court of Ukraine, Case No. 28/199 of May 29, 2002; Ex. 21, Decision of the Higher Economic Court of Ukraine, Case No. 28/198 of May 29, 2002.  On July 18, 2002, the Supreme Court of Ukraine declined to review.  Kostytska

Decl., Ex. 22, Decision of the Supreme Court of Ukraine of July 18, 2002, Seagroup Case; Ex. 23, Decision of the Supreme Court of Ukraine of July 18, 2002, Amruz Case.

The second wave of litigation challenging the acquisition of the Ukrtatnafta shares by Amruz and Seagroup started in September 2002, when the General Prosecutor's Office of Ukraine filed a claim before the Economic Court of the Poltava Region to declare null and void the provision of the Ukrtatnafta Agreement that authorized the payment for the shares with promissory notes.  On November 12, 2002, the Economic Court of the Poltava Region dismissed the claim. Kostytska Decl., Ex. 24, Decision of Poltava Region Economic Court of Nov. 12, 2002.

The third wave of litigation started in 2007, when the Ministry for Fuel and Energy of Ukraine filed a claim against Amruz and Seagroup and others to invalidate the Ukrtatnafta share purchase agreements.  On May 22, 2007, the Dnepropetrovsk City Court granted provisional measures and ordered Amruz and Seagroup to transfer their shares in Ukrtatnafta to Naftogaz. Kostytska Decl., Ex. 25, Decision of Dnepropetrovsk City Court.

Moreover, in July 2007, the General Prosecutor's Office of Ukraine filed a claim with the Kyiv Economic Court to annul the share purchase agreements with Amruz and Seagroup.  On September 17, 2007, the Kyiv Economic Court granted the requested relief.  Kostytska Decl., Ex. 26, Decision of the Kyiv Economic Court, Case No. 25/331 of Sept. 17, 2007;  Ex. 27, Decision of the Kyiv Economic Court, Case No. 25/330 of Sept. 17, 2007.

The litigation continued past December 2007, after Tatneft acquired the shares of Amruz and Seagroup (*see* E, *infra*).  Kostytska Decl., Ex. 18, Tatneft Answer on Jurisdiction, ¶ 132.  The Ukrainian courts at the highest levels confirmed the invalidity of the share purchase agreements with Amruz and Seagroup and ordered the return of the shares to Ukrtatnafta.

### 2.      Litigation regarding Tatneft's shares in Ukrtatnafta

In December 2007, the General Prosecutor's Office of Ukraine filed a claim with the Kiev Economic Court to annul the shareholders' resolutions that amended the form of Tatneft's contribution from oil fixtures to cash.   On September 4, 2008, the court granted the requested relief.  Kostytska Decl., Ex. 28, Decision of the Economic Court of Kyiv, Case No. 32/1 of Sept. 4, 2008.  This decision was affirmed by the Kyiv Economic Appeal Court on May 14, 2009 and by the Supreme Economic Court on August 20, 2009.  Kostytska Decl., Ex. 29, Decision of the Economic Court of Appeal, Case No. 32/1 of May 14, 2009; Ex. 30, Decision of the Higher Economic Court, Case No. 32/1 of Aug. 20, 2009.  On October 27, 2009, the Supreme Court of Ukraine declined to review.  Kostytska Decl., Ex. 31, Decision of the Supreme Court of Ukraine, Case No. 32/1 of Oct. 27, 2009.   In parallel, in August 2009, Ukrtatnafta also brought a claim against Tatneft for declaration of invalidity of the Tatneft's acquisition of the shares in Ukrtatnafta. On November 3, 2009, the Economic Court of the Poltava Region declared its invalidity. Kostytska Decl., Ex. 32, Decision of Economic Court of Poltava Region of Nov. 3, 2009.

### E.      Tatneft's Simultaneous Acquisition of the Shares of Amruz and Seagroup and Notification of the Investment Dispute to Ukraine

In December 2007, in the midst of the litigation battle surrounding the legality of the acquisition of Amruz's and Seagroup's shares in Ukrtatnafta, Tatneft nevertheless acquired their shares for the purpose of bringing damages claims against Ukraine in BIT arbitration.

During the month of November 2007 preceding the acquisition, Tatneft's Head of Department of Strategic Planning told the press that "Tatneft plans to submit claims *on behalf of* foreign minoritaries [*sic*] of the joint-stock company 'Ukrtatnafta' – Amruz Trading and Seagroup International."  Kostytska Decl., Ex. 33, *Tatneft Plans to Submit Claims on Behalf of Russian and Foreign Shareholders*, NEWS SERVICE, Nov. 13, 2007 (emphasis added).

8

In December 2007, Tatneft acquired 100% of the shares of Seagroup for USD 57.1 million, and 49.6% of the shares of in Amruz for USD $23.9 million, plus an option to purchase the remaining 49.1% of the shares in Amruz for $23.7 million (which was accounted for by Tatneft under the equity method, as if the remaining shares had already been acquired).  Kostytska Decl., Ex. 18, Tatneft Answer on Jurisdiction, ¶ 75; Ex. 34, Tatneft's Consolidated Financial Statements for the Years Ending Dec. 31, 2007 and 2008, at 14.  The handsome price that Tatneft paid for the shares of Amruz and Seagroup, embroiled in litigation in Ukraine, raises questions as to whether this was an arm's-length transaction.

During the same month of December 2007, Tatneft simultaneously notified Ukraine of the existence of an investment dispute under the Ukraine-Russia BIT.  Thus, on December 11, 2007, Tatneft sent to Ukraine a notice of investment dispute relating to its shareholding in Ukrtatnafta.  Kostytska Decl., Ex. 35, Tatneft Notice of Dispute of Dec. 11, 2007.  In the notice of dispute, Tatneft complained not only about "significant limitation of its shareholder rights" in Ukrtatnafta, but also about "the detriment of the interests of the [other] foreign investors" in Ukrtatnafta, particularly Amruz and Seagroup.  Kostytska Decl., Ex. 35, Tatneft Notice of Dispute of Dec. 11, 2007, at 1-2.  In particular, Tatneft complained that Ukrainian courts ordered the transfer of the shares of Amruz and Seagroup in Ukrtatnafta to the Ukrainian shareholder, Naftogaz, as a result of which Naftogaz took "full possession and control of these shares, including their voting rights." Kostytska Decl., Ex. 35, Tatneft Notice of Dispute of Dec. 11, 2007, at 2.

On June 10-11, 2008, Seagroup and Amruz sent to Ukraine their own notices of investment disputes relating to their stakes in Ukrtatnafta, under the Ukraine-United States BIT and the Energy Charter Treaty, respectively.  Kostytska Decl., Ex. 36, Amruz Notice of Dispute of June 11, 2008, and Ex. 37, Seagroup Notice of Dispute of June 10, 2008.  Seagroup and Amruz both complained

about the deprivation of their shares in Ukrtatnafta.  Kostytska Decl., Ex. 36, Amruz Notice of Dispute of June 11, 2008, at 2 and Ex. 37, Seagroup Notice of Dispute of June 10, 2008, at 1.  It is curious that Amruz and Seagroup filed their own notices of dispute in June 2008, six months after being acquired by Tatneft in December 2007, and seven months after Tatneft's announcement that it would bring claims on their behalf in November 2007.

       **F.**    **The BIT Arbitration**

Tatneft alone commenced an arbitration against Ukraine under the Ukraine-Russia BIT, claiming damages for the loss of *its* shareholding in Ukrtatnafta, as well as for the loss of Amruz's and Seagroup's shareholdings in Ukrtatnafta, which Tatneft had acquired the purpose of asserting damages claims against Ukraine.

As stated on page 2 of the Motion to Stay, the Arbitral Tribunal rendered the Merits Award holding Ukraine liable for violation of the "fair and equitable treatment" standard and ordering it to pay damages to Tatneft in the amount of $112 million plus interest. Dkt. 1, Ex. 6 ¶ 642.  The Arbitral Tribunal held Ukraine liable for violation of one provision and one provision only, which cannot be found anywhere in the Ukraine-Russia BIT and which the Contracting Parties to the BIT have deliberately excluded from their bilateral relations.  The Arbitral Tribunal dismissed all other claims based on the provisions actually included in the Ukraine-Russia BIT, including "expropriation" and "complete and unconditional legal protection" claims.  Most of the damages that the Arbitral Tribunal awarded to Tatneft—$81 million out of $112 million, or 72%—was on account of the shares in Ukrtatnafta that Tatneft acquired in bad faith from Amruz and Seagroup after the dispute with Ukraine had already arisen and with an improper motive of inflating its damages claim against Ukraine.  Only a small fraction of the damages awarded by the Arbitral Tribunal—$31 million out of $112 million, or 28% —was on account of the shares that Tatneft had actually held in Ukrtatnafta.

G.     **The French Setting-Aside Proceeding**

As mentioned in on page 4 of the Motion to Stay, the Merits Award and as well as the Jurisdictional Award are currently being challenged at the seat of arbitration in Paris, France.

## ARGUMENT

A.     **This Court Lacks Subject Matter Jurisdiction Under Section 1605(a)(6) of the FSIA**

It is axiomatic that "'[f]ederal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994)).  The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state" in the United States. *Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 434 (1989).  Indeed, the D.C. Circuit has explained that the FSIA is the "only . . . way for a court to obtain jurisdiction over a foreign state and it is not a particularly generous one."  *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005); *see also Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16, 34-35 (D.D.C. 2007).

The FSIA provides that foreign sovereigns are "presumptively immune from suit unless a specific exception applies."  *Permanent Mission of India to the United Nations v. City of N.Y.*, 551 U.S. 193, 197 (2007) (citing 28 U.S.C.A. § 1604); *see Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) ("a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state.").  Because "subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions . . . [a]t the threshold of every action in a District Court against a foreign state . . . the court must satisfy itself that one of the exceptions applies." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493-94 (1983).

The exceptions to sovereign immunity are "narrowly drawn." *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012); *see Haven v. Polska*, 215 F.3d 727, 731 (7th Cir. 2000) (noting that exception to foreign sovereign immunity "are narrowly construed"); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88 (D.C. Cir. 2002) (stating the FSIA's exceptions are "discrete and limited"); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010) (stating the FSIA "creates narrow exceptions" to sovereign immunity).

As this Court confirmed recently in the *Stati v. Republic of Kazakhstan* recognition and enforcement proceeding under the Federal Arbitration Act ("FAA") and the FSIA, "Under Federal Rules of Civil Procedure 12(b)(1), petitioner bears the burden of establishing jurisdiction by a preponderance of the evidence." *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 184 (D.D.C. 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing the[] elements.") and *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 1992)); *see also Nader v. The Democratic Nat'l Comm.*, 555 F. Supp. 2d 137, 146 (D.D.C. 2008), *aff'd*, 567 F.3d 692 (D.C. Cir. 2009) ("On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject-matter jurisdiction."); *Edmonds v. United States*, 436 F. Supp. 2d 28, 33 (D.D.C. 2006) (same).

Petitioner asserts that Respondent is not immune from the jurisdiction of this Court because the "arbitration exception" in Section 1605(a)(6) of the FSIA applies.  Dkt. 1 at 2.  Section 1605(a)(6) of the FSIA provides that "a foreign State shall not be immune from the jurisdiction of courts of the United States" where:

> the action is brought, either to enforce *an agreement made by the foreign state with or for the benefit of a **private party*** to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship,

> whether contractual or not, concerning a subject matter capable of
> settlement by arbitration under the laws of the United States, or *to
> confirm an award made **pursuant to** such an agreement to arbitrate*,
> if . . . the agreement or award is or may be *governed by a treaty or
> other international agreement in force for the United States calling
> for the recognition and enforcement of arbitral awards*[.]

28 U.S.C. § 1605(a)(6) (emphasis added).

The plain language of Section 1605(a)(6) makes clear that the "arbitration exception" applies *only* if the following elements are met:  (1) there was an "agreement made by a foreign state with or for the benefit of a ***private party*** to submit to arbitration"; and (2) the arbitral award was "made ***pursuant to*** such an agreement to arbitrate."  28 U.S.C. § 1605(a)(6) (emphasis added).  *A contrario*, if these elements are not met, this Court thus cannot assert subject matter jurisdiction over Ukraine.

In this case, the "arbitration exception" does not apply because:  (1) Tatneft is not a "*private party*"; and (2) the arbitral award was not made "*pursuant to*" any agreement to arbitrate, but rather *contrary to* such agreement to arbitrate.

### 1. The "arbitration exception" does not apply because Tatneft is not a "private party"

The "arbitration exception" does not apply because Tatneft is not a "*private party*," but rather a State-controlled entity subject to the pervasive control of Republic of Tatarstan.  Moreover, Tatneft was Tatarstan's *alter ego* in the Ukrtatnafta project out of which the underlying dispute arose.

*This issue is of first impression in this district*.  This Court has never been seized by a State-controlled entity posing as a "private party" and seeking to recognize and enforce a BIT arbitral award under the FSIA and the New York Convention.

The Congressional intent behind the "arbitration exception" was to enable "*private parties*" to resolve disputes with foreign States, and particularly to give effect to the agreements to arbitrate

13

and to the arbitral awards rendered pursuant to such agreements to arbitrate in the United States.

Congress did not intend to accord such protections to States and State entities, which are able to

resolve disputes with other States at the diplomatic level.  As confirmed by the State Department,

"The arbitration provisions would strengthen an increasingly favored method of dealing with

international commercial disputes between *private enterprises* and foreign states."  Testimony of

Elizabeth G. Verville, Department of State, H.R. 1149, 100th Cong. 1st Sess., May 28, 1987, at 25-

26 (emphasis added).   As further noted by the State Department, the FSIA was "principally

designed to make the foreign sovereign suable by *private parties* in domestic courts[.]"   *Id.*

(emphasis added).  More generally, the overall purpose of the FSIA was to assist "*private parties*"

who have no power to resolve their disputes with foreign States at the diplomatic level.  *See* H.R.

Rep. 94-1487, 9, 1976 U.S.C.C.A.N. 6604, 6607.  *A contrario*, the FSIA was not intended to turn

U.S. courts into a forum for resolving disputes between foreign States and State entities.

In this case, Tatneft is not the kind of party that is entitled to sue Ukraine in U.S. courts

under Section 1605(a)(6) of the FSIA, as explained below.

### a.   Tatneft is a State-controlled entity

Tatneft is not a "private party" because the Republic of Tatarstan:  (i) owns/controls the

stock[5] of Tatneft; (ii) controls the decision-making of Tatneft; (iii) uses Tatneft to fulfill its

budgetary needs; and (iv) appointed Tatneft as its agent in the interstate project Ukrtatnafta project

established by inter-governmental treaty and presidential decrees, out of which the dispute arose.

Tatneft's own admission to the SEC says it all:

> Through its indirect participation in Tatneft, its legislative, taxation
> and regulatory powers, and also through significant informal
> pressures, the Tatarstan government is able to exercise considerable
> influence over us.  The Tatarstan government has used its influence

---

[5] The terms "shares" and "stocks" are used interchangeably without regard for the distinctions drawn between the two by Russian corporate law.

> in the past to mandate oil sales and to cause us to raise capital for
> the benefit of Tatarstan or to pay the debts of Tatarstan when
> independently we may not have entered into such transactions. . . .
> The Tatarstan government has the power to exercise significant
> influence over our operations. . . . We may face pressures from the
> Tatarstan government to engage in certain business practices that we
> may not have independently chosen and that may not maximize
> shareholder value. . . . We have experienced liquidity problems in
> the past and could experience them in the future. . . . The Russian
> and Tatarstan governments can mandate deliveries of crude oil and
> refined products at less than market prices, adversely affecting our
> revenue and relationships with other customers.

Kostytska Decl., Ex. 38, SEC Submission of Nov. 10, 2006, at 85.

### i.  Tatarstan owns/controls the stock of Tatneft

Based on available information, the Republic of Tatarstan owns between 26.14% and 30%

of the shares of Tatneft through a joint stock company called Svyazinvestneftekhim.  Kostytska

Decl., Ex. 39, Spark Report.  Svyazinvestneftekhim, in turn, is wholly owned by the Republic of

Tatarstan.  *Id*.; Ex. 40, Directors' Report for the Year Ended 31 Dec. 2016 at 29.

While more information is needed to uncover the depths of the government's shareholding

control of Tatneft, the available information indicates that the Republic of Tatarstan may indirectly

own nearly all of shares of Tatneft through obscure intermediary companies.  For example,

according to Tatneft's submission to the United States Securities and Exchange Commission

("SEC") in 2006, "Tatarstan continues to own, directly or indirectly, controlling or substantial

minority stakes in or to exercise significant influence over operations of virtually all of the major

enterprises in Tatarstan[.]"  Kostytska Decl., Ex. 38, SEC Submission of Nov. 10, 2006, at 85.

Tatneft was not an exception.  Moreover, according to a Standard & Poor's report on

"Transparency and Disclosure by Russian State-Owned Enterprises" of 2005, "obscure

intermediary vehicles are used for the control by regional authorities in Tatneft."  Kostytska Decl.,

Ex. 41, Standard & Poor's Report, at 8.  This limited data comes against the backdrop of "Russian

state-controlled companies provid[ing] much less information on the existing private minority stakes than their foreign peers, and also disclos[ing] less information on governance mechanisms and shareholder rights." *Id*. at 8.

It is no secret that the Republic of Tatarstan owns the "golden share" in Tatneft, which gives it significant influence over the company through: the appointment of one member of the Board of Directors (*de facto*, the Chairman of the Board of Directors) and one representative to the Supervisory board; veto power over important company decisions, such as amendments to by-laws, restructuring and liquidation of the company, modification of share capital, all major transactions and transactions with affiliated parties; and the right to convene extraordinary shareholders meetings. Kostytska Decl., Ex. 38, SEC Submission of Nov. 10, 2006, at 84; Ex. 40, Directors' Report for the Year Ended 31 Dec. 2016 at 30, 32; Ex. 42, Federal Law of the Russian Federation on Privatization, art. 38. According to Tatneft's recent Directors' Report:

> Due to Svyazinvestneftekhim's current ownership of ordinary shares and its rights under the Golden Share, Tatarstan may elect members of the Board and influence our current and future operations, including decisions regarding acquisitions and other business opportunities, declaration of dividends and issuance of additional shares and other securities even without recourse to the Golden Share.

Kostytska Decl., Ex. 40, Directors' Report for the Year Ended 31 Dec. 2016 at 30.

### ii.    Tatarstan controls the decision-making of Tatneft

The Government of the Republic of Tatarstan controls the decision-making of Tatneft by holding key positions on Tatneft's Board of Directors and Supervisory Board. Tatneft's website shows that the Chairman of the Board of Directors of Tatneft is Mr. Rustam Minnikhanov, the President of the Republic of Tatarstan and the former Prime Minister of the Republic of Tatarstan in 1998-2010. Tatneft's Board of Directors also includes a variety of other high-level government officials, such as the Minister of Finance of the Republic of Tatarstan, the Adviser to President of

the Republic of Tatarstan on Development of Crude Oil and Gas Fields, the Assistant to the President of the Republic of Tatarstan, the Minister of Land and Property Relations of the Republic of Tatarstan, a Consultant to the President of the Republic of Tatarstan, and the Director of the Agency for State Debt Management of the Republic of Tatarstan.  Kostytska Decl., Ex. 43, Board of Directors; Ex. 40, Directors' Report for the Year Ended 31 Dec. 2016 at 35.

Aside from Tatarstan's control of the Board of Directors, it is open to question whether some Tatneft's decision-making is done through a governmental directive instead of a Board deliberation.  In that respect, a Standard & Poor's report found that "[t]here is no evidence that some of Tatneft's major investment decisions, such as an unsuccessful bid to buy Turkey's oil refiner Tupras at $650 million by its affiliate trader Efremov Kautchuk GmbH (although the affiliation was never disclosed by Tatneft), ever were considered by the company's board." Kostytska Decl., Ex. 41, Standard & Poor's Report at 13.

### iii.    Tatarstan uses Tatneft to fulfill its budgetary needs

The Republic of Tatarstan uses Tatneft to fulfill its budgetary needs.  In particular, Tatarstan goes through Tatneft to obtain bank loans for its own use.  According to a Standard and Poor's report, "Tatneft itself admitted some of its loans in 1997 and 1998 were raised for the Tatarstan government, leading to Tatneft's default (with the debt subsequently restructured). Industry analysts have been left to speculate regarding whether some of Tatneft's borrowings since 2000 have been made for the Tatarstan government, rather than for corporate purposes."  Kostytska *Id*.

According to news reports, in 1998, the government of Tatarstan borrowed $230 million from Chase and Credit Suisse through Tatneft, using Tatneft's expert revenues as collateral. Kostytska Decl., Ex. 44, *Tatarstan Got $230 Mln Through Tatneft Loans*, THE RUSSIA JOURNAL, Sept. 12, 1999.  According to the press article:

> The transactions have left Tatneft – Russia's fifth largest oil company – teetering on the brink of insolvency. . . .   The government of Tatarstan still owes Tatneft approximately $200 million . . . but the company will not receive it in cash.   Instead, as Tatneft makes loan payments to its creditors it deducts that amount from its tax bill to Tatarstan crimping the company's cash flow but ensuring that the government doesn't default . . . . In effect, Tatarstan borrowed the money from Chase and Credit Suisse using Tatneft and its export revenues as collateral.   On its own, bankers would have seen the government as too high a risk, but Tatneft, with proven oil reserves and guaranteed hard currency income, seemed safer.

*Id.*

Moreover, the Government of Tatarstan uses Tatneft to finance its public and social policies that have no connection to the oil industry.   As Tatneft's SEC submission acknowledges:

> In 2003, at the request of the Tatarstan government, we [Tatneft] purchased a promissory note due in 2022 in the amount of RR1.I97 million issued by Nedoimka, a unitary company controlled by the government of Tatarstan.   Nedoimka used the proceeds of this transaction to finance social expenditures planned under Tatarstan's budget.   We believed that this promissory note was not recoverable. Consequently, we wrote off the promissory note in fiscal year 2003, resulting in a charge to operations of RRl,197 million.

Kostytska Decl., Ex. 38, SEC Submission of Nov. 10, 2006, at 86.   As Tatneft's SEC submission details, "In January 2004, at the request of the Tatarstan government, we [Tatneft] purchased interest-free promissory notes due in 2004 in the amount of RR960 million from Tatgospostavki, a unitary company controlled by the government of Tatarstan.   Tatgospostavki used the proceeds of this transaction to finance social expenditures planned under Tatarstan's budget."   *Id.*

Moreover, the Republic of Tatarstan also uses Tatneft to guarantee the obligations of the State and other State-owned/controlled companies.   According to Tatneft's SEC submission, "[i]n the mid-1990s, we [Tatneft] informally agreed with the Tatarstan government that we would use up to 50% of our export receivables to secure loans for the benefit of the Tatarstan government."

Kostytska Decl., Ex. 38, SEC Submission of Nov. 10, 2006, at 85.  Tatneft went on to explain that "[i]n 1998, we [Tatneft] entered into a guarantee agreement for a U.S.$50 million loan made by Société Générale to TAIF, which was previously partly owned by the Tatarstan government. Under the terms of the guarantee, we agreed to meet all of TAIF's obligations under the loan agreement.  As a result of TAIF's failure to repay the loan in full, we became liable for paying U.S.$19 million to Société Générale.  This obligation was restructured under the terms of the Restructuring Agreement."  *Id.*

In exchange, Tatneft enjoys special economic benefits granted to it by the Republic of Tatarstan.  These benefits include Tatneft not having to pay the mineral extraction tax and getting a reduced export duty for extended periods.  Kostytska Decl., Ex. 46, *Tatneft to Continue Project to Expand Bituminous Oil Production*, NEWSROOM, April 4, 2016.

### b.    Tatneft was Tatarstan's agent in Ukrtatnafta

Evidence shows that the Republic of Tatarstan appointed Tatneft as its agent in Ukrtatnafta, the interstate economic project giving rise to the underlying dispute.  Evidence also shows that Tatneft participated in Ukrtatnafta pursuant to the instructions and directives of the Republic of Tatarstan.

Pursuant to Article 7 of the Ukrtatnafta Treaty, the Cabinet of Ministers of Tatarstan appointed Tatneft to represent Tatarstan in the Supervisory Board of Ukrtatnafta, together with the Vice Prime Minister of Tatarstan, a representative of the Ministry of Finance and other important governmental officials.  Kostytska Decl., Ex. 5, Ukrtatnafta Treaty, art. 7.

Moreover, Tatarstan specifically appointed Tatneft to hold Tatarstan's shares in Ukrtatnafta in "fiduciary management."  Tatneft voted at the Ukrtatnafta General Shareholders' Meetings and proposed candidates for appointment to the Ukrtatnafta Board of Directors and

Supervisory Board for the shares of the Tatarstan government, which it held in fiduciary management.  Kostytska Decl., Ex. 38, SEC Submission of Nov. 10, 2006, at 58.

According to Tatneft's admission, "As of October 2006, the Ministry of Property granted to Tatneft's Director General, Mr. Takhautdinov, wide powers of attorney with respect to Tatarstan's Ministry of Property's 28.778% stake in Ukrtatnafta.  That power of attorney includes the right to participate and vote the Ministry of Property's shares in ordinary and extraordinary shareholders meetings, to take decisions concerning the items discussed at the corporate meetings and to participate in the management of Ukrtatnafta."  Kostytska Decl., Ex. 18, Tatneft Answer on Jurisdiction, ¶ 120.

Tatneft and Tatarstan had a unity of interest in the Tatar shareholding in Ukrtatnafta.  According to its own admission, "Tatneft is also a leading member among shareholders allied in interest . . . , which include the Ministry of Property [of the Republic of Tatarstan], AmRuz and Seagroup, who, in aggregate, hold 55.7% of Ukrtatnafta's shares."  *Id.* ¶ 121.

* * * * *

In light of the foregoing evidence, Tatneft is not a "private party"—neither in the abstract nor for purposes of Section 1605(a)(5) of the FSIA.  Therefore, the "arbitration exception" does not apply and Ukraine enjoys sovereign immunity from the jurisdiction of this Court in this recognition and enforcement proceeding.  Thus, the case should be dismissed for lack of subject matter jurisdiction under the FSIA.

### c.    "Piercing the corporate veil" is not required, but would be warranted under the facts of this case

To demonstrate that Tatneft is not a "*private party*" pursuant to Section 1605(a)(6) of the FSIA, it is not necessary to pierce the corporate veil or find that that Tatneft is Tatarstan's alter ego—in the abstract or for purposes of the Ukrtatnafta project giving rise to the dispute.  All that

is necessary is to demonstrate that Tatneft is not a "private" party, but rather a "public" or "State" party.  Nevertheless, Tatneft meets the common law criteria for piercing the corporate veil and for being considered as Tatarstan's alter ego.  And where, as here, Tatneft is Tatarstan's *alter ego*, Tatneft certainly is not a "private party" in the meaning of Section 1605(a)(6) of the FSIA.

In *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347 (5th Cir. 2003), the Fifth Circuit set forth the criteria for determining whether Turkmenneft, an oil company owned and controlled by the Government of Turkmenistan was the Government's alter ego, for the purpose of determining whether an arbitral award rendered pursuant to an agreement to arbitrate with Turkmenneft could be enforced against the Government of Turkmenistan:  "(1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 359 (5th Cir. 2003).  For the first prong—control—the court set forth the following criteria:

> (1) the parent and subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operated with grossly inadequate capital; (8) the parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) the subsidiary does not observe corporate formalities.

*Bridas*, 447 F.3d 411, 415 (5th Cir. 2003).  It also endorsed further criteria relevant in the context of State-owned enterprises:

> (1) whether the directors of the 'subsidiary' act in the primary and independent interest of the 'parent'; (2) whether others pay or guarantee debts of the dominated corporation; and (3) whether the

alleged dominator deals with the dominated corporation at arm's
length.

*Id*. at 420.

As for the second prong—fraud or wrong—the court noted that it is satisfied by evidence

of "misuse of corporate form."  *Id*. at 417.

By application of these criteria, the Fifth Circuit concluded that Turkmenneft was the alter

ego of Turkmenistan, finding, *inter alia*:

> The Government caused the incorporation of Turkmenneft and there
> was some identity between high-ranking Government and
> Turkmenneft officials.  Further, Government officials attended the
> JVA's board meetings. . . [T]he Government used its sovereign
> powers to force Bridas [a foreign company] a financial advantage
> which would ultimately benefit the Government. . . .  [T]he
> Government did not really deal with Turmenneft at arm's length. . . .
> [T]he Government created Turkmenneft as the Turkmenisan [sic]
> Party's successor, Turkmenneft was grossly undercapitalized with
> . . . a paltry sum to finance oil and gas exploration and production
> . . . Turkmenneft's revenues were diverted to a State Oil and Gas
> Fund that also collected revenues from other state-owned entities.

*Id*. at 420.

As in *Bridas*, the Tatarstan State-owned oil company Tatneft is as much the Government's

alter ego as the Turkmenistan State-owned oil company Turkmenneft—located 1,200 miles apart

but equally connected to its Government.

The *first* "control" prong is satisfied because, *inter alia*, Tatneft was created by a USSR

government resolution of which Tatarstan was part; Tatneft's was later "incorporated" by

Tatarstan; Tatarstan now owns Tatneft's shares, including the "golden share"; a large number of

Tatneft directors are either current or former high-ranking governmental officials; Tatarstan and

Tatneft have common decision-makers; Tatarstan finances Tatneft by providing it with special tax

exemptions, while Tatneft finances Tatarstan's public and social projects and guarantees its and

other State-owned companies' debts; the main business of Tatneft is oil development in the fields owned by Tatarstan.

The *second* "fraud or wrong" prong is satisfied, not only at the stage of the underlying dispute arising out of Ukrtatnafta, but also at the present recognition and enforcement proceeding. In the Ukrtatnafta project, Ukraine suffered injustice as a result of Tatneft's being Tatarstan's alter-ego. Being Tatarstan's alter ego enabled Tatneft to use State power to remain in the Ukrtatnafta project, despite its failure to make a timely contribution needed to ensure the financial viability of Ukrtatnafta. Tatneft's special status made it practically impossible for the Ukrainian shareholders to force Tatneft to make the promised timely contribution of oil fixtures or to expel it from the joint venture for failure to do so—as it was done with other minority shareholders that joined Ukrtatnafta sometime later. Kostytska Decl., Ex. 47, Minutes No. 2 of Ukrtatnafta General Meeting of Shareholders of July 19, 1997, point 2. The Ukrainian shareholders, who contributed the Kremenchug refinery, suffered injustice as a result of the Tatar shareholders' undercapitalization of Ukrtatnafta, which paved the way for the entry of obscure minority shareholders to aid the capitalization of Ukrtatnafta. *See* 8, *supra*.

Now Ukraine continues to suffer injustice as a result of Tatneft's posing as a "private party" before this Court and trying to strip Ukraine of its sovereign immunity from suit in the United States. Had Tatneft shown its true face to this Court, it would not have been able to come anywhere near this courthouse and sue Ukraine under the FSIA.

* * * * *

The available evidence shows that Tatneft is not a "private party" but rather Tatarstan's alter ego, and accordingly, the "arbitration exception" does not apply and the case should be dismissed for lack of subject matter jurisdiction under the FSIA. If any doubt remains as to

Tatneft's status upon consideration of Tatneft's Petition and Ukraine's Motion to Dismiss, Ukraine requests leave of Court to seek limited jurisdictional discovery from Tatneft.  *See* Motion for Leave to Seek Discovery.

> **2.     The "arbitration exception" does not apply because the award was not made "pursuant to" any agreement to arbitrate**

In addition to the FSIA's requirement that an action to confirm an arbitral award be brought by a "*private party*," the arbitral award must also be rendered "*pursuant to*" any agreement to arbitrate.  For two reasons, the arbitral award here fails this requirement.

*First*, the arbitral award that condemned Ukraine for violations of the "fair and equitable treatment" provision, and that provision only, was made *contrary to* the offer to arbitrate, which Russia and Ukraine reciprocally extended to the investors of the other Contracting Party.  Russia and Ukraine deliberately excluded that provision from their BIT and from their bilateral relations.

*Second*, the arbitral award awarded the vast majority of the damages for the shares of Swiss and American companies that are not covered by the offer to arbitrate.  Tatneft fraudulently acquired the shares of Amruz, a Swiss company, and Seagroup, an American company, after the dispute with Ukraine arose and for the sole purpose of increasing its damages claims against Ukraine.

> **a.     An agreement to arbitrate is formed by accepting the State's standing offer to arbitrate on its terms**

To understand whether there was *an agreement to arbitrate* between Ukraine and Tatneft, and whether the Merits Award was made *pursuant to* such agreement, it is necessary to understand how such *agreements to arbitrate* are formed in BIT arbitrations.

Article 9 of the Ukraine-Russian BIT "constitutes a unilateral standing offer" by Ukraine with respect to Russian investors, "an offer to submit to arbitration when certain conditions are met."  *BG Group, PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1217 (2014) (C.J. Roberts,

dissenting).  "An offer must be accepted for a legally binding contract to be formed."  *Id.* at 1217-18 (C.J. Roberts, dissenting).

The unilateral standing offer to arbitrate must be interpreted in accordance with the intent of the Contracting Parties, Ukraine and Russia.  In the words of the U.S. Supreme Court, "a treaty is a contract, though between nations.  Its interpretation normally is, like a contract's interpretation, a matter of *determining the parties' intent*."  *Id.* at 1208 (emphasis added) (internal citations omitted).  The Court must give "the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties."  *Air France v. Saks*, 470 U.S. 392, 399 (1985).  "Treaties must receive a fair interpretation according to the intention of the contracting parties."  *Wright v. Henkel*, 190 U.S. 40, 57 (1903).

The unilateral standing offer to arbitrate must be accepted on its terms, if at all.  "And it is an 'undeniable principle of the law of contracts, that an offer . . . by one person to another, imposes no obligation upon the former, until it is accepted by the latter, *according to the terms in which the offer was made.  Any qualification of, or departure from, those terms, invalidates the offer*."  *BG Group* at 1217-1218 (Roberts dissent) (citing *Eliason v. Henshaw*, 4 Wheat. 225, 228 (1819) (emphasis added)).  "This principle applies to international arbitration agreements just as it does to domestic commercial contracts."  *BG Group* at 1218 (Roberts dissent) (citing international arbitration scholars).

To accept Ukraine's offer to arbitrate qualifying investment claims, qualifying Russian investors accept the offer by filing a notice of arbitration (or request of arbitration).  *Id.* at 1213 (Sotomayor concurring) (describing BITs as "a nation state's standing offer to arbitrate with an amorphous class of private investors.").

### b.  The Merits Award was not made pursuant to the terms of the offer to arbitrate

The "arbitration exception" does not apply because the Merits Award was not made "*pursuant to*" any agreement to arbitrate; rather, it was made *contrary to* the standing offer to arbitrate.

### i.  The "fair and equitable treatment" provision was excluded from the offer to arbitrate

The Merits Award condemned Ukraine of violation of the "fair and equitable treatment" provision, and that provision only, despite that the Contracting Parties deliberately excluded that provision from the offer to arbitrate and from their bilateral relations.  Ukraine and Russia never agreed to reciprocally provide "fair and equitable treatment" to investors from the other Contracting Party.  Because this protection was excluded from the terms of the offer, it could not be accepted by investors.  Accordingly, no agreement to arbitrate "fair and equitable treatment" claims could be formed with investors.  Even if there was an "arbitration agreement" between Ukraine and Tatneft to arbitrate the substantive claims actually set forth in the BIT (such as expropriation, complete and unconditional legal protection)—*quad non*—there was no "arbitration agreement" to arbitrate the fair and equitable treatment claim that was intentionally and deliberately excluded from the BIT.  The Merits Award, which dismissed all substantive claims that were actually set out in the BIT but upheld the one claim that the Contracting Parties intentionally and deliberately excluded from their BIT, was not made *pursuant to* the agreement to arbitrate; it was *contrary to* the agreement to arbitrate.

*This issue is of first impression in this district*.  This Court has never been asked to recognize and enforce an arbitral award rendered pursuant to a provision, and that provision only, that the Contracting Parties to the BIT deliberately excluded from their BIT and from their bilateral relations.

26

It is undisputed that the Ukraine-Russia BIT does not contain the "fair and equitable treatment" clause.  Rather, the Arbitral Tribunal incorporated it from the Ukraine-UK BIT, through the "most-favored-nation" clause contained in the Ukraine-Russia BIT.  Dkt. 1-4, 1-5, 1-6, 1-7, Merits Award ¶¶ 391-413.

Even though most-favored-nation clauses can generally be used to incorporate more favorable clauses from other treaties, such incorporation cannot override the intent of the Contracting Parties.  In other words, the consent of the Contracting Parties limits the types of clauses that can be incorporated.  *See* Kostytska Decl., Ex. 50, *Ambatielos Case (Greece v. UK)* (1963) XII UNRIAA, Award of Mar. 6, 1956, at 105 ("The question [of what kind of clauses can be incorporated through the most-favored-nation clause] can only be determined in accordance with *the intention of the Contracting Parties* as deduced from a reasonable interpretation of the Treaty." (emphasis added)).  In particular, these clauses cannot be used to incorporate provisions that the Contracting Parties have deliberately, wilfully and intentionally excluded from their BIT, their bilateral relations and their political compromise.

Evidence shows that Ukraine and the Russian Federation deliberately, wilfully and intentionally excluded the fair and equitable treatment and full protection and security clauses from their BIT.  Such evidence comes not only in the form of the text of the BIT, but also in the form of the *travaux préparatoires* to the BIT.  The "fair and equitable treatment" clause was *included in the draft BIT* sent by the Ministry of Economy of the Russian Federation to the Embassy of Ukraine in the Russian Federation on September 30, 1997.  Article 3 of the draft BIT entitled "Treatment of investments" guaranteed fair and equitable treatment in paragraph 1:

> Each Contracting Party shall guarantee ***fair and equitable treatment*** to the investments of the investors of the other Contracting Party and investment-related activities, precluding the use of discriminatory measures, which could interfere with the management and disposal of those investments.

Kostytska Decl., Ex. 51, Letter from the Ministry of Economy of the Russian Federation to the Embassy of Ukraine in the Russian Federation of Sept. 30, 1997, enclosing draft BIT, art. 3(1) (highlighting omitted, emphasis added).  The term "fair and equitable treatment" was highlighted with a yellow marker, which indicates that this term was subject to discussions by or between the Contracting Parties.  *Id*.

Paragraph 2 provided that such fair and equitable treatment shall be no less favorable than national treatment and most-favored-nation treatment:

> The regime mentioned in paragraph 1 of this Article shall be no less favorable than the one granted to the investments and investment-related activities of its own investors or investors of any third state.

*Id*. (highlighting omitted).

In stark contrast to the draft BIT, the final version of the BIT did not contain the "fair and equitable treatment" clause.  The fair and equitable treatment clause was *deleted* from the final version of the BIT, which was signed and ratified by the Contracting Parties.  Kostytska Decl., Ex. 52, Ukraine-Russian Federation BIT, art. 3(1).  The title of Article 3 changed from "Treatment of Investments" to "National [Treatment] and Most Favored Nation Treatment"; the fair and equitable treatment clause was *deleted* and replaced with the national treatment and most-favored-nation treatment. *Id*.

Thus, the Contracting Parties deliberately, wilfully and intentionally excluded fair and equitable treatment claims from the scope of their BIT. In so doing, the Contracting Parties manifested their will to exclude fair and equitable treatment claims from the scope of jurisdiction of the Arbitral Tribunal under their BIT. Considering that the Contracting Parties expressed their will to exclude fair and equitable treatment claims from their BIT, such claims cannot be introduced through the "back door," so as to override the express will of the Contracting Parties.

That the exclusion of the fair and equitable treatment clause was deliberate is also evidenced by the Russian Federation's and Ukraine's treaty practice with other countries. Out of 59 BITs in force with the Russian Federation, only four BITs, with Ukraine, Armenia, Germany and Austria, did not contain the fair and equitable treatment clause. Kostytska Decl., Ex. 53, Overview of Effective BITs. Out of 56 BITs in force with Ukraine, only four BITs, with the Russian Federation, Cuba, Croatia and Turkey, did not contain this clause. *Id*. The BITs concluded by both the Russian Federation and Ukraine pre-1998 either contained the fair and equitable treatment clause, or they did not. In 1998, the Russian Federation and Ukraine were fully aware that they had an option of guaranteeing fair and equitable treatment to each other's investors, and they chose not to do it.

Thus, the treaty practice of the Russian Federation and Ukraine evidences that the deletion of the fair and equitable treatment clause from the Ukraine-Russian Federation BIT was not an accident. It was a deliberate choice of the Contracting Parties.

The incorporation of clauses from other treaties through the "most-favored-nation" clause, against the consent of the contracting parties, has been sanctioned by national courts sitting in setting aside proceedings. For example, in *RosInvest v. Russian Federation*, Swedish courts annulled the arbitral award in which the arbitral tribunal exceeded the scope of consent, and thus exceeded its jurisdiction, in ruling on the *existence* and *legality* of expropriation, and not only on the *amount* and *payment of compensation* for expropriation. Judgment of Stockholm District Court of Nov. 9, 2011 (supplemented), 6.1.1; Doc. 18-8, *RosInvest v. Russian Federation*, Judgment of Svea Court of Appeal of Sept. 3, 2013, at 3-4. The Russian Federation-UK BIT, applicable in that dispute, enabled international arbitral tribunals to decide on the *amount* and *payment of compensation* for expropriation; it reserved the decisions on the *existence* and *legality* of

expropriation for national courts.  In that case, the arbitral tribunal ruled on the *entirety* of the claim for expropriation, that is, on the *existence* and *legality* of expropriation, as well as the *amount* and *payment of compensation* for expropriation.  To do that, the arbitral tribunal incorporated a broader provision from the Russian Federation-Denmark BIT through the "most-favored-nation" clause.

The Russian Federation sought setting aside of the award before Swedish courts for, *inter alia*, in the absence of a valid "arbitration agreement between the parties covering the disputed issues in the arbitration proceeding," and more precisely, in the absence of an agreement to arbitrate claims as to the *existence* and *legality* of expropriation.  Doc. 18-8, *RosInvest v. Russian Federation*, Judgment of Svea Court of Appeal of Sept. 5, 2013.  2013. The Russian Federation relied on Section 34(1) of the Swedish Arbitration Act ("SAA") allowing Swedish courts to set aside an award "if it is not covered by a valid arbitration agreement between the parties." Kostytska Decl., Ex. 54, Swedish Arbitration Act, § 34(1).

The Swedish courts annulled the arbitral award for lack of jurisdiction ("arbitrability").[6] They reasoned that the arbitral tribunal violated the *constant policy* of the Soviet Union to reserve the questions of the *existence* and *legality* of expropriation to national courts, and not to submit them to international arbitral tribunals.  Kostytska Decl., Ex. 55, *RosInvest v. Russian Federation*, Judgment of Stockholm District Court of Nov. 9, 2011 (supplemented), ¶ 6.2.10 (emphasis added). Accepting the arguments of the Russian Federation, it further reasoned that the arbitral tribunal violated the *political compromise* meticulously negotiated between the Soviet Union, which considered expropriation to be a sovereign act and did not want to submit it to international arbitration, and the UK, which wanted to enable its investors to submit a wide range of claims to international arbitration.  *Id*. ¶ 4.1.5 (emphasis added).  They further reasoned that: "It is obvious

---

[6] The term "arbitrability" refers to the jurisdiction of the arbitral tribunal.

that the Soviet Union had never intended that, and would never have entered into the Soviet-UK BIT if its **constant policy** behind the carefully negotiated article 8 were to be disregarded by reference to article 3(2)."  Kostytska Decl., Ex. 55, *RosInvest v. Russian Federation*, Judgment of Stockholm District Court of Nov. 9, 2011 (supplemented), ¶ 6.2.11 (emphasis added). The Stockholm district court also reasoned that the host state's offer to arbitrate, and hence consent to arbitral jurisdiction, would also depend on the "*political position of the states in question and the negotiations which have given rise to the specific BIT*."  *Id.* ¶ 4.1.2.  The Stockholm district court further stated:

> Many modern BITs do provide an aggrieved investor some rights to invoke arbitration directly against the host state ('diagonal proceedings'). By using this right, the investor accepts the offer of an arbitration agreement that the host state, by entering into the relevant BIT, has made and an arbitration agreement arises. Depending on the type of BIT, this offer may be more or less extensive, *depending on the political position of the states in question and the negotiations which have given rise to the specific BIT.*

*Id.* ¶ 4.1.2 (emphasis added).  The takeaway point is that any arbitral award that incorporates a more favorable clause from another treaty through the "most-favored-nation" clause, in violation of the consent of a Contracting Party, expressed through its constant policy or otherwise, contravenes the offer to arbitrate. In Sweden at the seat of arbitration, it must be set aside pursuant to Section 34(1) of the SAA.

In this case, just as in *RosInvest v. Russian Federation*, the Merits Award and Jurisdictional Award that incorporate the "fair and equitable treatment" clause from another treaty through the "most-favored nation" clause violate the consent of the Contracting Parties, which deliberately, wilfully and intentionally excluded it from their BIT, their bilateral relations and their political compromise, as evidenced by the *travaux préparatoires* and their treaty practice.  In the U.S. at

the place of recognition and enforcement, the arbitral award does not meet the requirements of Section 1605(a)(6) of the FSIA and warrants dismissal.

Not only national courts, but arbitral tribunals as well have refused to incorporate clauses from other treaties through the most-favored-nation clause against the *consent* of the contracting parties.  For example, in *Telenor v. Hungary*, the arbitral tribunal refused to resort to the "most-favored-nation" clause to extend the offer to arbitrate to the "fair and equitable treatment" claim, and therefore dismissed the claim for lack of jurisdiction.  The applicable Hungary-Norway BIT constituted an offer to refer certain aspects of "expropriation" claims to international arbitrators, while reserving other claims for national adjudicators or diplomatic protection. Other BITs concluded with Hungary constituted an offer to refer other types of claims, particularly "fair and equitable treatment" claims, to international arbitrators. The *Telenor* tribunal's analysis of its ability to adjudicate the "fair and equitable treatment" clause, by incorporating it through the most-favored-nation clause, was grounded in "the intention of the parties." Ex. 56, *Telenor Mobile Commc'ns A.S. v. Republic of Hungary*, ICSID Case No. ARB/04/15, Award of Sept. 13, 2006, ¶ 91.  In ascertaining the intention of the parties, the arbitral tribunal looked into their treaty practice.  *Id.* ¶¶ 95 *et seq*.  Having reviewed all Norwegian and all Hungarian BITs concluded with other countries, and having analyzed whether the relevant clauses were included or excluded from those BITs, the arbitral tribunal concluded that Norway and Hungary "made a deliberate choice" to only submit certain aspects of "expropriation" claims to international arbitration, to the exclusion of "fair and equitable treatment" claims.  *Id.* ¶¶ 95-97.  Thus, the arbitral tribunal declined to issue an award adjudicating the "fair and equitable treatment" claim.  *Id.* ¶ 91.

In this case, the arbitral award adjudicating the "fair and equitable treatment" claim and that claim only, despite that the Contracting Parties deliberately excluded the "fair and equitable

treatment" claim from their BIT, is *contrary to* the agreement to arbitrate. As such, the arbitral award does not satisfy the requirement of Section 1605(a)(6) of the FSIA and warrants dismissal for lack of subject matter jurisdiction.

\* \* \* \* \*

For the foregoing reasons, the Merits Award that condemned Ukraine for violation of the "fair and equitable treatment provision," which was not part of Ukraine's offer to Russian investors, was made *contrary to* the terms of the offer and contrary to any alleged agreement to arbitrate. The "arbitration exception" in Section 1605(a)(6) of the FSIA does not apply and the case should be dismissed for lack of subject matter jurisdiction.

### ii. Most of the damages were awarded for the shares of Swiss and American companies *contrary to* the offer to arbitrate with *bona fide* Russian investors

The Merits Award awarded the vast majority of the damages for the shares of Swiss and American companies that were not covered by Ukraine's offer to arbitrate with Russian investors. The Tatneft company acquired the shares of Amruz, a Swiss company, and Seagroup, an American company, in bad faith for the sole purpose of augmenting its damages claims against Ukraine.

Investor-State case law makes clear that the State's standing offer to arbitrate can only be accepted by "investors" acting in good faith. Investor-State arbitral tribunals have consistently found that the offer to arbitrate could not be accepted by the purported "investors" acting in bad faith, with abuse of process and abuse of rights,[7] and have consistently held that there was no agreement to arbitrate in such circumstances.

Upholding the principle of good faith in *Inceysa v. El Salvador*, the arbitral tribunal essentially found that there was no agreement to arbitrate between El Salvador and Inceysa because

---

[7] In international investment law, the terms "abuse of process" and "abuse of rights" are used interchangeably.

33

Inceysa acted in bad faith.  The arbitral tribunal noted:  "Good faith is a supreme principle, which governs legal relations in all of their aspects and content. . . . *El Salvador gave its consent to the jurisdiction of the [ICSID] Centre, presupposing good faith behavior on the part of future investors. . . .*" Kostytska Decl., Ex. 13, *Inceysa Vallisoletana S.L. v. Republic of El Salvador, ICSID Case No. ARB/03/26*, Award of Aug. 2, 2006, ¶¶ 230-231, 238-239 (footnote omitted, emphasis added).

Investor-State case-law makes clear that corporate restructuring lacking economic rationale and designed for litigation purposes invalidates the State's offer to arbitrate.  While such case-law is abundant, Ukraine draws the Court's attention to only two significant cases:  *Phoenix Action v. Czech Republic* and *Philip Morris v. Australia*.

In the landmark *Phoenix Action Ltd. v. Czech Republic* case, the arbitral tribunal essentially found that there was no agreement to arbitrate between the Czech Republic and Phoenix, an Israeli company, which acquired two Czech companies for the sole purpose of bringing international arbitration claims against the Czech Republic.  Kostytska Decl., Ex. 57, *Phoenix Action v. Czech Republic*, ICSID Case No. ARB/06/5, Award of Apr. 15, 2009, ¶ 144.

In that case, Phoenix, an Israeli company owned by Mr. Vladimir Beno, acquired the shares of two Czech companies, Benet Praha and Benet Group, in late December 2002.  At the time of the acquisition, the two Czech companies were involved in civil litigation and were subject to asset freezes in the Czech Republic.  In early March 2003, or about *two months later*, Phoenix notified the Czech Republic of the investment dispute; in mid-February 2004, or about *a year later*, Phoenix filed a request for arbitration with ICSID.

The arbitral tribunal stated at the outset that "[t]he purpose of the international mechanism of protection of investment through ICSID arbitration cannot be to protect investments made in

violation of the laws of the host State or *investments not made in good faith*." *Id*. ¶ 100 (emphasis added) (footnote omitted). "In other words, the purpose of international protection is to protect legal and *bona fide* investments." *Id*. *Mala fide* investments do not deserve protection through ICSID or BIT arbitration, and are not part of the offer to arbitrate extended by host States to foreign investors.

To determine whether Phoenix Action made a *bona fide* investment that deserves protection by the BIT, including the benefit of the offer to arbitrate contained therein, the arbitral tribunal considered a number of factors.   With regard to the first factor—*the timing of the investment*—the arbitral tribunal found:   "Phoenix bought an *"investment" that was already burdened with the civil litigation as well as the problems with the tax and customs authorities*. . . . . The civil litigation was ongoing since fourteen months, the criminal investigation was ongoing since twenty months, and the bank accounts had been frozen for eighteen months. The Claimant was therefore well aware of the situation of the two Czech companies in which it decided to "invest" . . . . *Id*. ¶ 136 (emphasis added).   With regard to the next factor—the *timing of the dispute*—the arbitral tribunal found:   *"The whole file shows that Phoenix's "investment project" was made simply to assert a claim under the BIT.*   The Claimant presented Phoenix's notification of an investment dispute to the Czech Republic on March 2, 2003, . . . a mere *two months* after its acquisition of the Benet Companies and filed the dispute with the Centre [ICSID] eleven months later. . . ." *Id*. ¶ 138 (emphasis added).   Regarding the next factor—*the nature of the initial request for arbitration*—the arbitral tribunal observed that it "was based on a claim by the two Czech companies, which were supposedly assigned to Phoenix." *Id*. ¶ 137.   As for the next factor—the *substance of the transaction*—the arbitral tribunal concluded that "[t]he alleged investment appears

therefore as a mere redistribution of assets within the Beňo family." *Id.*, ¶ 139.  Finally, with regard to the last critical factor—the *true nature of the operation*—the arbitral tribunal found that:

> The evidence indeed shows that the Claimant made an "investment" ***not for the purpose of engaging in economic activity, but for the sole purpose of bringing international litigation against the Czech Republic***.  This alleged investment was ***not made in order to engage in national economic activity, it was made solely for the purpose of getting involved with international legal activity***.  The unique goal of the "investment" was to transform a pre-existing domestic dispute into an international dispute subject to ICSID arbitration under a bilateral investment treaty.  *This kind of transaction is not a bona fide transaction and cannot be a protected investment under the ICSID system.*

*Id.* ¶ 142 (emphasis added, footnote omitted).

In light of the above reasoning, the arbitral tribunal held that Phoenix's purported investment in the two Czech companies "does not qualify as a protected investment under the Washington Convention and the Israeli/Czech BIT," which means that the offer to arbitrate does not cover such *mala fide* investment.  *Id.* ¶ 145.  Thus, the arbitral tribunal dismissed the case for lack of jurisdiction.  *Id.*

Similarly, in the recent *Philip Morris v. Australia* case, the arbitral tribunal essentially found that there was *no agreement to arbitrate* between Australia and Philip Morris because Philip Morris abused its rights by engaging in corporate restructuring, when the dispute with Australia was foreseeable and for the purpose of suing Australia.  Kostytska Decl., Ex. 58, *Philip Morris v. Australia*, PCA Case No. 2012-12, Award on Jurisdiction and Admissibility of Dec. 17, 2015, ¶¶, 585, 588.  In that case, a Philip Morris Australian entity was initially held by a Philip Morris Swiss entity.  After the Australian government announced its decision to implement plain packaging legislation in April 2010 and before such legislation was enacted in November 2011, Philip Morris engaged in corporate restructuring whereby Philip Morris Switzerland transferred its shares in Philip Morris Australia to Philip Morris Hong Kong in February 2011.  *Id.* ¶ 335.  Australia argued

that the reason for the Philip Morris's restructuring was to sue Australia under a BIT, or in other words, to come within the terms of Australia's offer to arbitrate. Australia extended such offer to arbitrate to Hong Kong investors by signing a BIT with Hong Kong; Australia did not make any offer to arbitrate with Swiss investors in the absence of a BIT with Switzerland.

Having surveyed prior case-law on abuse of rights, the arbitral tribunal concluded that the tests for abuse of rights "revolv[e] around the concept of foreseeability" and that "the commencement of a treaty-based investor-State arbitration constitutes *an abuse of rights* (or an abuse of process) when *an investor has changed its corporate structure to gain the protection of an investment treaty at a point in time where a dispute was foreseeable.*" *Id.* ¶¶ 554, 585 (emphasis added).

Mindful of this test, the arbitral tribunal carefully considered the factual chronology of the dispute relating to the plain packaging legislation and of Philip Morris's corporate restructuring, as well as Philip Morris's alleged business reasons for the restructuring. The arbitral tribunal concluded that "the initiation of this arbitration" by Philip Morris "constitutes an abuse of rights, as the corporate restructuring" occurred when the dispute with Australia was reasonably foreseeable and "as it was carried out for the principal, if not sole, purpose of gaining Treaty protection." *Id.* ¶ 588. Accordingly, the arbitral tribunal held that it was precluded from exercising jurisdiction over the dispute. *Id.*

In this case, Tatneft's acquisition of the shares of Amruz and Seagroup in Ukrtatnafta, after the dispute with Ukraine became foreseeable and for the sole purpose of asserting damages claims against Ukraine in BIT arbitration, constitutes an abuse of rights. Tatneft's *mala fide* "investment" in the shares of Swiss and American companies, embroiled in litigation in Ukraine and subject to

the Ukrainian courts' coercive measures, is excluded from the offer to arbitrate extended by Ukraine to *bona fide* Russian "investors."

The factual chronology speaks for itself. *See* E, *supra*. Tatneft acquired the shares of Amruz and Seagroup in December 2007, during the same month when it notified Ukraine of the existence of an investment dispute under the Ukraine-Russia BIT. Kostytska Decl., Ex. 18, Tatneft Answer on Jurisdiction, ¶ 75. In the notice of dispute, Tatneft complained not only about the limitation of *its* shareholder rights in Ukrtatnafta, but also about the injury to the shareholder rights of Amruz and Seagroup. Kostytska Decl., Ex. 35, Tatneft Notice of Dispute of Dec. 11, 2007, at 1-2. What is more, during the month of preceding the acquisition, November 2007, Tatneft's Head of Department of Strategic Planning told the press that "Tatneft plans to submit claims *on behalf of* foreign minoritaries [*sic*] of the joint-stock company Ukrtatnafta – Amruz Trading and Seagroup International." Kostytska Decl., Ex. 33, *Tatneft Plans to Submit Claims on Behalf of Russian and Foreign Shareholders*, NEWS SERVICE, Nov. 13, 2007.

Under invertor-State case-law, Tatneft's *mala fide* acquisition of the shares of the Swiss and American companies, after the dispute with Ukraine arose and for the sole purpose of asserting international arbitration claims against Ukraine, constituted an *abuse of process or abuse of rights*. Tatneft's purported "investment" in these Swiss and American companies was not included in the terms of Ukraine's offer to arbitrate with Russian investors. Therefore, the Merits Award awarding the vast majority of the damages for the share of Swiss and American companies in Ukrtatnafta, acquired by the Russian company for litigation purposes, was made *contrary to* Ukraine's offer to arbitrate.

Tatneft may argue that the acquisition of Amruz and Seagroup for the purpose of suing Ukraine was not an abuse of process nor an abuse of rights, insofar as Amruz and Seagroup could

have pursued their own claims against Ukraine under the Energy Charter Treaty and the Ukraine-Russia BIT, respectively.  However, Amruz's and Seagroup's legal and practical ability to pursue their own treaty claims against Ukraine is debatable.

Considering that the ultimate beneficiaries of Amruz and Seagroup were likely high-level Tatneft business executives, BIT arbitration would have raised unwanted questions about their identity and nationality.  Kostytska Decl., Ex. 19, *Who Led Ukrtatnafta to Bankruptcy*, DNI RU, Nov. 9, 2007.  Such inquiries may have been *very uncomfortable* for high-level Tatneft business executives.

Moreover, Amruz and Seagroup would not have been able to overcome the "denial of benefits" clause contained in the Energy Charter Treaty and the United States-Ukraine BIT. Article 17 of the Energy Charter Treaty provides:  "Each Contracting Party reserves the right to deny the advantages of [the Treaty] to: (1) a legal entity *if citizens or nationals of a third state own or control such entity* and *if that entity has no substantial business activities in the Area of the Contracting Party in which it is organized.*"  Kostytska Decl., Ex. 59 Energy Charter Treaty, art. 17 (emphasis added).  Article I(2) of the United States-Ukraine BIT contains a comparable provision.  Under Article of the Energy Charter Treaty, as applied here, Ukraine reserved the right to deny the benefits of the Treaty to Amruz, a Swiss company, if:  (1) Amruz was owned or controlled by citizens or nationals of a "third state" to the Energy Charter Treaty and (2) Amruz had no substantial business activities in the country of incorporation.

With regard to the *first* prong—the absence of ownership or control by citizens or nationals of a "third State"—Amruz would have likely had to demonstrate that even though it was owned or controlled by Russian nationals, Russia was not a "third state" to the Energy Charter Treaty. Amruz would have had to take a position that the Energy Charter Treaty applied to Russia

provisionally pursuant to Article 45 of the Energy Charter Treaty, since Russia signed it in 1994 and even though Russia never ratified it.  Article 45 provides: "Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or regulations."  Kostytska Decl., Ex. 59, Energy Charter Treaty, art. 45.

In 2007-2008, it would have been *highly problematic* for Amruz, represented by Cleary Gottlieb, to take a position that the Energy Charter Treaty applied to the Russian Federation provisionally, since in 2007-2008, the Russian Federation, also represented by Cleary Gottlieb, was advancing the contrary position in the gigantic *Yukos v. Russian Federation* arbitration, which ultimately resulted in a $50 billion award against the Russian Federation.  In the *Yukos* case, the jurisdictional memorials were filed in February-June 2006, and the jurisdictional hearing was planned for November-December 2008.  Kostytska Decl., Ex. 60, *Yukos Universal Ltd. (Isle of Man) v. The Russian Federation*, *UNCITRAL,* PCA Case No. AA 227, Interim Award on Jurisdiction and Admissibility of Nov. 30, 2009, ¶¶ 17, 32 and Final Award of July 18, 2014, ¶ 20. So the solution to the problem was likely for the Amruz beneficial owners to get rid of all the Amruz stock by transferring it to Tatneft, and for Tatneft alone to proceed with Amruz's claims against Ukraine under the Ukraine-Russia BIT, thus avoiding annoying inquiries and awkward litigation posture.

The *second* prong—"substantial business activities" in the country of incorporation— Amruz would not have been able to satisfy.  Being a Swiss shell company, Amruz would not have been able to demonstrate "substantial business activities" in the oil production and refining industry in Switzerland.  In the *Yukos* case and similar cases, shells companies have not even tried to satisfy the second prong and conceded that they could not.  Kostytska Decl., Ex. 60, *Yukos*

*Universal Ltd. (Isle of Man) v. The Russian Federation*, UNCITRAL, PCA Case No. AA 227, Interim Award on Jurisdiction and Admissibility of Nov. 30, 2009 (Poncet, Schwebel, Fortier), ¶ 72.

As for Seagroup, it was facing similar difficulties under Article I(2) of the United State-Ukraine BIT.  Kostytska Decl., Ex. 61, United States-Ukraine BIT, art. I(2).  Moreover, proceeding under the United States-Ukraine BIT may have been barred by United States policy, confirmed by the U.S. Trade Representative, to "prevent[] the use of shell companies to access ISDS [investor-State dispute settlement]."  Kostytska Decl., Ex., 62, Fact Sheet:  Investor-State Dispute Settlement ("ISDS").

\* \* \* \* \*

Because the Merits Award was made *contrary to* any agreement to arbitrate, the arbitration exception in Section 1605(a)(6) of the FSIA does not apply and the case should be dismissed for lack of subject matter jurisdiction.

## B.    This Matter Should Be Dismissed On The Basis Of *Forum Non Conveniens*

Other than this Court not having subject matter jurisdiction, this matter should be dismissed on *forum non conveniens* grounds.  *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp*., 549 U.S. 422, 423 (2007).  The test established by the Supreme Court on a motion to dismiss on *forum non conveniens* grounds requires the district court to:  (A) consider whether an adequate alternative forum exists; (B) balance the public and private interest factors affecting the convenience of the forum.  *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 239 n.6 (1981).

### 1.    Ukraine is an adequate alternative forum

This Court must first determine whether there is "an alternative forum that is both available and adequate."  *MBI Grp., Inc. v. Credit Foncier du Cameroun*, 616 F.3d 568, 571 (D.C. Cir.

2010).  "An alternative forum is ordinarily adequate if the defendants are amendable to service of process there and the forum permits litigation of the subject matter of the dispute."  *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n.22 (1981).

In this case, Ukraine is an adequate and available alternative forum that permits recognition and enforcement of international arbitral awards and foreign judgments, including against the State, pursuant to the Ukrainian legislation.[8]  U.S. court have previously found that Ukraine was an adequate and available alternative forum for recognition and enforcement proceeding against the State.  *See In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 499 (2d Cir. 2002).  Thus, the Second Circuit rejected Gazprom's and its affiliates' "bare denunciations and sweeping generalizations" about Ukraine's judicial system.  *Id*. at 499.  In describing Ukraine as an alternative form, the Second Circuit noted, "This simply is not a case where the alternative forum is characterized by a complete absence of due process or an inability of the forum to provide substantial justice to the parties."  *Id.*  The Second Circuit also rejected unfounded statements and "speculation" about any inability to execute against the assets of the State or a State-owned company.  Rather, the Second Circuit noted that "Ukrainian law specifically provides for the execution of judgments against government properties."  *Id*.

### 2.   The balancing of public and private interest factors weighs in favor of dismissal

The *forum non conveniens* analysis next requires the Court to weigh both the public and private interest factors.  *MBI Grp., Inc. v. Credit Foncier du Cameroun*, 616 F.3d 568, 571 (D.C. Cir. 2010).  The private interests include "ease of access to sources of proof," "availability of

---

[8] Ukraine acknowledges *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005), and reserves the rights to rely on *Figueiredo Ferraz E Engenharia de Projeto Ltda v. Republic of Peru*, 665 F.3d 384 (2d Cir. 2011) as the proceedings advance.

compulsory process for attendance of unwilling" witnesses, "the cost of obtaining attendance of willing" witnesses, and "all other practical problems that make trial of a case easy, expeditious and inexpensive." *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). The public interests include an overburdened and congested judicial system, or the "local interest in having localized controversies decided at home." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).

In the case at hand, both the private and public interests weigh in favor of dismissal on *forum non conveniens* grounds. This case has no connection to the District of Columbia or the United States, other than the United States being a party to the New York Convention. The locus of the dispute is in Ukraine. This dispute involves complex issues of Ukrainian, Russian and Soviet law that percolate into this U.S. recognition and enforcement proceeding. The witnesses and experts are located in Ukraine and Russia. Most of Ukraine's assets are located in Ukraine, and Tatneft has not identified any non-sovereign assets in the District of Columbia or in the United States. Ukrainian regulations require that payments out of the State budget in satisfaction of international arbitral awards and foreign judgments be made upon a presentation of a resolution regarding the initiation of the enforcement proceedings in Ukraine. Kostytska Decl., Ex. 63, Resolution of the Cabinet of Ministers of Ukraine No. 408 of Mar. 7, 2007. While American courts may have an interest in enforcing the policy favoring enforcement of international arbitral awards, this interest is outweighed by Ukraine's "sovereign prerogative" to regulate Ukraine's payments of international arbitral awards and foreign judgments out of the State budget. *See Figueiredo Ferraz E Engenharia de Projeto Ltda v. Republic of Peru*, 665 F.3d 384, 392 (2d Cir. 2011) (finding that "[a]lthough enforcement of [international arbitral] awards is normally a favored policy of the United States . . . , that general policy must give way to the significant public factor

43

of Peru's cap statute" limiting the amount of money Peru could pay in satisfaction of judgments to 3% of the annual budget and directing dismissal on *forum non conveniens* grounds).

Indeed, Tatneft has not pursued enforcement in Ukraine, the simplest and the most logical way to enforce the Merits Award, which awarded Tatneft $112 million, and the Paris Court of Appeal judgment, which awarded it €200,000.  Tatneft owes an explanation to Ukraine as to why it is neglecting it as a forum.

Instead of pursuing enforcement in the most logical forum, Ukraine, Tatneft has tried (unsuccessfully) to pursue enforcement in the Moscow Arbitrazh Court, seeking to attach the Ukrainian Embassy and the Ukrainian Cultural Center in Moscow.  The Moscow first-instance court dismissed Tatneft's petition with prejudice due to the lack of non-sovereign assets in Moscow and due to Ukraine's sovereign immunity.  Kostytska Decl., Ex. 64, Decision of Moscow Arbitrazh Court of 4 July 2017; Ex. 65, C. Simson, *Tatneft Can't Get USD 112M Award Against Ukraine OK's in Russia*, LAW360, July 3, 2017.  Tatneft, however, has indicated its intention to appeal the Moscow first-instance court judgment and fight to the end in Russia.  Kostytska Decl., Ex. 66, *Ukrainian Immunity Did Not Surrender*, KOMMERSANT.RU, June 27, 2017 (supplemented).  In addition, it is Ukraine's understanding based on press reports that Tatneft is also trying to pursue recognition and enforcement before the London High Court, while again recognizing that Ukraine does not have attachable assets in that jurisdiction.

## CONCLUSION

At the corner of M Street and the Key Bridge, overlooking the Potomac River, a historic building is located.  In that building, General Uriah Forrest and his former commander George Washington discussed prior battles during the Revolutionary War and future prospects of erecting the nation's new capital, the federal city of Washington, D.C.  In that building, William Marbury contemplated his legal strategy for *Marbury v. Madison* that formed the basis of American judicial

review.  Since the early 1990s, that building is owned and occupied by the Embassy of the independent Ukraine.  This Court should not allow Tatneft to set in motion a chain of events that may lead to the attachment and seizure of that historic building and, figuratively speaking, to affixing Tatneft's logo to that building and turning it into a gas station.  This Court should not allow Tatneft to turn the United States into a no-go zone for Ukraine, where no Ukrainian airplanes and ships can come without fear of forcible attachment and international embarrassment.  This Court should not allow Tatneft to hinder the flow of international commerce between our friendly nations.  Tatneft's affront to Ukraine's sovereignty and its dishonoring of Ukraine's judiciary should stop right here, in the U.S. District Court for the District of Columbia.

For the foregoing reasons, Ukraine respectfully requests that this Court dismiss this action with prejudice for lack of subject matter jurisdiction and *forum non conveniens*.

Respectfully submitted,

s/  Maria Kostytska

Maria Kostytska (D.C. Bar # 500678)
(admitted *pro hac vice*)
Winston & Strawn LLP
48 rue Cambon
Paris 75001, France
(331) 53648282
(331) 53648220 (fax)

Thomas M. Buchanan (D.C. Bar # 337907)
Winston & Strawn LLP
1700 K Street NW
Washington, D.C. 20006
(202) 282-5000
(202) 282-5100 (fax)

*Counsel for Ukraine*

Dated:  July 25, 2017

**CERTIFICATE OF SERVICE**

I, Maria Kostytska, hereby certify that on July 25, 2017, the foregoing Motion to Dismiss along with the accompanying documents was served via ECF to all counsel of record.

Respectfully submitted,

s/  Maria Kostytska
Maria Kostytska (D.C. Bar # 500678)
(admitted *pro hac vice*)
Winston & Strawn LLP
48 rue Cambon
Paris 75001, France
(331) 53648282
(331) 53648220 (fax)