# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PAO Tatneft              )
                                )

| | |
|---|---|
| PAO Tatneft | ) |
| | ) |
| | )    **Case No. 1:17-cv-00582-CKK** |
| Petitioner, | ) |
| | ) |
| -against- | ) |
| | ) |
| | ) |
| UKRAINE | ) |
| | ) |
| Respondent. | ) |
| | ) |

**PETITIONER'S REPLY IN FURTHER SUPPORT OF PETITION
TO CONFIRM ARBITRAL AWARD AND TO ENTER
<u>JUDGMENT IN FAVOR OF PETITIONER</u>**

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Jonathan I. Blackman
One Liberty Plaza
New York, New York
Tel: (212) 225-2000
Fax: (212) 225-3999
Email: jblackman@cgsh.com

Matthew D. Slater
2000 Pennsylvania Avenue, N.W.
Washington, D.C.
Tel: (202) 974-1500
Fax: (202) 974-1999
Email: mslater@cgsh.com

*Attorneys for Petitioner PAO Tatneft*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

RELEVANT FACTS ............................................................................................................ 2

    A.    Facts Concerning Professor Orrego Vicuña ......................................................... 2

             *1.*    *Proceedings in the underlying arbitration.* ................................................ 2

             *2.*    *Proceedings in* DP World v. Peru. ........................................................... 4

             *3.*    *Proceedings in* South American Silver v. Bolivia. .................................... 4

             *4.*    *Proceedings in the Paris Court of Appeal.* .............................................. 5

    B.    Facts Concerning Tatneft's Acquisition of AmRuz and Seagroup Shares ............ 6

             *1.*    *AmRuz and Seagroup's initial investment in Ukrtatnafta and first wave of litigation.* ................................................................................ 6

             *2.*    *Ukrainian court proceedings in 2007.* ...................................................... 7

             *3.*    *Events following Tatneft's acquisition of AmRuz and Seagroup shares.* .................................................................................................. 8

             *4.*    *The Tribunal rejects Ukraine's admissibility objection to Tatneft's claims in respect of the AmRuz and SeaGroup shares.* ........................... 9

             *5.*    *The Paris Court of Appeal rejects Ukraine's argument that Tatneft's acquisition of AmRuz and SeaGroup shares was an abuse of rights.* ............................................................................................... 11

ARGUMENT ..................................................................................................................... 11

I.    UKRAINE BEARS THE BURDEN TO DEMONSTRATE THAT ONE OF THE EXCEPTIONS IN ARTICLE V OF THE NEW YORK CONVENTION APPLIES .......................................................................................................... 11

II.    UKRAINE FAILS TO SHOW THAT ENFORCEMENT OF THE FINAL AWARD SHOULD BE DENIED DUE TO PROFESSOR ORREGO VICUÑA'S ALLEGED UNDISCLOSED CONFLICT OF INTEREST ........................................ 12

    A.    Ukraine's Objection To Professor Orrego Vicuña's Alleged Partiality Is Properly Addressed Under Article V(2)(b), Under Which It Clearly Fails ......... 13

    B.    In Any Event, Ukraine's Argument Also Fails Under Article V(1)(d) ............... 18

III.    UKRAINE FAILS TO SHOW THAT ENFORCEMENT OF THE FINAL AWARD SHOULD BE DENIED BECAUSE IT INCLUDES DAMAGES IN RESPECT OF SHARES TATNEFT ACQUIRED FROM AMRUZ AND SEAGROUP ...................................................................................................... 20

A.     Ukraine Fails To Demonstrate That The United States' Interests In Preventing "Abuse Of Process" Outweighs The Strong Policy Favoring Arbitration, Or That Tatneft Committed Any Such "Abuse" .............................. 21

B.     The United States' Public Policy Against Colluding To Create Diversity Jurisdiction In Federal Courts Is Obviously Irrelevant ....................................... 23

C.     Ukraine Fails To Demonstrate That The Final Award Was Procured By Fraud ................................................................................................................ 24

CONCLUSION .......................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Al-Harbi v. Citibank, N.A.*,
85 F.3d 680 (D.C. Cir. 1996) .............................................................. 14

*Anatolie Stati v. Republic of Kazakhstan*,
No. CV 14-1638 (ABJ), 2018 WL 1461898 (D.D.C. Mar. 23, 2018) ............................... 25

*\*BCB Holdings Ltd. v. Gov't of Belize*,
110 F. Supp. 3d 233 (D.D.C. 2015) .................................................... passim

*\*Belize Bank Ltd. v. Gov't of Belize*,
852 F.3d 1107 (D.C. Cir. 2017) ...................................................... passim

*\*Chevron Corp. v. Republic of Ecuador*,
795 F.3d 200 (D.C. Cir. 2015) ............................................................ 12

*Commercial Union Ins. Co. v. Lines*,
378 F.3d 204 (2d Cir. 2004) ............................................................... 24

*\*Commonwealth Coatings Corp. v. Cont'l Cas. Co.*,
393 U.S. 145 (1968) .................................................................... 13, 15

*\*Compagnie des Bauxites de Guinee v. Hammermills, Inc.*,
No. CIV.A. 90-0169 (JGP), 1992 WL 122712 (D.D.C. May 29, 1992) ............................ 18

*Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*,
844 F.3d 281 (D.C. Cir. 2016) ............................................................ 22

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
364 F.3d 274 (5th Cir. 2004) ............................................................. 21

*Nat'l Fitness Holdings, Inc. v. Grand View Corp. Ctr., LLC*,
749 F.3d 1202 (10th Cir. 2014) ........................................................... 24

*\*Nat'l Indem. Co. v. IRB Brasil Resseguros S.A.*,
164 F. Supp. 3d 457 (S.D.N.Y. 2016), *aff'd*, 675 F. App'x 89 (2d Cir. 2017) ............. 17

*Positive Software Sols., Inc. v. New Century Mortg. Corp.*,
476 F.3d 278 (5th Cir. 2007) ............................................................. 15

*Ray v. Chafetz*,
Civil Action No. 16-428 (CKK), 2017 WL 663527 (D.D.C. 2017) .................................... 14

*Republic of Argentina v. AWG Grp. Ltd.*,
211 F. Supp. 3d 335 (D.D.C. 2016) .................................................................... 13, 16

*Sathianathan v. Smith Barney, Inc.*,
No. C 04-02130, 2009 WL 537158 (N.D. Cal. Mar. 3, 2009)............................................ 17

*Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*,
668 F.3d 60 (2d Cir. 2012)................................................................................ 15

*Schmitz v. Zilveti*,
20 F.3d 1043 (9th Cir. 1994) .............................................................................. 13

*TermoRio S.A. E.S.P. v. Electranta S.P.*,
487 F.3d 928 (D.C. Cir. 2007).............................................................................. 12

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*,
484 U.S. 29 (1987)..................................................................................... 22, 23

*Venco Imtiaz Constr. Co. v. Symbion Power LLC*,
No. CV 16-1737 (JDB), 2017 WL 2374349 (D.D.C. May 31, 2017) ............................... 20, 21

**Federal Statutes**

9 U.S.C. § 10(a)(2).......................................................................................... 13

9 U.S.C. §§ 201-208 ........................................................................................ 11

Pursuant to the Court's March 19, 2018 Memorandum Opinion ("March 19 Opinion") and Order, ECF Nos. 33 and 34, Petitioner PAO Tatneft ("Petitioner" or "Tatneft") respectfully submits this reply in further support of its Petition to Confirm Arbitral Award and to Enter Judgment in Favor of Petitioner (the "Petition").[1]

## PRELIMINARY STATEMENT

Following the March 19 Opinion, two throwaway defenses under Article V of the New York Convention are all that remain of Ukraine's efforts to resist enforcement of the Final Award in this Court. *First*, Ukraine argues that the arbitral tribunal (the "Tribunal") was composed in a way contrary to the parties' agreement because one of its members, Professor Orrego Vicuña, purportedly failed to disclose a single appointment by Tatneft's law firm in an unrelated arbitration while the underlying arbitration here was still pending. This argument does not come close to meeting the applicable standard for disqualifying an arbitrator. *Second*, Ukraine argues that enforcement of the Final Award, to the extent it awarded Tatneft damages for the loss of the shares it acquired from AmRuz and Seagroup, would be "contrary to the public policy" of the United States. Ukraine, however, cannot identify any applicable public policy of this Nation sufficient to overcome its strong policy in favor of enforcing arbitration awards, and instead, as with its already rejected "jurisdictional" defense based on the AmRuz and SeaGroup shares, *see* March 19 Opinion at 13-15, simply seeks to relitigate the facts found by the Tribunal. The Court should reject Ukraine's makeweight Article V defenses and grant the Petition.

---

[1] Terms used herein, if not otherwise defined, have the meaning given to them in the Petition. The Final Award, Russia-Ukraine BIT, and Jurisdiction Decision are attached as Exhibits A, B, and C, respectively, to the Declaration of Jonathan I. Blackman, dated March 30, 2017, ECF No. 1-3. Unless otherwise indicated, citations to exhibits herein refer to those submitted with the Supplemental Declaration of Jonathan I. Blackman, dated August 22, 2017, ECF No. 27-2. Ukraine's Opposition to the Petition, ECF No. 22, is cited as the "Opposition" and its Motion to Dismiss the Petition, ECF No. 21, is cited as "MTD."

## RELEVANT FACTS

The background facts and procedural history of this proceeding are summarized in the Petition and the March 19 Opinion.  Below are the facts specifically relevant to this reply.

A.    Facts Concerning Professor Orrego Vicuña

1.    *Proceedings in the underlying arbitration.*

Tatneft initiated the underlying arbitration (the "Arbitration") on May 21, 2008, by serving on Ukraine a Notice of Arbitration and Statement of Claim pursuant to the Russia-Ukraine BIT.  Final Award ¶ 6.  The Russia-Ukraine BIT provides for arbitration by "an ad hoc arbitration tribunal in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL)."  Russia-Ukraine BIT, art. 9(2); Final Award ¶ 6.  In addition, the Russia-Ukraine BIT delineates a procedure for selecting the members of the tribunal:

> "[each of the] Contracting Parties . . . shall appoint one member of the arbitration tribunal within two months of receiving the arbitration notice.  [T]hose two members of the tribunal shall select a citizen of a third country who, given the consent thereto of both Contracting Parties shall be appointed as a chairperson of the tribunal within one month of the appointment of the other two members of the tribunal."

Russia-Ukraine BIT, art. 10.

In accordance with the Russia-Ukraine BIT, Tatneft appointed one member of the tribunal along with its Statement of Claim—Professor Dr. Rudolf Dolzer—Ukraine appointed the second arbitrator, The Honorable Marc Lalonde, and the two party-appointed arbitrators together appointed Professor Orrego Vicuña as the presiding arbitrator.   Jurisdiction Decision ¶¶ 6-8; Final Award ¶ 8.  On October 27, 2008, Ukraine gave notice of a challenge to Tatneft's appointed arbitrator under Article 11 of the UNCITRAL Rules.  Jurisdiction Decision ¶ 11.  That Rule provides that parties must raise circumstances "that give rise to justifiable doubts as to the arbitrator's impartiality or independence" within fifteen days of such circumstances becoming

known to the party. Ex. B (UNCITRAL Rules) art. 11. After reviewing comments from both parties, the Secretary-General of the Permanent Court of Arbitration sustained the challenge to Professor Dolzer. Jurisdiction Decision ¶ 11-12; Final Award ¶ 9. Tatneft subsequently appointed The Honorable Charles N. Brower instead. Jurisdiction Decision ¶ 13; Final Award ¶ 9. Ukraine did not object to the appointment of Judge Brower, nor to Professor Orrego Vicuña as presiding arbitrator.

The three members of the Tribunal are each recognized leaders in the field of public international law. Professor Orrego Vicuña is a law professor with extensive experience as an arbitrator in international disputes, and is a judge of the International Monetary Fund's Administrative Tribunal, among other appointments. Exs. F, G, H, I, K. Mr. Lalonde was for more than 12 years a member of the Canadian Parliament, serving in various senior roles, including as Minister of Finance and Minister of Justice and Attorney General of Canada. Ex. O. He has participated in over one hundred arbitrations and has served as an ad hoc judge of the International Court of Justice. Ex. N. Finally, Judge Brower has extensive experience in the field of international arbitration, including serving as Acting Legal Advisor at the United States Department of State, a judge of the Iran-United States Claims Tribunal, and an ad hoc judge of the International Court of Justice. Exs. J, L, M.

The Arbitration thereafter proceeded under the UNCITRAL Rules. On September 28, 2010, following extensive written submissions and a hearing, the Tribunal issued its Jurisdiction Decision confirming that it had jurisdiction over the dispute and that Tatneft's claims were admissible. Jurisdiction Decision ¶¶ 202-224. After further detailed written submissions and document disclosure, the Tribunal held a hearing on the merits from March 18, 2013 to March 27, 2013, during which fact and expert witnesses testified and were cross-examined. Final

Award ¶¶ 17-46.  Post-hearing submissions were completed on May 30, 2013.  *Id.* ¶¶ 47-48.  On July 29, 2014, the Tribunal issued its unanimous Final Award.  *Id.*

The Final Award concluded that Ukraine had breached its obligation under the Russia-Ukraine BIT to provide "fair and equitable treatment" to Tatneft.  It also denied some of Tatneft's claims, *id.* ¶¶ 412, 464, 545, 609, 615, 617; Tatneft had requested a total of US$ 1.444 billion in damages as compensation for loss of shareholdings and unpaid oil deliveries, *id.* ¶ 545, but the Tribunal awarded Tatneft US$ 112 million plus interest as compensation for the value of its shareholdings, and declined to award Tatneft compensation for the unpaid oil deliveries, concluding that Ukraine was not liable on that claim.  *Id.* ¶¶ 609, 610, 615, 617, 642.

2.      *Proceedings in* DP World v. Peru.

In the meantime, as Ukraine describes in its Opposition, on July 22, 2011—i.e., after the Jurisdiction Decision but before the Final Award—Professor Orrego Vicuña was appointed as an arbitrator by Cleary Gottlieb, the law firm representing Tatneft, in an unrelated arbitration, *DP World Callao S.R.L., P&O Dover (Holding) Limited and The Peninsular and Oriental Steam Navigation Company v. Republic of Peru*.  Ex. P.  Professor Orrego Vicuña accepted his appointment as arbitrator in *DP World* on September 21, 2011.  *Id.*  On January 17, 2012, Professor Orrego Vicuña's appointment in *DP World* by Cleary Gottlieb was reported by Global Arbitration Review ("GAR"), a publication and database that is regularly read and used by virtually all international arbitration practitioners, including Ukraine's counsel in the Arbitration here.  *Id.*  While it was thus public knowledge, Professor Orrego Vicuña did not update his original disclosures in the Arbitration to include his *DP World* appointment.

3.      *Proceedings in* South American Silver v. Bolivia.

Although Ukraine does not mention this fact in its Opposition, on April 30, 2013—*i.e.*, after the hearing but before the Final Award in the underlying Arbitration—Ukraine's then law

firm in the Arbitration, King & Spalding, appointed Professor Orrego Vicuña as an arbitrator in *South American Silver Ltd. v. Bolivia*. Exs. Q, R. In that case, which remains pending, the claimant represented by King & Spalding is seeking damages of more than $300 million. Exs. Q, R, S. This unrelated appointment, like his unrelated *DP World* appointment, was not disclosed in the Arbitration here.[2]

>    4.    *Proceedings in the Paris Court of Appeal.*

In connection with Ukraine's effort to annul the Final Award in the Paris Court of Appeal, which has primary jurisdiction as the seat of arbitration, Ukraine argued that Professor Orrego Vicuña's failure to disclose his *DP World* appointment was grounds for vacating the Final Award. Declaration of Jean-Yves Garaud ¶ 3, dated June 26, 2017, ECF No. 16-1 ("Garaud Declaration"); Garaud Declaration Ex. A-2 (Paris Court of Appeal Order) at 12. In its November 29, 2016 decision confirming the Final Award, the Paris Court of Appeal rejected this argument, including because Ukraine failed to demonstrate that a single appointment of Professor Orrego Vicuña by Cleary Gottlieb over the course of a nearly seven-year arbitration had the potential to raise a reasonable doubt about Professor Orrego Vicuña's impartiality. Garaud Declaration ¶ 4; Garaud Declaration Ex. A-2 (Paris Court of Appeal Order) at 13.

---

[2] *South American Silver* was not the only arbitration in which King & Spalding appointed one of the arbitrators from the *Tatneft v. Ukraine* Arbitration while the latter was pending. On May 21, 2011, Judge Brower accepted King & Spalding's appointment in *Turkiye Petrolleri v. Kazakhstan*. Ex. T. Furthermore, Eric Schwartz, a King & Spalding lawyer who was lead counsel to Ukraine in the *Tatneft* Arbitration, sat on an arbitral panel alongside Professor Orrego Vicuña and Mr. Lalonde (two of the three *Tatneft* arbitral panel members) in the *Karmer Marble Tourism v. Georgia* arbitration, which lasted from June 2009 to August 2012— a period of time completely overlapping with the Arbitration here. Ex. U. As with *South American Silver*, Ukraine mentions none of these facts in its belated attack on Professor Orrego Vicuña, not did it challenge Judge Brower, Mr. Lalonde or Professor Orrego Vicuña on the basis of these appointments.

B. Facts Concerning Tatneft's Acquisition of AmRuz and Seagroup Shares

The facts regarding Tatneft's acquisition of AmRuz and Seagroup shares, and Ukraine's actions to deprive those shares of any rights or value, are set forth at length in the Final Award. Because Ukraine improperly seeks to relitigate those facts under the guise of its "public policy" defense to enforcement, we summarize them here.

          1.     *AmRuz and Seagroup's initial investment in Ukrtatnafta and first wave of litigation.*

Ukrtatnafta was formed in 1995 as a joint-stock company that owns and operates the Kremenchug Refinery in Ukraine. Jurisdiction Decision ¶¶ 45-47; Final Award ¶ 57. Pursuant to Ukrtatnafta's incorporation agreement, its three major stockholders at that time were Tatarstan, Tatneft, and the State Property Fund of Ukraine ("SPFU"). Jurisdiction Decision ¶ 49; Final Award ¶ 59. In 1998 and 1999, Ukrtatnafta's shareholders approved several share purchase agreements that resulted in U.S.-based Seagroup International Inc. ("Seagroup") and Switzerland-based AmRuz Trading Co. ("AmRuz") each also owning portions of Ukrtatnafta's shares. Jurisdiction Decision ¶¶ 52-53; Final Award ¶ 62; March 19 Opinion at 3. Following these share purchase transactions, Tatneft, Tatarstan, AmRuz, and Seagroup (collectively, the "Tatarstan Shareholders") owned 56% of Ukrtatnafta's shares, and they agreed to vote their shares in alliance, allowing Tatneft and the other Tatarstan Shareholders to control Ukrtatnafta's management. Jurisdiction Decision ¶ 223; Final Award ¶¶ 141, 562 n.903.

A series of Ukrainian court cases between 2001 and 2006 challenged the legality of the acquisitions by Seagroup and AmRuz of Ukrtatnafta shares, each one resulting in a final judgment *upholding* these transactions. Jurisdiction Decision ¶ 58; Final Award ¶¶ 270-275. Specifically, on August 8, 2001, the SPFU initiated court proceedings in the Kiev Economic Court seeking invalidation of the share purchase agreements by which AmRuz and Seagroup

acquired their Ukrtatnafta shares. Jurisdiction Decision ¶ 58; Final Award ¶ 270. Although the courts initially decided in favor of the SPFU, these decisions were reversed by the Higher Economic Court on May 29, 2002, and the "cassation appeals" of the SPFU from that May 29, 2002 decision were dismissed by the Supreme Court of Ukraine later that year. Jurisdiction Decision ¶ 58; Final Award ¶¶ 271-273. A second proceeding was filed on September 16, 2002 by the Prosecutor General of Ukraine in the Poltava Region Economic Court, seeking to set aside the provision of Ukrtatnafta's incorporation agreement by which AmRuz and Seagroup acquired their Ukrtatnafta shares. Final Award ¶ 274. The court, however, dismissed that claim in light of the Higher Economic Court's May 29, 2002 decision. *Id.* Finally, in 2005 the Kiev Economic Court dismissed a third proceeding, this time brought by Naftogaz, Ukraine's wholly-owned national oil and gas company, to which the SPFU's Ukrtatnafta shares had been transferred, that also sought to obtain the annulment of the provision of Ukrtatnafta's incorporation agreement by which AmRuz and Seagroup acquired their shares. Jurisdiction Decision ¶ 58; Final Award ¶ 275.

### 2. *Ukrainian court proceedings in 2007.*

The situation changed radically in 2007, when the Privat Group, headed by corporate raider Igor Kolomoisky, obtained a "toehold" in Ukrtatnafta. Final Award ¶ 143. As the Tribunal found in the Final Award, from then onwards, the Privat Group enlisted the assistance of Ukrainian courts and prosecutors in a series of strong-arm tactics and pretextual legal actions to seize control of Ukrtatnafta at the expense of Tatneft and its allied shareholders. *Id.* ¶¶ 143, 223, 266-268, 396, 400-404. With regard to the AmRuz and Seagroup shares, this process began with the request of Ukraine's Ministry of Fuel and Energy for interim measures requiring the transfer of AmRuz's and Seagroup's shares in Ukrtatnafta to Naftogaz. Jurisdiction Decision ¶ 58. In addition, in July 2007, the Prosecutor General of Ukraine filed a lawsuit seeking the

cancellation of the AmRuz and Seagroup share purchase agreements and an order that the shares

be transferred to Naftogaz, which the Kiev Economic Court granted on September 17, 2007.

Jurisdiction Decision ¶ 59. The Kiev Economic Court of Appeal rejected appeals filed by

AmRuz and Seagroup on October 30, 2007, and on December 14, 2007 the Kiev Economic

Court ordered measures for the enforcement of its September 17, 2007 decision. *Id.* ¶ 60.

> 3. *Events following Tatneft's acquisition of AmRuz and Seagroup shares.*

In December 2007, during the pendency of the foregoing proceedings, Tatneft acquired

shares of Seagroup and AmRuz for US$ 57.1 million and US$ 23.9 million, respectively. *Id.*

After that acquisition, the Prosecutor General "lodged an extraordinary cassation appeal" with

the Supreme Court of Ukraine to set aside the May 29, 2002 decision of the Higher Economic

Court and reopen the dismissed cases that had sought to annul the share purchase agreements by

which AmRuz and Seagroup acquired their Ukrtatnafta shares. Final Award ¶¶ 270, 276. The

Tribunal found no evidence that this application was even properly served on Tatneft, AmRuz, or

SeaGroup. *Id.* ¶ 316. Nevertheless, in February 2008, the Supreme Court of Ukraine accepted

the extraordinary cassation appeal, reopened the court proceedings initiated by the SPFU in

2001, and remanded those proceedings back to the Kiev Economic Court. Jurisdiction Decision

¶ 61; Final Award ¶ 277.[3] The Tribunal found that there was no valid basis to reopen these

proceedings, and that doing so violated basic principles of *res judicata*. Final Award ¶¶ 320-

325. On remand, the Ukrainian lower courts nonetheless annulled the 1998 and 1999 share

purchase agreements and ordered the return of AmRuz and Seagroup shares to Ukrtatnafta, and

---

[3] Meanwhile, the proceedings regarding the AmRuz and Seagroup shares that had begun earlier in 2007 were stayed, and ultimately discontinued, in favor of these newly reopened proceedings. Jurisdiction Decision ¶ 62.

the Supreme Court of Ukraine rejected appeals from those decisions in November and December 2008.  Jurisdiction Decision ¶ 61; Final Award ¶ 278-279.

Shortly afterwards, the Privat Group, through one of its entities called Korsan, filed an application with the Economic Court of the Poltava Region in December 2008 seeking an order requiring Ukrtatnafta to sell AmRuz's and Seagroup's shares.  *Id*. ¶ 63; Final Award ¶ 280.  That court granted Korsan's application in March 2009 without informing Tatneft, AmRuz, or Seagroup of this proceeding.  *Id.*  An auction was then held in June 2009 at which Korsan was the sole bidder and winner.  Jurisdiction Decision ¶ 63.

> 4. *The Tribunal rejects Ukraine's admissibility objection to Tatneft's claims in respect of the AmRuz and SeaGroup shares.*

In the underlying Arbitration, Ukraine objected to the "admissibility" of Tatneft's claims for damages with respect to the shares it acquired from AmRuz and Seagroup in December 2007 on grounds that Tatneft acquired them after the events giving rise to the alleged harm and allegedly for litigation purposes rather than commercial purposes.  Jurisdiction Decision ¶¶ 203, 211.  Just as it does here in its Opposition, Ukraine argued that while Tatneft acquired the shares in December 2007, Ukrainian courts had twice held earlier that year that the share purchase agreements were invalid and ordered Seagroup and AmRuz to return their shares to Ukrtatnafta. *Id.* ¶ 203.  Ukraine also, again as here, pointed out that these two entities had separately sent notices of dispute to Ukraine under different treaties in June 2008 that complained of Ukraine's actions in 2007.  *Id.* ¶ 202, 213.  Ukraine argued that these facts showed that there was no purpose for the share acquisitions by Tatneft other than impermissible forum shopping.  *Id.* ¶ 204.

In its Jurisdiction Decision, the Tribunal rejected Ukraine's objection to the admissibility of claims in respect of AmRuz and Seagroup shares.  Jurisdiction Decision ¶¶ 210-224.  The

Tribunal acknowledged the proceedings in 2007 on which Ukraine relied, but also noted that the 2008 proceeding initiated by the Prosecutor General's extraordinary cassation appeal to the Supreme Court of Ukraine, by which the AmRuz and Seagroup shares actually were taken away, had not yet begun in December 2007. *Id.* ¶¶ 214-215. The Tribunal also noted that the orders in 2007 were interim measures, which were stayed and eventually discontinued in light of the subsequent proceeding. *Id.* ¶¶ 215, 217. Thus it was only in late 2008, at the earliest, that it became clear that AmRuz and Seagroup were deprived of their shares, if not later in 2009 when these shares were auctioned off to Korsan. *Id.* ¶¶ 215-217.

The Tribunal also found that Tatneft had not engaged in impermissible forum shopping. *Id.* ¶¶ 219-220. The Tribunal noted that Tatneft represented that it had elected to bring all of its claims in one proceeding because it "was deemed more efficient as it avoided parallel arbitrations and reduced costs for both parties." *Id.* ¶ 219. The Tribunal stated that it does not "sit in judgment of the parties' litigation strategies, except when there might be some form of abuse." *Id.* On that question, the Tribunal found "that no particular advantage could be obtained by bringing a case to this forum as opposed to the Ukraine-US BIT or the Energy Charter Treaty," applicable to Seagroup and AmRuz, respectively, including because the standard of protection under those treaties was at least as favorable as that under the Russia-Ukraine BIT. *Id.* ¶ 220. The Tribunal thus found that there was "no evidence that Tatneft's purpose was to defeat the nationality requirement of the applicable BIT." *Id.*

The Final Award concluded that Ukraine had breached its obligation under the Russia-Ukraine BIT to provide "fair and equitable treatment" to Tatneft, explicitly noting that "[t]his finding relates not just to Tatneft's direct interests in Ukrtatnafta but also to those held indirectly through AmRuz and Seagroup." Final Award ¶ 412. As a remedy for this breach, the Final

Award calculated damages to Tatneft based on "the amounts of the share transactions through which [Tatneft] acquired direct and indirect ownership" in Ukrtatnafta. *Id.* ¶ 609. The Tribunal found that "[t]his approach . . . most fairly and accurately reflects the value that was lost to [Tatneft] on account of [Ukraine's] breach of the BIT." *Id.* Accordingly, the Tribunal ordered Ukraine to "pay [Tatneft] the amount of US$ 112 million," comprised of the price Tatneft paid to acquire 8.613% of Ukrtatnafta in 2000 (US$ 31 million), as well as the US$ 23.94 million it paid for 49% of AmRuz and US$ 57.12 million for Seagroup in December 2007. *Id.* ¶¶ 610, 615, 642(1). As previously noted above, this was considerably less than the amount Tatneft had sought. *Id.* ¶ 545.

> 5. *The Paris Court of Appeal rejects Ukraine's argument that Tatneft's acquisition of AmRuz and SeaGroup shares was an abuse of rights.*

As with the objection to Professor Orrego Vicuña's impartiality, Ukraine also raised this "AmRuz/Seagroup" objection to the Paris Court of Appeal, which rejected it. Garaud Declaration Ex. A-2 (Paris Court of Appeal Order) at 8-9. That court found Ukraine failed to establish that arbitrating under the Russia-Ukraine BIT provided a significant advantage compared to other treaties applicable to AmRuz and SeaGroup's investments in Ukrtatnafta, and Ukraine therefore failed to show that Tatneft committed an abuse of rights by invoking the protection of the Russia-Ukraine BIT for its investments acquired from AmRuz and SeaGroup. *Id.*

## ARGUMENT

## I. UKRAINE BEARS THE BURDEN TO DEMONSTRATE THAT ONE OF THE EXCEPTIONS IN ARTICLE V OF THE NEW YORK CONVENTION APPLIES

The Court has already ruled that this proceeding to recognize and enforce the Final Award is governed by the New York Convention, which is given effect through the FAA, 9 U.S.C. §§ 201-208. *See* March 19 Opinion at 12. As the Court recognized in its March 19

Opinion, *see id.* at 30-31, the New York Convention "affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards." *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 207 (D.C. Cir. 2015).[4]  The Court "may refuse to enforce the award only on grounds explicitly set forth in Article V of the Convention." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007).  Moreover, because such grounds are limited and "narrow," "confirmation proceedings are generally summary in nature." *BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 247 (D.D.C. 2015) (Kollar-Kotelly, J.). "[T]he burden of establishing the requisite factual predicate" to demonstrate one of the Article V exceptions "rests with the party resisting confirmation, and the showing required to avoid summary confirmation is high." *Id.*; *see also Belize Bank Ltd. v. Gov't of Belize*, 852 F.3d 1107, 1111 (D.C. Cir. 2017) ("Because Belize challenges enforcement of the arbitral award, it bears the burden of proof of meeting this exacting standard.").

## II.    UKRAINE FAILS TO SHOW THAT ENFORCEMENT OF THE FINAL AWARD SHOULD BE DENIED DUE TO PROFESSOR ORREGO VICUÑA'S ALLEGED UNDISCLOSED CONFLICT OF INTEREST

Ukraine makes the novel argument that the Court should refuse to enforce the Final Award under Article V(1)(d) because Professor Orrego Vicuña's "failure" to disclose his appointment in *DP World* means that the "[t]he composition of the arbitral authority . . . was not in accordance with the agreement of the parties."  Opposition at 9-15.  The reason why Ukraine has framed its objection, which is actually a baseless attack on Professor Orrego Vicuña's impartiality, in this novel way is apparent:  Ukraine's argument flunks the only test that is actually applied by U.S. courts in arbitrator impartiality cases under the New York Convention,

---

[4] Unless otherwise indicated, all internal citations and quotation marks have been omitted from case law citations herein.

most recently by the D.C. Circuit in the *Belize Bank* decision, which inexplicably Ukraine

ignores.  In any event, even if it were appropriate to analyze this objection under Article V(1)(d),

as no U.S. court has done before, the claim still would be utterly meritless.

A.    Ukraine's Objection To Professor Orrego Vicuña's Alleged Partiality Is Properly
      Addressed Under Article V(2)(b), Under Which It Clearly Fails

Although couched in novel terms, Ukraine's Article V(1)(d) objection is in reality no

different than any other challenge to an arbitrator's impartiality based on his or her failure to

disclose a claimed conflict of interest.  *See, e.g.*, *Commonwealth Coatings Corp. v. Cont'l Cas.

Co.*, 393 U.S. 145, 146 (1968) (plurality op.); *see also id.* at 151-52 (White, J., concurring).  In

proceedings to enforce *domestic* arbitration awards, such claims are analyzed under the FAA's

"evident partiality" standard.  *See* 9 U.S.C. § 10(a)(2) (providing that court "may make an order

vacating [an arbitration] award upon application of any party to the arbitration . . . [w]here there

was evident partiality . . . in the arbitrators").  The only two U.S. cases Ukraine cites in support

of its objection to Professor Orrego Vicuña's impartiality both addressed domestic awards and

thus applied the FAA's evident partiality standard.  *See* Opposition at 13; *Commonwealth

Coatings*, 393 U.S. at 146-47; *Schmitz v. Zilveti*, 20 F.3d 1043, 1044-45 (9th Cir. 1994).

However, because the United States is only a secondary jurisdiction under the New York

Convention with respect to the Final Award, *see BCB Holdings*, 110 F. Supp. 3d at 246, the

FAA's domestic provisions—including the evident partiality provision—do *not* apply to this

proceeding.  *Cf. Republic of Argentina v. AWG Grp. Ltd.*, 211 F. Supp. 3d 335, 346 (D.D.C.

2016) (noting that when "award is *made in the United States*, the parties may, through Article

V(1)(e), seek vacatur of the arbitration award under the FAA provisions applicable to domestic

awards in 9 U.S.C. §§ 10 and 11") (emphasis added).  The D.C. Circuit thus recently explained

that the "only potentially relevant ground" for refusing recognition and enforcement under

Article V where, as here, a party to an arbitration seated abroad challenges the impartiality of an arbitrator, is the "public policy" exception of Article V(2)(b). *Belize Bank*, 852 F.3d at 1112. That exception requires the party challenging the arbitrator to show that her partiality was so egregious that enforcing the award would violate the United States' "most basic notions of morality and justice." *Id.* at 1111 ("Article V(2)(b) does not require a fly-specking of the ABA Model Rules of Professional Conduct."). This standard is notably more difficult for the challenging party to satisfy than the FAA's "evident partiality" standard applicable to domestic awards. *See id.* (noting that "even if the conduct did satisfy the FAA standard [of evident partiality], we would be unable to deny enforcement in this case").

While simply ignoring the controlling authority of *Belize Bank*, Ukraine fails to cite a single U.S. case supporting its argument that an arbitrator's failure to disclose an alleged conflict of interest should be addressed under Article V(1)(d), much less adopting the less demanding test Ukraine argues should apply here. *See* Opposition at 10-14. As the D.C. Circuit made clear in *Belize Bank*, Ukraine has it precisely backwards: the burden on Ukraine in challenging the impartiality of Professor Orrego Vicuña in this proceeding to enforce a foreign arbitral award is *higher*, not lower, than the burden on a party to demonstrate evident partiality under the FAA in a domestic arbitration case. *See* 852 F.3d at 1111.

In any event, on the undisputed facts of this case, Ukraine cannot show evident partiality, and thus *a fortiori* cannot show such egregious partiality that it would be contrary to the public policy of the United States to enforce the Final Award. "[T]he burden on a claimant for vacation of an arbitration award due to 'evident partiality' is heavy, and the claimant must establish specific facts that indicate improper motives on the part of an arbitrator." *Al-Harbi v. Citibank, N.A.*, 85 F.3d 680, 683 (D.C. Cir. 1996); *see also Ray v. Chafetz*, Civil Action No. 16-428

(CKK), 2017 WL 663527, at *6 (D.D.C. 2017) (Kollar-Kotelly, J.) ("The alleged partiality must be direct, definite, and capable of demonstration rather than remote, uncertain or speculative.").

In addition to erroneously arguing that the applicable standard is lower than the FAA's evident partiality standard, Ukraine even misstates the evident partiality standard itself. Ukraine relies on the plurality opinion of the Supreme Court in *Commonwealth Coatings* to suggest that an arbitrator's mere failure to disclose "facts showing *potential* partiality" may itself be grounds for vacating an award. *See* Opposition at 13 (emphasis added). But as the D.C. Circuit (and other circuits) have recognized, it is Justice White's narrower concurring opinion in *Commonwealth Coatings* that is controlling. *See Belize Bank*, 852 F.3d at 1114 n.4 ("Justice White's concurrence is the narrowest grounds for judgment, which means that it is the holding of the Court."); *Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 282-83 (5th Cir. 2007) (collecting cases with same holding regarding significance of Justice White's concurrence, which "supports ample but not unrealistic disclosure, and . . . a cautious approach to vacatur [of arbitral awards] for nondisclosure"). Notably, Justice White's controlling opinion in *Commonwealth Coatings* specifically disagreed with the parts of the plurality opinion cited by Ukraine here. *Compare* 393 U.S. at 150-151 ("The Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges . . . . [An arbitrator] cannot be expected to provide the parties with an unexpurgated business biography.") *with* Opposition at 13.

The correct standard, therefore, requires showing more than a mere appearance of potential bias: "an arbitrator is disqualified only when a reasonable person, considering all the circumstances, would *have* to conclude that an arbitrator was partial to one side." *Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 72 (2d Cir. 2012) (emphasis

in original).  "The nondisclosure does not by itself constitute evident partiality.  The question is whether the *facts* that were not disclosed suggest a material conflict of interest."  *Id.* at 77 (emphasis in original).  *See also id.* at 72 ("[W]e have repeatedly cautioned that we are not quick to set aside the results of an arbitration because of an arbitrator's alleged failure to disclose information.").

Ukraine falls far short of this standard.  The Opposition cites a number of authorities that state only the noncontroversial, and question-begging, proposition that an arbitrator "owes to the parties *a continued duty to disclose* any circumstances that are likely to give rise to justifiable doubts as to impartiality or independence."  Opposition at 10 (emphasis in original).  Ukraine, however, fails to cite even one source suggesting that a single appointment by one of the parties' law firms in an unrelated arbitration constitutes such a circumstance.  This lacuna in its argument is all the more notable for one source it *fails* to cite:  the IBA Guidelines, which make clear that a single appointment need *not* be disclosed unless specific circumstances require.  *See AWG Group Ltd.*, 211 F. Supp. 3d at 355 (noting "courts have found these guidelines to be persuasive, but not binding authority" on arbitrator conflicts of interest).[5]  Ukraine's unsupported assertion that there is a *per se* rule requiring disclosure in these circumstances does not even attempt to deal with these well-known Guidelines, much less explain any particular circumstances requiring

---

[5] The IBA Guidelines, *inter alia*, define the situations in which an arbitrator is permitted to continue, or is required to decline (or resign), an appointment by reference to a color-coded list of different scenarios.  One of these, the "Orange List," addresses "situations that, depending on the facts of a given case, may, in the eyes of the parties, give rise to doubts as to the arbitrator's impartiality or independence."  *See* Ex. V at 18 (IBA Guidelines).  One of the scenarios on the Orange List is the following:  "The arbitrator has, within the past three years, been appointed on *more than three occasions* by the same counsel, or the same law firm."  *Id.* at 24 (emphasis added).  Here, Ukraine alleges only one such appointment.  In other words, the facts of this case do not implicate the Orange List, and thus there was no need to disclose.  *Cf. AWG Group Ltd.*, 211 F. Supp. 3d at 255 (addressing "'Non-Waivable Red List' of conflicts for arbitrators that cannot be waived").

disclosure here.  At most, Ukraine argues that Professor Orrego Vicuña will be paid (not by

Cleary Gottlieb or their client), and may have "ex parte" communications with Cleary Gottlieb

lawyers, in connection with his service as an arbitrator in *DP World* (although in fact, as

Ukraine's counsel well knows, such communications are limited to the appointment process

itself, which occurred years ago in an unrelated case).  But the same is always true when an

arbitrator simultaneously serves in two cases where he is appointed by the same law firm, and

thus Ukraine's objections would amount to a *per se* prohibition, contrary to the IBA Guidelines.[6]

In any event, the courts that have considered Ukraine's argument have rejected it.  In one,

the losing party argued, just as Ukraine does here, that the "neutral" arbitrator's "appointment

and payment as party-arbitrator" by its adversary in a separate arbitration "produced a material or

commercial financial relationship with [the adversary] sufficient to constitute evident partiality."

*Nat'l Indem. Co. v. IRB Brasil Resseguros S.A.*, 164 F. Supp. 3d 457, 481-82 (S.D.N.Y. 2016),

*aff'd*, 675 F. App'x 89 (2d Cir. 2017).  The court there noted that "it cannot be that selection and

payment for a person's services as party-arbitrator or umpire, without more, produces a 'material

or commercial financial relationship' sufficient to constitute disqualifying partiality.  If it did, the

entire commercial arbitration system, which universally uses such procedures, would be

undermined."  *Id.* at 479-80.  Other cases have reached the same conclusion.  *See, e.g.*,

*Sathianathan v. Smith Barney, Inc.*, No. C 04-02130 SBA, 2009 WL 537158, at *6 (N.D. Cal.

Mar. 3, 2009) (noting even "repeated appearance of counsel before either a judge or an arbitrator,

---

[6] Ukraine's baseless objection to Cleary Gottlieb having "ex parte" communications with one arbitrator is particularly risible in light of the fact that the principal lawyer for Ukraine in the underlying Arbitration served on a separate arbitration panel with two of the three members of the *Tatneft v. Ukraine* Tribunal for most of the pendency of this very Arbitration.  *See* fn. 2 *supra*.

does not by itself constitute 'evident partiality or corruption'"), *aff'd*, 362 F. App'x 853 (9th Cir. 2010).

Finally, Ukraine's objection is particularly ironic in light of the fact that Ukraine's counsel *also* appointed Professor Orrego Vicuña as an arbitrator in another arbitration before the Final Award was handed down. That Ukraine fails to mention this fact, much less explain how it is consistent with its current purported view that one appointment by Cleary Gottlieb raises "justifiable doubts" about Professor Orrego Vicuña's impartiality, speaks volumes.

Because Ukraine fails to show "evident partiality," *a fortiori*, it does not show the kind of extraordinary facts suggesting partiality on the part of Professor Orrego Vicuña that would make enforcement of the Final Award against the public policy of the United States. The Court should reject Ukraine's challenge to Professor Orrego Vicuña's impartiality on this ground alone.

B.     <u>In Any Event, Ukraine's Argument Also Fails Under Article V(1)(d)</u>

Even assuming *arguendo* that Article V(1)(d) provided the proper framework for Ukraine's challenge to Professor Orrego Vicuña's impartiality, Ukraine's argument would still fall far short of demonstrating that the Court should refuse to enforce the Final Award. In a case in this District that is again ignored by Ukraine, the court rejected an argument strikingly similar to the one Ukraine makes here. *See Compagnie des Bauxites de Guinee v. Hammermills, Inc.*, No. CIV.A. 90-0169 (JGP), 1992 WL 122712, at *5 (D.D.C. May 29, 1992). There the party challenging the award "reason[ed] that the arbitration clause in its contract . . . provided for arbitration 'according to the Rules of Conciliation and Arbitration of the [ICC],' and therefore any procedural violation of ICC Rules necessarily violates 'the agreement of the parties' under the Convention." *Id.* The court responded to this flawed reasoning as follows:

> The Court does not believe that section 1(d) of Article V was intended, as CBG argues, to permit reviewing courts to police every procedural ruling made by the Arbitrator and to set aside the award if any violation of ICC procedures is found.

> Such an interpretation would directly conflict with the "pro-enforcement" bias of the Convention and its intention to remove obstacles to confirmation of arbitral awards. . . . Rather, the Court believes that a more appropriate standard of review would be to set aside an award based on a procedural violation only if such violation worked *substantial prejudice* to the complaining party.

*Id.* (emphasis added).

Even if Ukraine were able to demonstrate that Professor Orrego Vicuña's failure to disclose his *DP World* appointment violated applicable UNCITRAL Rules (which it cannot), Ukraine cannot show substantial prejudice flowing from such "violation" for the same reason as above—the purported conflict was not disqualifying, and even if Professor Orrego Vicuña had disclosed it, nothing would have changed.

An additional reason Ukraine cannot show "substantial prejudice," although the Court need not reach it, is that Ukraine cannot seriously dispute that it had actual knowledge of Professor Orrego Vicuña's separate appointment by Cleary Gottlieb while the underlying Arbitration was still pending. Even if Ukraine's counsel at King & Spalding somehow failed to notice the announcement of Professor Orrego Vicuña's *DP World* appointment in GAR (which is highly doubtful), at a bare minimum King & Spalding would have become aware of that appointment when it appointed Professor Orrego Vicuña *itself* in a separate arbitration. In connection with that appointment, Professor Orrego Vicuña would have provided a list of his ongoing arbitrations, and King & Spalding would surely have conducted its own due diligence besides. Yet Ukraine never mentioned this until after the Final Award. That Ukraine chose not to raise the issue in the Arbitration is telling as to whether it was "substantially prejudiced"; it is more than likely that Ukraine chose to hold this in its back pocket to try to avoid confirmation and enforcement in the event of an adverse award. Accordingly, this Court should reject Ukraine's belated and disingenuous objection to Professor Orrego Vicuña's impartiality, as did the Paris Court of Appeal, regardless of which Article V exception applies.

### III. UKRAINE FAILS TO SHOW THAT ENFORCEMENT OF THE FINAL AWARD SHOULD BE DENIED BECAUSE IT INCLUDES DAMAGES IN RESPECT OF SHARES TATNEFT ACQUIRED FROM AMRUZ AND SEAGROUP

As noted above, Article V(2)(b) of the New York Convention provides that the Court may refuse recognition and enforcement of an arbitral award if doing so "would be contrary to the public policy" of the United States. In light of the United States' strong public policy weighing in *favor* of enforcement of arbitration awards, and "[w]ary of the potentially vast possibilities of [the public policy] exception, courts have been careful not to stretch [its] compass." *Venco Imtiaz Constr. Co. v. Symbion Power LLC*, No. CV 16-1737 (JDB), 2017 WL 2374349, at *2 (D.D.C. May 31, 2017). This exception is therefore "construed extremely narrowly" and will be applied "only where enforcement would violate the most basic notions of morality and justice." *BCB Holdings*, 110 F. Supp. 3d at 250. The party resisting enforcement thus has a "substantial burden" to demonstrate a "well defined and dominant" public policy of the United States sufficient to overcome the public policy favoring arbitration, which "is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* "Although this defense is frequently raised, it has rarely been successful." *Id.*

Here, Ukraine argues that recognition and enforcement of the Final Award would be "contrary to the public policy" of the United States because Tatneft's acquisition of AmRuz and Seagroup shares (as described above) allegedly constitutes (a) "abuse of process," (b) "manipulation of corporate structures to obtain jurisdiction," or (c) "illegality and wrongdoing." Opposition at 15-20. None of these arguments comes close to satisfying Ukraine's substantial burden to demonstrate that enforcement of the Final Award should be refused as against the public policy of the United States.

A.    Ukraine Fails To Demonstrate That The United States' Interests In Preventing
      "Abuse Of Process" Outweighs The Strong Policy Favoring Arbitration, Or That
      Tatneft Committed Any Such "Abuse"

Ukraine argued in the underlying Arbitration and in the Paris Court of Appeal, both times without success, that Tatneft's acquisition of AmRuz and Seagroup shares constituted an "abuse of rights."  Jurisdiction Decision ¶¶ 202-224; Garaud Declaration Ex. A-2 (Paris Court of Appeal Order) at 13.  Here, Ukraine repackages this argument into an accusation that Tatneft engaged in an "abuse of process," asserting (without a single citation in support) that "the United States and the District of Columbia have a public policy of guarding against abuse of process and ensuring that such abuse is not rewarded."  Opposition at 16.  The fact that Ukraine cannot cite a single example of a court holding that this "policy" is such a basic notion of morality and justice as to justify non-enforcement of an arbitral award, *see id.*, is telling.  *Cf. Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir. 2004) ("The abuse of rights doctrine is not established in American law . . . ."); *Venco*, 2017 WL 2374349, at *3 ("Symbion has cited no cases, nor can the Court find any, holding that the general policy of issue preclusion is such a 'basic notion of morality and justice' as to justify non-enforcement of an arbitration award under the public policy exception. The Court doubts that it is.").  This is not to say there is *no* policy of any kind against "reward[ing]" abuses of process, but that such a policy may exist is a far cry from saying that it is substantial enough to override the strong policy in favor of enforcing arbitral awards.  *See BCB Holdings*, 110 F. Supp. 3d at 250 ("Although this Court recognizes that the United States has a strong public policy against corruption abroad, this policy does not reach the threshold required to outweigh the policy in favor of enforcement.").

In any event, even if an award obtained by an "abuse of process" would be sufficiently offensive to the most basic notions of morality and justice to justify refusal to enforce that award,

Ukraine does not come close to showing that Tatneft committed an abuse of process here. Ukraine notes the elements of this tort are (i) a perversion of the judicial process (ii) to achieve a purpose not contemplated in the regular prosecution of the charge (iii) where the party harbored an ulterior motive. *See* Opposition at 16. Ukraine's argument fails at each step. As the Tribunal found, at the time Tatneft acquired the AmRuz and SeaGroup shares, Ukraine had not irreversibly stripped them of their value. For that reason alone, the Tribunal concluded that Tatneft did not acquire these shares solely to augment its recovery against Ukraine. Moreover, the Tribunal also found that AmRuz and Seagroup were both entitled to pursue their own claims against Ukraine under different treaties (so this case is unlike the *Phoenix* and *Phillip Morris* arbitration cases cited by Ukraine). Finally, the Tribunal expressly found that Tatneft did *not* act with an improper motive. *See supra* at 10.

These findings of fact are entitled to considerable deference. *See Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 289 (D.C. Cir. 2016) ("In addressing the public policy question at the enforcement stage, the Supreme Court has given significant weight to the arbitrator's findings of fact."). In *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, for example, the Supreme Court reversed the lower court's vacatur of an arbitral award because "factfinding" is "a task that exceeds the authority of a court asked to overturn an arbitration award." 484 U.S. 29, 44-45 (1987) ("The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe [witnesses and gather facts]. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task.").

Ukraine cannot overcome this deference to the Tribunal's factual findings. Indeed, it concedes that the other shareholders could claim under different treaties. *See, e.g.*, Opposition at

17 ("To be sure, Amruz and Seagroup *could* have brought their own claims under separate treaties . . . .") (emphasis in original). Lacking contrary facts, Ukraine instead speculates that: "[t]he handsome price that Tatneft paid for the shares of AmRuz and Seagroup, embroiled in litigation in Ukraine, raises questions as to whether this was an arms' length transaction," *id.* at 8; *see also* MTD at 9 (same); Tatneft had an "ulterior motive," Opposition at 17, 19; and "Amruz's and Seagroup's legal and practical ability to pursue their own treaty claims against Ukraine is debatable," MTD at 39.[7]

Ukraine forgets that the six-plus-year Arbitration is over. Whether something "raises questions" or is "debatable" at this point cannot overcome the Tribunal's findings of fact. *See United Paperworkers*, 484 U.S. at 44, 45 ("A refusal to enforce an award must rest on more than speculation or assumption."). Nor is this summary enforcement proceeding the time or the place for further discovery in the vain hope that it will confirm such speculation. *See id.* ("If additional facts were to be found, the arbitrator should find them . . . .").

B.    The United States' Public Policy Against Colluding To Create Diversity
        Jurisdiction In Federal Courts Is Obviously Irrelevant

Ukraine next argues that the Final Award should be rejected because it conflicts with a "strong public policy" of the United States "against manipulation of corporate structures to obtain jurisdiction." Opposition at 17. The cases Ukraine cites in support of its assertion that such a policy exists, however, make clear that the policy to which it refers is an utterly irrelevant one: the policy that parties may not collude to create diversity jurisdiction in federal courts. *See*

---

[7] The last is speculation piled on speculation (piled on more speculation): Ukraine speculates that the ultimate beneficiaries of AmRuz and Seagroup were Tatneft executives, which Ukraine further speculates may have given it certain defenses to their treaty claims, which it further speculates would have necessitated Tatneft's counsel making an argument contradicting an argument it made in a separate arbitration on behalf of a separate client. MTD at 39-41.

*Nat'l Fitness Holdings, Inc. v. Grand View Corp. Ctr., LLC*, 749 F.3d 1202, 1203 (10th Cir.

2014) (deciding whether party had impermissibly assigned interest in order "to manufacture

diversity jurisdiction in violation of 28 U.S.C. § 1359").  The policy behind those decisions is

rooted in the unique nature of federal courts under the constitutional design of limited Article III

jurisdiction and federalism, as reflected in a statute that specifically governs the jurisdiction of

federal courts.  *See Nat'l Fitness Holdings*, 749 F.3d at 1205.  The Tribunal's determination as to

its own competence to hear this dispute pursuant to the Russia-Ukraine BIT obviously has

nothing to do with such concerns.

In any event, even viewing this argument charitably, at best it is the same argument

Ukraine unsuccessfully made in its Motion to Dismiss, where it tried to spin its previous

"admissibility" objection as a question of whether the AmRuz and Seagroup claims were

arbitrable.  *See* Opposition at 17-18 (arguing that it did not "consent" to arbitrate the AmRuz and

Seagroup claims).  As noted above, however, the Tribunal's findings on this issue are entitled to

deference, which Ukraine cannot overcome.  *See supra* at 22.  Again, therefore, this argument

fails.

C.     Ukraine Fails To Demonstrate That The Final Award Was Procured By Fraud

Finally, Ukraine argues that the Final Award should be rejected because it conflicts with

a "strong public policy" of the United States "against illegality and wrongdoing in their various

forms."  Opposition at 18.  The United States does have a public policy against enforcing arbitral

awards obtained by fraud.  *See Commercial Union Ins. Co. v. Lines*, 378 F.3d 204, 208 (2d Cir.

2004).  Ukraine, however, does not even allege (nor could it) that Tatneft defrauded the Tribunal,

much less that such fraud somehow prejudiced Ukraine.  As noted above, Ukraine merely

speculates that it might discover additional facts that would tend to contradict the Tribunal's

findings that AmRuz and Seagroup could have filed their own treaty claims and thus there was

no bad faith in Tatneft bringing them under the Russia-Ukraine BIT. But this kind of wishful thinking is no ground for refusing enforcement of the Final Award. *See Anatolie Stati v. Republic of Kazakhstan*, No. CV 14-1638 (ABJ), 2018 WL 1461898, at *9 (D.D.C. Mar. 23, 2018) (noting "public policy exception is not an invitation to re-try" fraud claims rejected by arbitral tribunal).

Ukraine also tries to stretch the public policy against enforcing awards procured by fraud to cover awards involving any "illegal" action or "wrongdoing" in connection with the arbitration, even suggesting this policy encompasses questions like whether Tatneft's acquisitions of the AmRuz and Seagroup shares followed the correct procedure under Russian corporate law, an issue on which Ukraine says discovery is warranted. *See* Opposition at 19. But Ukraine cites no case remotely suggesting that the United States has a strong policy—or any policy—of correctly policing Russian corporate law (or "international investment law") that could overcome the presumption in favor of enforcement of an arbitration award, simply because the losing party says, based on pure speculation, that an arbitral tribunal may have misinterpreted such laws. *See id.* at 19-20.

## CONCLUSION

For the foregoing reasons, Petitioner Tatneft respectfully requests that the Court grant the Petition.

Dated:   April 16, 2018
         New York, New York

                              Respectfully submitted,

                              CLEARY GOTTLIEB STEEN & HAMILTON LLP


                              By:  _____/s/ Jonathan I. Blackman_____
                                     Jonathan I. Blackman (admitted *pro hac vice*)
                                     A Member of the Firm

                              One Liberty Plaza
                              New York, New York
                              Tel: (212) 225-2000
                              Fax: (212) 225-3999
                              Email: jblackman@cgsh.com

                              Matthew D. Slater (D.C. Bar # 386986)
                              2000 Pennsylvania Avenue, N.W.
                              Washington, D.C.
                              Tel: (202) 974-1500
                              Fax: (202) 974-1999
                              Email: mslater@cgsh.com


                              *Attorneys for Petitioner PAO Tatneft*