# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PAO TATNEFT,

     Petitioner/Plaintiff,

     v.

UKRAINE,

     Respondent/Defendant.

Civil Action No. 17-582 (CKK)

## MEMORANDUM OPINION
(August 24, 2020)

Pending before this Court is Petitioner Pao Tatneft's [1] Petition to Confirm Arbitral Award and to Enter Judgment in Favor of Petitioner.[1]  Pao Tatneft, formerly known as OAO Tatneft, brings this action to enforce a 2014 foreign arbitral award entered in favor of Petitioner Pao Tatneft and against Respondent Ukraine by the International Arbitral Tribunal in *OAO Tatneft v. Ukraine*, an arbitration seated in Paris, France and conducted pursuant to the Rules of the United Nations Commission on International Trade Law ("UNCITRAL").  Pao Tatneft was awarded $112 million plus interest accruing at the U.S. dollar LIBOR rate plus 3%, compounded every three months, with further instructions about accrual of interest.  *See* Merits Award (also referred to as the "Final

---

[1] In connection with this Memorandum Opinion, the Court considered Petitioner's [1] Petition to Confirm Arbitral Award and to Enter Judgment in Favor of Petitioner ("Pao Tatneft Pet."), and exhibits attached thereto, including but not limited to the Merits Award, which is filed at ECF No. 1-4 through 1-7; Respondent's [22] Opposition to Petitioner's Petition to Confirm Arbitral Award (Ukraine Opp'n."); Petitioner's [35] Reply in Further Support of Petition to Confirm Arbitral Award and to Enter Judgment in Favor of Petitioner ("Pao Tatneft Reply"); the Jurisdiction Decision, attached as Ex. A to the Supplemental Declaration of Jonathan Blackman, ECF No. 27-3; and the record in this case.  In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

Award") , attached as Ex. A to Declaration of Jonathan Blackman, ECF No. 1-3.[2]

For the reasons set forth herein, the Court GRANTS Pao Tatneft's [1] Petition to Confirm Arbitral Award, and requests that the Petitioner file a proposed order of judgment reflecting the amount of the constituent parts of the award, along with a brief summary of the interest calculations, and Respondent have the opportunity to respond thereto.

I. BACKGROUND[3]

A. Factual Background Leading to the Merits Award

Petitioner Pao Tatneft (hereinafter referred to as "Pao Tatneft" or "Tatneft") is a "publicly-traded open joint stock company, established and existing under the laws of the Russian Federation. *See* Pao Tatneft Pet., ECF No. 1, at ¶ 1.  On July 4, 1995, Tatarstan and Ukraine entered into an agreement to create CJSC Ukrtatnafta Transnational Financial and Industrial Oil Company ("Ukrtatnafta"), a Ukrainian joint stock company that operates the largest oil refinery in Ukraine, with Tatneft, Ukraine, and Tatarstan as its three major shareholders.  *See* Declaration of Jonathan I. Blackman in support of Petition ("Blackman Decl."), ECF No. 1-3, Ex. A (Merits Award), ECF No. 1-4, at ¶¶ 57-59. Tatneft and Tatarstan were initially slated to make capital contributions of oil-related fixed assets to Ukrtatnafta, but later agreed to make contributions of cash and other assets in 1997 and 1998.  Merits Award, ECF No. 1-4, at  ¶¶ 61, 174, 176.

In 1998 and 1999, the United States-based Seagroup International, Inc. ("Seagroup") and Switzerland-based AmRuz Trading Co. ("AmRuz") acquired shares in Ukrtatnafta, and together

---

[2] Mr. Blackman is a partner at the law firm of Cleary Gottlieb Steen & Hamilton LLP, counsel for Petitioner Pao Tatneft in this action and during the arbitration.
[3] Much of the background is borrowed from the background information contained in this Court's March 19, 2018 [34] Memorandum Opinion and this Court's May 13, 2020 [48] Memorandum Opinion.  This has been supplemented with background information relevant to the arguments made by Ukraine.

with Tatneft and Tatarstan (the four entities are collectively referred to as the "Tatarstan Shareholders"), they owned a majority 56% of Ukrtatnafta's shares, and they agreed to vote as a bloc. *See* Merits Award, ECF No. 1-4, at ¶ 141; ECF No. 1-6, at ¶ 562 & n.903.  In January 2007, the Ukrainian Privat Group acquired a 1% interest in Ukrtatnafta.  *Id.,* ECF No. 1-4, at ¶ 143; ECF No. 1-5, at ¶¶ 223, 268. The Privat Group subsequently obtained Ukrainian judgments that purportedly invalidated the 1997 and 1998 shareholder resolutions whereby Tatartan and Tatneft obtained their interests in Ukrtatnafta, and resulted in the Tatarstan Shareholders being barred from management of Ukrtatnafta and ownership of its shares.  *Id.*, ECF No. 1-4, at ¶¶ 126-28, 147, 156, 159-62, 169-71, 174-76; ECF No. 1-5, at ¶¶ 221-38, 276-80, 316, 320, 325; ECF No. 1-6, at ¶ 465.

On December 11, 2007, Tatneft sent a Notice of Dispute to Ukraine, requesting negotiations pursuant to Article 9 (1) of the Russia-Ukraine Bilateral Investment Treaty ("Russia-Ukraine BIT" or "BIT").  Merits Award, ECF No. 1-4, at ¶ 6;  Blackman Decl., ECF No. 1-3, Ex. B (Russia-Ukraine BIT), ECF No. 1-8, at art. 9(1). On May 21, 2008, after trying to resolve the dispute for approximately five months, Tatneft served Ukraine with a Notice of Arbitration and Statement of Claim under UNCITRAL, alleging that Ukraine had violated its obligations with regard to granting legal protection to and disallowing discrimination against investors from Russia, such as Tatneft, under the Russia-Ukraine BIT.  Merits Award, ECF No. 1-4, at  ¶ 7; Russia-Ukraine BIT, ECF No. 1-8,  at arts. 2, 3(1).

The Russian-Ukraine BIT provides for arbitration by "an ad hoc arbitration tribunal in accordance with the Arbitration Rules of the United Nations Commission on International Trade law (UNCITRAL)."  Russia-Ukraine BIT, ECF No. 1-8, at art. 9(2)(c); Merits Award, ECF No. 1-4, at ¶ 6.  Furthermore, the Russia-Ukraine BIT sets out a procedure for selecting members of the arbitral tribunal:

Each [of the] Contracting Parties shall appoint one member of the arbitration tribunal

within two months of receiving the arbitration notice.  Those two tribunal members shall then select a citizen of a third country who with the consent of both Contracting Parties shall be appointed as a chairperson of the tribunal within one month of the appointment of the two other tribunal members.

Russian-Ukraine BIT, ECF No. 1-8, at art. 10.

In accordance with the Russia-Ukraine BIT, Tatneft appointed one member of the tribunal, Professor Rudolph Dolzer, and Ukraine appointed The Honorable Marc Lalonde, and these two appointees appointed the third and presiding member of the panel – Professor Orrego Vicuña. Merits Award, ECF No. 1-4, at ¶ 8.  Ukraine challenged Tatneft's appointment of Professor Dolzer, and after the challenge was sustained, Tatneft appointed the Honorable Charles N. Brower instead. Merits Decision, ECF No. 1-4, at ¶ 9.  Ukraine did not object to Judge Brower or to Professor Vicuña, who is a "law professor with extensive experience as an arbitrator in international disputes, and is a judge of the International Monetary Fund's Administrative Tribunal, among other appointments."  Tatneft Reply, ECF No. 35, at 8.[4]

Following written submissions and a hearing, the arbitral tribunal issued a September 28, 2010 decision confirming its jurisdiction over Tatneft's claims (the "Jurisdiction Decision"), and after receiving additional written submissions and documents, the arbitral tribunal held a merits hearing from March 18, 2013 to March 27, 2013, wherein fact and expert witnesses testified. Merits Award, ECF No. 1-4, at ¶¶ 6-46.  On July 29, 2014, the arbitral tribunal issued its Merits Award, whereby it concluded that Ukraine's actions resulted in a "total deprivation of [Tatneft's] rights as a shareholder of Ukrtatnafta" and further, that Ukraine had failed under the Russia-Ukraine BIT to provide fair and equitable treatment (FET) to Tatneft. Merits Award, ECF No. 1-5, at ¶ 412; ECF No. 1-6, at ¶ 464.  Ukraine was ordered to "pay [Tatneft] the amount of US $112

_____

[4] Page numbers cited by the Court refer to the page numbers assigned by the Court's Electronic Case Filing ("ECF") system.

million as compensation for its breaches of the Russia-Ukraine BIT" along with interest at the U.S. dollar LIBOR rate plus 3% compounded every three months, with further instructions about the accrual of interest.   Merits Award, CF No. 1-6, at ¶ 642(1)-(3).  Each party was ordered to bear its own costs, and each party was ordered to pay half the cost of the arbitration.  Merits Award, ECF No. 1-6, at ¶ 642 (5),(6).

On July 22, 2011, in the period between the issuance of the Jurisdiction Decision and the Merits Award, Professor Vicuña was appointed as an arbitrator by Cleary Gottlieb, the law firm representing Tatneft, in an unrelated arbitration (*DP World, et al. v. Republic of Peru*), and he accepted the appointment on September 21, 2011.  Ukraine Opp'n., ECF No. 22, at 6; Pao Tatneft Reply, ECF No. 35, at 4.  The appointment was reported by Global Arbitration Review, "a publication and database that is regularly read and used by virtually all international arbitration practitioners[.]" Pao Tatneft Reply, ECF No. 35, at 9.  Professor Vicuña "did not update his original disclosures in the Arbitration to include his *DP World* appointment."  *Id.*

During this same period between the issuance of the Jurisdiction Decision and the Merits Award, on April 30, 2013, Ukraine's law firm from the arbitration – King & Spaulding – appointed Professor Vicuña as an arbitrator in *South American Silver Ltd. v. Bolivia*, a case where the claimant (represented by King & Spalding) seeks more than $300 million, and this appointment was not disclosed in the arbitration at issue in this case.  Pao Tatneft Reply, ECF No. 35, at 9-10.

B. Procedural Background After the Merits Award

On August 27, 2014, Ukraine brought an action before the Paris Court of Appeal in France to annul both the Merits Award and the earlier Jurisdiction Decision. Blackman Decl. ¶ 5. On November 29, 2016, the Paris Court of Appeal rejected Ukraine's annulment request, upheld both the Jurisdiction Decision and the Merits Award, and ordered Ukraine to pay fees and costs to Tatneft. *Id.*  In connection  with  Ukraine's effort to annul the Merits Award, Ukraine argued that Professor

Vicuña's failure to disclose his *DP World* appointment was grounds for vacating the Merits Award. *See* June 26, 2017 Declaration of Jean-Yves Garaud, ECF No. 16-1 ("Garaud Decl."), at ¶ 3; Ex. A-2 (Paris Court of Appeal Order), ECF 16-3, at 12.[5]  This argument was rejected by the Paris Court of Appeal in its November 29, 2016 decision confirming the Merits Award, when that court found that: "Ukraine fail[ed] to demonstrate how a single appointment in the course of the seven years that the arbitration lasted, which did not characterize a history of business between the arbitrator and this law firm, had the potential to raise a reasonable doubt about the independence and impartiality of Mr. Orrego Vicuña."  ECF No. 16-3, at 13.

Ukraine filed a subsequent request for appeal, on March 21, 2017, to the French Court of Cassation.  On December 29, 2016, Tatneft sent a letter to Ukraine demanding payment of the Merits Award amount and noting that if payment was not made by February 15, 2017, Tatneft would commence enforcement proceedings. *See* Blackman Decl., ECF No. 1-3, Ex. C (Dec. 29, 2016 Demand Letter), ECF No. 1-9, at 2.  Tatneft filed its Petition to Confirm Arbitral Award on March 30, 2017, seeking recognition of the award in this Court.   The Petition was fully briefed in mid-2018, but prior to this Court ruling on the Petition, Ukraine filed a motion to dismiss on jurisdictional grounds, and the case was stayed subsequently while Ukraine appealed from this Court's denial of its motion to dismiss.  The stay was lifted after the Court of Appeals affirmed this Court's decision and issued its mandate, and subsequently, this Court ordered the parties to file a Joint Status Report.

The parties' [43] Joint Status Report indicated that Ukraine had filed a motion for reinstatement of the French Court of Cassation proceeding, but Ukraine did not seek a further stay of this proceeding because of that motion, although it reserved its right to renew a motion for stay

---

[5] Jean-Yves Faraud is a partner at Cleary Gottlieb Steen & Hamilton, LLP, counsel for Pao Tatneft in this matter and during the arbitration.

if and when the French Court of Cassation proceeding resumes.  Jt. Status Rpt., ECF No. 43, at 1-

2.  The parties noted that they were unaware of any new cases or law affecting the pending briefing.

*Id.* at 2.  Finally, the parties notified this Court of a decision in a parallel proceeding in the United

Kingdom (the "UK") High Court denying one of Ukraine's challenges to enforcement of the Final

Award.  *Id.*; *see* Joint Status Report, Ex. A ([UK] Approved Judgment), ECF No. 43-1.  This

challenge by Ukraine was brought under section 103(2)(e) of the UK Arbitration Act 1996, which

implements Article V(1)(d) of the New York Convention. This UK ruling will be discussed herein

in the context of one of Ukraine's arguments against enforcement of the Petition in this case, *i.e.*,

that the Court should refuse to recognize and enforce the Final Award pursuant to Article V(1)(d).

Also pending before the High Court is Ukraine's challenge to enforcement of the Final

Award under section 103(2)(d) of the UK Arbitration Act 1996, which implements Article V(1)(c)

of the New York Convention.  While Ukraine made no argument pursuant to Article V(1)(c) in

response to the Petition in this case, Ukraine filed a motion asking this Court for permission to

provide supplemental briefing on that issue.  That request to provide additional briefing was denied

by this Court, *see* May 13, 2020 Memorandum Opinion, ECF No. [48], and accordingly, Pao

Tatneft's Petition is now ripe for resolution by this Court.   Pao Tatneft seeks to confirm the Merits

Award under the Federal Arbitration Act ("FAA"), 9 U.S.C. §201, *et seq.,* which codifies the

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21

U.S.T. 2517 (the "New York Convention").

II. LEGAL STANDARD

The New York Convention, which is incorporated in the Federal Arbitration Act, *see* 9

U.S.C. §§ 201-208*, "*is a multilateral treaty that, with exceptions, obligates participating countries

to honor international commercial arbitration agreements and to recognize and enforce arbitral

awards rendered pursuant to such agreements." *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 283 (D.C. Cir. 2016).  The New York Convention provides for "recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." *See* Art. 1.1, 21 U.S.T. 2517. Since the award in this case was made in France and enforcement is sought in the United States, both of which are signatories to the New York Convention, the confirmation is governed by the Convention. *See* Pao Tatneft Pet.*,* ECF No. 1, at ¶ 3; 9 U.S.C. Section 207 (permitting any party to an arbitration under the Convention to seek confirmation of the arbitral award in United States federal district court within three years of the award); *see also BCB Holdings Ltd. v Gov't of Belize*, 110 F. Supp. 3d 233, 242 (D.D.C. 2015) (finding that the FAA affirms that the purpose of the New York Convention is to encourage recognition and enforcement of commercial arbitration agreements in international contracts), *aff'd*, 650 F. App'x 17 (D.C. Cir. 2016), *cert den.,* 137 S. Ct. 619 (2017).

As the United States Court of Appeals for the District of Columbia Circuit has recognized, "[c]onsistent with the 'emphatic federal policy in favor of arbitral dispute resolution' recognized by the Supreme Court[,]. . . the FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).  The FAA provides that a district court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [ ] Convention." 9 U.S.C. § 207; *see TermoRio S.A. E.S.P. v. Electanta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (A district court "may refuse to enforce the award [under the New York Convention] only on the grounds explicitly set forth in Article V of the Convention."), *cert denied*, 552 U.S. 1038

(2007); *see also Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech*., 763 F. Supp. 2d 12, 20 (D.D.C. 2011) ("Confirmation proceedings are generally summary in nature" because "the New York Convention provides only several narrow circumstances where a court may deny confirmation of an arbitral award.") (citation omitted).

The party resisting confirmation bears a heavy burden of establishing that one of the grounds for denying confirmation in Article V applies. *Seelmperial Ethiopian Gov't. v. Baruch-Foster Corp.*, 535 F.2d 334, 336 (5ᵗʰ Cir. 1976); *see also Ottley v. Schwartzberg*, 819 F. 2d 373, 376 (2d Cir. 1987)("[T]he showing required to avoid summary confirmation is high."). Pursuant to the New York Convention: (1) an arbitral award may be refused at the request of the party against whom it is invoked where (a) the parties to the agreement were under some incapacity; (b) the party against whom the award is invoked did not receive proper notice of the arbitration proceedings; (c) the award deals with an issue not falling within the terms of the parties' submission to arbitration; (d) the composition of the arbitral tribunal was not in accordance with the parties' agreement; (e) the award has not yet become binding; or (2) recognition and enforcement of an arbitral award may be refused in the country where it is sought if (a) the issue arbitrated is not capable of being arbitrated under the law or (b) it would be contrary to the public policy of such country. New York Convention, Art. V, June 10, 1958, 21 U.S.T. 2517, 1970 WL 104417 (effective for the United States on Dec. 29, 1970).

III. ARGUMENT

Ukraine argues against confirmation and enforcement of the Merits Award on New York Convention Article V grounds; namely, Ukraine alleges there was a lack of impartiality of the arbitral tribunal, and further, that recognition and enforcement would be contrary to the public policy of the United States. These two arguments by Ukraine will be addressed in turn.

A. <u>Composition of the Arbitral Tribunal</u>

Article V(1)(d) of the New York Convention provides that "[r]ecognition and enforcement of the award may be refused" if "[t]he composition of the arbitral authority . . . was not in accordance with the agreement of the parties. . . "  New York Convention, art. V(1)(d).   Ukraine explains that "[w]hen Tatneft elected to arbitrate under the UNCITRAL Arbitration Rules, such Rules became part of the agreement to arbitrate [,] [and these] Rules contain specific rules governing the composition of the arbitral authority in Section II, Articles 5-14."  Ukraine Opp'n., ECF No. 22, at 11.   Article 9 of the UNCITRAL Arbitration Rules sets the standard for an arbitrator's duty of disclosure as follows:

> A prospective arbitrator shall disclose to those who approach him in connection with his possible appointment any circumstances likely to give rise to justifiable doubts as to his impartiality or independence.  An arbitrator, once appointed or chosen, shall disclose such circumstances to the parties unless they have already been informed by him of the circumstances.

1976 UNCITRAL Arbitration Rules, art. 9.

Ukraine alleges that "[d]uring the course of the arbitration, President of the Arbitral Tribunal, Mr. Francisco Orrego Vicuña, failed to fulfill his duty of disclosure owed to the Parties [when] [h]e concealed from the Parties information that was likely to give rise to justifiable doubts as to his independent and impartiality."   Ukraine Opp'n, ECF No. 22, at 6.  More specifically, at the time the parties were "making their final written submissions on the merits," Mr. Vicuña was approached by the law firm that represented Pao Tatneft, and he was offered (and accepted) a "prestigious and lucrative appointment" in "a major investment arbitration" being conducted in Washington, D.C., where he could be expected to earn hundreds of thousands of dollars.  *Id.* at 6-8.  Ukraine contends that it "did not become aware of Mr. Orrego Vicuña's appointment . . . until after the conclusion of the arbitration."  *Id.* at 8.  As a preliminary matter, this Court must establish the appropriate standard under which to examine Mr. Vicuña's actions.

1. Applicable Standard for Challenging an Arbitrator's Partiality

Ukraine proffers that, pursuant to Section 10(a)(2) of the FAA, an arbitral award may be vacated "where there was evident partiality . . . in the arbitrators, or either of them[,]"and this is a higher standard than in Article 10 of the UNCITRAL Arbitration Rules, which merely require a showing of "justifiable doubts" as to the arbitrator's impartiality or independence.  Ukraine Opp'n., ECF No. 22, at 15 (citing FAA, § 10(a)(2) and UNCITRAL, Art. 10).[6] In arguing that the standard is evident partiality, Ukraine relies on *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 148-9 (1968) ("We can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias.") and *Schmitz v. Zilveti*, 20 F. 3d 1043, 1047 (9th Cir. 1994) ("The parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed.").

Ukraine asserts that "[i]n light of U.S. case law, Mr. Orrego Vicuña's failure to disclose an appointment that likely brought him revenue around USD 300,000 would have been more than sufficient to characterize "evident partiality" in the meaning of Section 10(a)(2) of the FAA, and would have been more than sufficient to vacate the award under that Section."  Ukraine Opp'n., ECF No. 22 , at 15 (emphasis omitted); *see Applied Industrial Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.,* 492 F.3d 132 (2d Cir. 2007) (affirming a district court's denial of a petition to confirm an arbitration award from an arbitration held in New York, and holding that an arbitrator's failure to investigate and disclose the fact that a company he chaired and was CEO for had earned revenue of $275,000 from his relationship with one of the parties amounted to "evident

---

[6] Article 10 of the 1976 UNCITRAL Arbitration Rules provide that "[a]ny arbitrator may be challenged if circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence."  1976 UNCITRAL Arbitration Rules, art. 10.

partiality").  Ukraine indicates that had it become aware of Mr. Vicuña's "lucrative and prestigious appointment by Tatneft's counsel in the midst of the parties' final submission on the merits and in anticipation of the Merits Award," Ukraine "justifiably [could] have had serious doubts" as to the arbitrator's impartiality and independence.  Ukraine Opp'n., ECF No. 22, at 16.

Pao Tatneft contests the standard proffered by Ukraine and explains that the FAA's "evident partiality" standard is used to assess claims in cases involving <u>domestic arbitration awards</u>, which is not the case here.  Pao Tatneft notes further that the *Commonwealth Coatings* and *Zilvetti* cases relied upon by Ukraine are distinguishable because they both addressed domestic awards and therefore applied this standard. "However, because the United States is only a secondary jurisdiction under the New York Convention with respect to the Final Award, *see BCB Holdings*, 110 F. Supp 3d at 246, the FAA's domestic provisions — including the evident partiality provision — do not apply to this proceeding."  Pao Tatneft Reply, ECF No. 35, at 18; *cf. Republic of Argentina v. AWG Grp. Ltd.,* 211 F. Supp. 3d 335, 346 (D.D.C. 2016) (noting that when "the award is made in the United States, the parties may, through Article V(1)(e), seek vacatur of the arbitration award under the FAA provisions applicable to domestic awards in 9 U.S.C. §§ 10 and 11"), *aff'd.*, 894 F.3d 327 (D.C. Cir. 2018).

Furthermore, in *Belize Bank*, a case that was not cited by Ukraine, the United States Court of Appeals for the District of Columbia Circuit explained this distinction in some detail:

> The cases upon which Belize relies address a provision of the Federal Arbitration Act (FAA) that permits a district court to vacate a domestic arbitration award "where there was evident partiality or corruption in the arbitrators."  9 U.S.C. § 10(a)(2)  For the reasons set forth below, Belize has failed to allege conduct that would warrant denial of enforcement under our cases interpreting that standard.  But even if the alleged conduct did satisfy the FAA standard, we would be unable to deny enforcement in this case.  As we have explained above, we may refuse to enforce this international arbitration award "only on the grounds explicitly set forth in Article V" of the New York Convention, *TermoRio*, 487 F.3d at 935, and the only potentially relevant ground is that enforcement of the arbitration award "would be contrary to the public policy of [the United States]," New York Convention art. V(2)(b). As we have also explained, this requires Belize to show that [an arbitrator's] participation

in the arbitration violated this country's "most basic notions of morality and justice." *TermoRio*, 487 F.3d at 938.

*Belize Bank Ltd. v. Govt. of Belize*, 852 F.3d 1107, 1112 (D.C. Cir. 2017)

Pao Tatneft notes that Ukraine not only ignores *Belize Bank,* but it also "fails to cite a single U.S. case supporting its argument that an arbitrator's failure to disclose an alleged conflict of interest should be addressed under Article V(1)(d), much less adopting the less demanding test Ukraine argues should apply here." Pao Tatneft Reply, ECF No. 35, at 19.  This Court agrees that this Circuit has made it clear that the burden on Ukraine in challenging Professor Vicuña's impartiality in a proceeding to enforce a foreign arbitration award is higher than the FAA's evident partiality standard, which is applied to domestic arbitration cases, and that such claims should be brought pursuant to the public policy exception. Nevertheless, because Pao Tatneft responds to Ukraine's arguments as if the [less-stringent] evident partiality standard applies and/or Ukraine may rely on the Article V(1)(d) of the New York Convention, this Court will analyze Ukraine's argument under those standards.

a. Even under the Evident Partiality Standard, Ukraine's Argument Fails

Assuming *arguendo* that the evident partiality standard applies, Pao Tatneft asserts that Ukraine would not meet that standard. "[T]he burden on a claimant for vacation of an arbitration award due to 'evident partiality' is heavy, and the claimant must establish specific facts that indicate improper motives on the part of an arbitrator."  *Al-Harbi v. Citibank, N.A.,* 85 F.3d 680, 683 (D.C. Cir. 1996), *cert den.*, 519 U.S. 981 (1996).   Pao Tatneft notes that Ukraine relies on the plurality opinion in *Commonwealth Coatings* to suggest that the mere failure to disclose facts showing potential partiality by an arbitrator could be enough to vacate an award; however, the D.C. Circuit has recognized that "Justice White's concurrence is the narrowest grounds for the judgment, which means that it is the holding of the Court."  Pao Tatneft Reply, ECF No. 35, at 20

13

(citing *Belize Bank*, 852 F. 3d at 1114 n.4).  Accordingly, Pao Tatneft concludes that this evident partiality standard requires "showing more than a mere appearance of potential bias" to disqualify an arbitrator, *id.* at 20, such as when "a reasonable person, considering all the circumstances, would *have* to conclude that an arbitrator was partial to one side."  *Id.* (citing *Scandinavian Reinsurance Co. Ltd. v. St. Paul Fire and Marine Ins. Co.,* 668 F.3d 60, 72 (2d Cir. 2012) (emphasis in original) (citation omitted); *see also id.* at 72 ("[W]e have repeatedly cautioned that we are not quick to set aside the results of an arbitration because of an arbitrator's alleged failure to disclose information.") (internal quotation marks and citation omitted).

Ukraine relies on the UNCITRAL Arbitration Rules, cases and commentary propounding generally that "the arbitrator owes to the parties *a continued duty to disclose* any circumstances that are likely to give rise to justifiable doubts as to impartiality or independence."  Ukraine Opp'n., ECF No. 22, at 11-12 (emphasis in original).  Pao Tatneft acknowledges these authorities cited by Ukraine but notes that not even one source "suggest[s] that a single appointment by one of the parties' law firms in an unrelated arbitration constitutes such a circumstance."  Pao Tatneft Reply, ECF No. 35, at 21.  Notably, Ukraine does not cite to the IBA Guidelines on Conflicts of Interest in International Arbitrations, which are "persuasive, but not binding authority" on arbitrator conflicts of interest. *AWG Group Ltd.*, 211 F. Supp. 3d at 355.  Pao Tatneft asserts that those Guidelines "make clear that a single appointment need not be disclosed unless specific circumstances require."  *Id.* at 21 & n.5 (explaining that under the IBA Guidelines, a situation that may give rise to doubts on impartiality involves an arbitrator being appointed on more than three occasions within the past three years by the same counsel or law firm).  Importantly, Ukraine does not mention that its counsel also appointed Professor Vicuña as an arbitrator in another arbitration before the Final Award was handed down.

Pao Tatneft argues that courts which have considered Ukraine's argument, which amounts

to a *per se* rule requiring disclosure of a single appointment by one of the parties' law firms, have rejected it. *See, e.g., Nat'l Indem. Co. v. IRB Brasil Resseguros S.A.,* 164 F. Supp. 3d 457, 479-80 (S.D.N.Y. 2016) (noting that "it cannot be that selection and payment for a person's services as a party-arbitrator or umpire, without more, produces a 'material or commercial financial relationship' sufficient to constitute disqualifying partiality [because] [if] it did, the entire commercial arbitration system, which universally uses such procedures, would be undermined"), *aff'd*, 675 F. App'x 89 (2d Cir 2017); *Sathianathan v. Smith Barney*, *Inc*., No. C 04-02130 SBA, 2009 WL 537158, at *6 (N.D. Cal. Mar. 3, 2009) (noting even "repeated appearance of counsel before either a judge or an arbitrator does not by itself constitute 'evident partiality or corruption'") (citation omitted), *aff'd,* 362 F. App'x 853 (9th Cir. 2010).  As such, this Court finds that, even assuming that the applicable standard was "evident partiality," Ukraine fails to demonstrate that this standard has been met, and accordingly, denial of confirmation of Pao Tatneft's arbitral award is unwarranted.

     b. Even under Section V(1)(d), Ukraine's Argument Fails

       Furthermore, assuming *arguendo* that Section V(1)(d) of the New York Convention was the appropriate section under which to proceed, Pao Tatneft contends that "Ukraine's argument would still fall far short of demonstrating that the Court should refuse to enforce the Final Award." Pao Tatneft Reply, ECF No. 35, at 23.  As a preliminary matter, this issue of arbitral impartiality — based on the same circumstances asserted here — was raised by Ukraine under Section 103(2)(e) of the United Kingdom Arbitration Act, in a parallel proceeding before the High Court of Justice, Business and Property Courts of England and Wales Commercial Court, and it was rejected by the High Court in its December 20, 2019 decision.[7]  The High Court examined this

_____

[7] The decision is attached to the parties' Joint Status Report, ECF No. 43. In that Joint Status Report, the parties note that "Section 103(2)(e) of the Arbitration Act 1996 implements Article

question in light of *Halliburton Company v. Chubb Bermuda Insurance Ltd.* [2018] EWCA Civ. 817, [2018] 1 WLR 3361 (finding it a "false comparison"); the IBA Guidelines on Conflicts of Interest in International Arbitration (finding "nothing in [those] Guidelines in force at the time of these matters which assists" and concluding that disclosure would not "currently be required"); and International Chamber of Commerce ("ICC") guidance.  *See* High Court Decision (attached to Joint Status Report), ECF No. 43-1, at ¶¶ 19, 64-65, 67, 75-77, 87, 98.  The High Court noted that the Paris Court of Appeal had addressed this argument and "dismissed all the bases advanced by Ukraine" when it rejected this challenge on November 29, 2016 .  High Court Decision, ECF No. 43-1, at ¶¶ 21, 23.  The High Court found that:

> Whether or not the Paris Court applies a slightly different test in substance to the one which is operative here, like the Paris Court I do not consider that it can at all be said that a single appointment in the course of the seven years the arbitration lasted would or might provide the basis for a reasonable apprehension about the independence or impartiality of Professor Vicuña; and still less that they were likely to give rise to justifiable doubts so as to trigger the duty of disclosure.  The argument that this appointment does so is in reality premised on the supposed fair-minded and informed observer being either not entirely fair-minded or not entirely informed, or both.

High Court Decision, ECF No. 43-1, at ¶ 84.  The High Court concluded that there was "no failure to disclose" and "no failure of arbitral procedure."  *Id.* at ¶ 103.

Accordingly, this Court is the third entity to examine Ukraine's claim of arbitral impartiality that has been twice rejected.  In an argument brought under Section V(1)(d), Pao Tatneft argues that Ukraine would need to demonstrate both that Professor Vicuña's failure to disclose the *DP World* appointment somehow violated UNCITRAL Rules and that there was substantial prejudice flowing from any alleged violation, pursuant to the ruling in *Compagnie des Bauxites de Guinee v. Hammermills, Inc.*, No. CIV. A 90-0169 (JGP), 1992 WL 122712, at *5 (D.D.C. May 29, 1992), a

---

V(1)(d) of the New York Convention."  ECF No. 43, at 2 & n.1. (comparing the language of Section 103(2)(e)  with art. V(1)(d)).

case from this Court, which was not addressed by Ukraine.   In that case, the party challenging an arbitration award "reason[ed] that the arbitration clause in its contract . . . provided for arbitration 'according to the Rules of Conciliation and Arbitration of the [ICC],' and therefore any procedural violation of the ICC Rules necessarily violates 'the agreement of the parties' under the Convention." *Id.*  The court responded to that argument as follows:

> The Court does not believe that section 1(d) of Article V was intended, as CBG argues, to permit reviewing courts to police every procedural ruling made by the Arbitrator and to set aside the award if *any* violation of ICC procedures is found. Such an interpretation would directly conflict with the "pro-enforcement" bias of the Convention and its intention to remove obstacles to confirmation of arbitral awards. . . . Rather, the Court believes that a more appropriate standard of review would be to set aside an award based on a procedural violation only if such violation worked substantial prejudice on the complaining party.

*Id.* (emphasis in original) (internal citations omitted).

Here, Ukraine would have to show (and it does not) that had Professor Vicuña disclosed the *DP World* appointment, it would have been disqualifying.  This is problematic for Ukraine for several reasons, including that the arbitration was announced publicly by Cleary Gottlieb in a publication used by law firms that participate in arbitrations, thereby giving counsel - King & Spalding - notice, and furthermore, as previously noted, King & Spalding also appointed Professor Vicuña as an arbitrator in one of their cases, and thus should have been aware by that time of the arbitrations in which Professor Vicuña was active.   In either case, Ukraine never mentioned this *DP World* appointment "until after the Final Award," Pao Tatneft Reply, ECF No. 35, at 24, which weighs against any claim of "substantial prejudice."   Accordingly, even if proceeding under Section (V)(1)(d), Ukraine's argument regarding Professor Vicuña's alleged lack of impartiality fails, and denial of confirmation of the arbitral award is unwarranted.

In sum, Ukraine's arguments regarding application of the evident partiality standard and/or proceeding pursuant to Article V(1)(d) fail, are in fact contradicted by the law of this Circuit, *see*

*Belize Bank, supra.*, which applies a more stringent standard to challenges regarding impartiality of arbitrators in foreign arbitration proceedings and indicates that those type of claims shall be brought pursuant to the public policy exception.   Furthermore, as explained above, Ukraine fails to meet the less stringent standards proposed in its Opposition and rebutted in Pao Tatneft's Reply.   Ukraine alternatively argues that various public policy exceptions are applicable to invalidate the Merits Award in this case.

B. Public Policy

Article V(2)(b) of the New York Convention provides that "[r]ecognition and enforcement of an award may also be refused" if it would be "contrary to the public policy" of the United States. New York Convention, art. V(2)(b); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 638 (1985).   "The public policy defense under Article V(2)(b) of the New York Convention is to be construed narrowly and is available only where an arbitration award 'tends clearly to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property.'"   *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 289 (D.C. Cir. 2016) (quoting *TermoRio S.A. v. Electranta S.P*, 487 F.3d 928, 938 (D.C. Cir. 2017)).   "Although this defense is frequently raised, it has rarely been successful."   *BCB Holdings Ltd.*, 110 F. Supp. 3d at 250 (quotation omitted).

The party contesting enforcement has a "substantial burden" to demonstrate a "well-defined and dominant" United States public policy that sufficiently overcomes the public policy favoring arbitration, and such policy shall "be ascertained by reference to the laws and legal precedents and not from general consideration of supposed public interests."   *Id.*; *see also Enron*, 844 F.3d 281 at 289 (noting the "heavy burden"). In this case, Ukraine argues that recognition and enforcement of the Merits Award would violate United States public policies against: (1) abuse of process; (2) manipulation of corporate structure to create jurisdiction; and (3) illegality and wrongdoing, and

18

these allegations will be discussed in turn.

1. Abuse of Process

Ukraine asserts that the United States and District of Columbia have a "public policy guarding against abuse of process and ensuring that such abuse is not rewarded," Ukraine Opp'n., ECF No. 22, at 17. Ukraine, however, fails to proffer any legal authority that any such policy against abuse of process would outweigh any policy in favor of enforcement of arbitration awards, and on an even more basic level, Ukraine fails to proffer any legal authority explaining such public policy against abuse of process. *Cf. Venco Imtiaz Cnstruction Co. v. Symbion Power LLC*, Civil Action No. 16-1737 (JDB), 2017 WL 2374349, at *3 (D.D.C. May 31, 2017) ("Symbion has cited no cases, nor can the Court find any, holding that the general policy of issue preclusion is such a 'basic notion of morality and justice' as to justify non-enforcement of an arbitration award under the public policy exception. The Court doubts that it is."), *aff'd.*, 2018 WL 3407572 (D.C. Cir. Jul. 10, 2018); *see also BCB Holdings*, 110 F. Supp. 3d at 250 ("Although this Court recognizes that the United States has a strong public policy against corruption abroad, this policy does not reach the threshold required to outweigh the policy in favor of enforcement [of an arbitral award].")

The Court notes that Ukraine cites *Nader v. The Democratic Nat. Comm.*, 555 F. Supp. 2d 137, 153 (D.D.C. 2008), in support of its proposition that abuse of process involves "perver[sion] of the judicial proceeding, achiev[ing] a purpose not contemplated in the regular prosecution of the charge and harbor[ing] an ulterior motive." That case is however inapposite, as it pertains to claims involving the Rooker-Feldman doctrine that the "U.S. Supreme Court's appellate jurisdiction precludes federal district courts from exercising subject-matter jurisdiction to review state-court judgments in an appellate capacity." *Id.* Furthermore, the court in *Nader* found that the "plaintiffs' abuse of process claims d[id] not require this court to revisit a matter previously decided in state court." *Id.* Accordingly, Ukraine simply saying that there is a public policy against abuse of process

19

and citing a case with no bearing on the issue of confirmation of an arbitral award does not make it applicable, nor does it demonstrate that such public policy outweighs the policy in favor of enforcing awards.

Moreover, even if Ukraine did demonstrate that three aforementioned elements in *Nader* are the necessary elements for pursuing an abuse of process claim in this case, Ukraine's conclusory statement that "Tatneft's perversion of the BIT arbitration process" was done with an "ulterior motive of bringing BIT claims against Ukraine," Ukraine Opp'n., ECF No. 22, at 18,  is just that - a conclusory statement that does not come close to showing that Pao Tatneft committed an abuse of process.  Pao Tatneft summarizes the findings by the arbitral panel in rebutting claims by Ukraine that Pao Tatneft engaged in some sort of wrongdoing:

> As the Tribunal found, at the time Tatneft acquired the AmRuz and SeaGroup shares, Ukraine had not irreversibly stripped them of their value.  For that reason alone, the Tribunal concluded that Tatneft did not acquire these shares solely to augment its recovery against Ukraine.  Moreover, the Tribunal also found that AmRuz and SeaGroup were both entitled to pursue their own claims against Ukraine under different treaties . . .  [and] [f]inally, the Tribunal expressly found that Tatneft did *not* act with an improper motive.

Pao Tatneft Reply, ECF No. 35, at 27 (emphasis in original); *see id.* at 15 (with additional cites to the Jurisdiction Decision).

"A refusal to enforce an [arbitration] award must rest on more than speculation or assumption."  *United Paperworkers Int'l. Union, AFL-CIO v. Misco*, 484 U.S. 29, at 44-45 (1987).  Such speculation by Ukraine does not overcome the arbitral panel's findings of fact, which are entitled to deference.  "In addressing the public policy question at the enforcement stage, the Supreme Court has given significant weight to the arbitrator's findings of fact."  *Enron Nigeria Power Holding*, 844 F.3d at 289 (citation omitted); *see also United Paperworkers*, 484 U.S. at 44-45 ("The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe [witnesses] and be familiar with [the facts].  Nor does the fact that

is it inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task.")

Accordingly, this Court concludes that Ukraine has failed to demonstrate that confirmation of the Final Award should be denied based on its speculative claim that Pao Tatneft engaged in an abuse of process, as this claim has neither been demonstrated nor has Ukraine shown that it would outweigh the public policy favoring arbitration.

2. Manipulation of Corporate Structures to Create Jurisdiction

Ukraine next argues that the Final Award should be rejected because it conflicts with a "strong public policy [in the U.S.] against manipulation of corporate structures to obtain jurisdiction." Ukraine Opp'n, ECF No. 22, at 18 (emphasis omitted).  In support of this proposition, Ukraine cites two cases, but those cases refer to the policy that parties may not collude to create diversity jurisdiction in federal courts.  Ukraine tries to analogize that "federal courts are of limited jurisdiction, just like BIT arbitral tribunals," *id.*, but Pao Tatneft argues that an arbitration tribunal's "determination as to its own competence to hear this dispute pursuant to the Russia-Ukraine BIT obviously has nothing to do with" a statute that governs the jurisdiction of federal courts.  Pao Tatneft Reply, ECF No. 35, at 29.   Even assuming *arguendo* that this is somehow analogous, as with its claim in subsection 1 above, Ukraine proffers only a generalized statement that Tatneft "improperly and collusively acquired shares in Amruz and Seagroup to extend the Arbitral Tribunal's jurisdiction to cover Amruz's and Seagroup's damages claims."  Ukraine Opp'n., ECF No. 22, at 18 (even while Ukraine acknowledges that Amruz and Seagroup could have brought their own claims under separate treaties).  Similar to the claim in subsection 1 above, this generalization ignores the Tribunal's findings on this issue.  *See* Pao Tatneft Reply, ECF No. 35, at 29; *see id.* at 27, *id.* at 15 (with cites to the Jurisdiction Decision).  Accordingly, Ukraine has failed to demonstrate that the Final Award should be rejected based on its vague claim that Pao Tatneft manipulated corporate structures to create jurisdiction, as this claim is unsupported, and there is no indication that it would outweigh the

public policy favoring arbitration.

3. Illegality and Wrongdoing

Finally, Ukraine contends that the Final Award should be rejected because it conflicts with the "strong public policy" in the United States "against illegality and wrongdoing in their various forms." Ukraine Opp'n., ECF No. 22, at 19; *see United Paperworkers Int'l* Union, 484 U.S. at 42 (recognizing that "no court will lend its aid to one who found a cause of action upon an immoral or illegal act"); *Commercial Union Ins. Co. v. Lines*, 378 F.3d 204, 208 (2d Cir. 2004) (indicating that the United States does have a public policy against enforcing arbitral awards obtained by fraud.) Ukraine states generally that:

> Enforcement of the Merits Award would lend the Court's power to wrongdoers: Amruz and Seagroup, which unlawfully acquired their shares in Ukratnafta using promissory notes in violation of Ukrainian law; and Tatneft, which acquired shares of Amruz and Seagroup in bad faith, for a remarkable price of USD 81 million, despite that the shares had already been transferred to Naftogaz and were otherwise disputed in ongoing litigation, and with the ulterior motive of suing Ukraine for damages.

Ukraine Opp'n., ECF No. 22, at 20. The Court notes that these are the same types of allegations discussed and rejected in subsections 1 and 2 above.

Assuming that Ukraine is relying on fraud as a form of illegality and wrongdoing, Ukraine fails to explain the manner in which Pao Tatneft committed such alleged fraud or how such alleged fraud was prejudicial. Ukraine suggests instead that there may have been some wrongdoing and asserts that "discovery is needed" in order to "appreciate" whether actions taken by Tatneft, Amruz and Seagroup were "legal under Russian law." Ukraine Opp'n., ECF No. 22, at 20. Pao Tatneft notes that Ukraine surmises that it "might discover additional facts that would tend to contradict the Tribunal's findings that [there was no bad faith because ] AmRuz and Seagroup could have filed their own treaty claims," but "this kind of wishful thinking is no ground for refusing enforcement of the Final Award." Pao Tatneft Reply, ECF No. 35, at 29-30. *See Anatolie Stati v. Republic of*

22

*Kazakhstan*, 302 F. Supp. 2d 187, 201 (D.D.C. 2018) (noting that the public policy exception imposes a "heavy burden [which] exists precisely because the public policy exception is not an invitation to re-try" valid, final arbitral awards"), *aff'd.*, 773 Fed. App'x. 627 (D.C. Cir. 2019), *cert den.*, 140 S. Ct. 381 (2019).

Accordingly, this Court finds that Ukraine has failed to demonstrate that this Court should deny confirmation of the Final Award, based on Ukraine's vague claim that Pao Tatneft engaged in some form of illegality and wrongdoing that might be fleshed out through discovery.  Ukraine's claim does not outweigh the public policy favoring arbitration.  The Court reiterates further that this public policy argument asserted by Ukraine is contrary to the findings of the arbitral tribunal.  *See Stati, id.* ("In other words, there is a difference between enforcing an award that is alleged to be tainted by fraud that has never been addressed and enforcing an award after the jurisdiction that issued it has head and rejected the allegations.")

IV. CONCLUSION

The Court must confirm the Merits Award unless it finds that Respondent has established one of the grounds for refusal specified in the New York Convention.  *See* 9 U.S.C. § 7.  Having rejected Ukraine's arguments under the New York Convention, Articles V(1)(d) and V(2)(b), this Court will accordingly confirm the Merits Award.  This leaves open however the question of how much to award.  In its Petition, ECF No. 1, at 7 ¶¶ 17-18, Pao Tatneft indicates that the Award to be paid by Ukraine is in the amount of US$112 million, and the Award provides further that Ukraine must pay interest on this amount at the U.S. dollar LIBOR rate plus 3% compounded every three months, accruing until the date of payment.  Furthermore, the Award states that the interest on $68.44 million (of the total $112 million) would begin accruing on May 12, 2009, while the interest on the other $43.56 million would begin accruing on January 27, 2020, though accrual of interest was suspended for sixty days after the issuance of the Award.  *Id.*  Accordingly, by September 21, 2020, Petitioner

shall file a proposed order of judgment reflecting the <u>exact monetary amount</u> of its constituent parts of the Final Award, along with a brief summary of its <u>calculations of interest</u>.  Ukraine may respond to the form of the proposed order and associated calculations by no later than October 12, 2020, and Pao Tatneft's reply, if any, is due by October 26, 2020.   A separate Order accompanies this Memorandum Opinion.


DATED: August 24, 2020                              _____/s/_____
                                                   COLLEEN KOLLAR-KOTELLY
                                                   UNITED STATES DISTRICT JUDGE